McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
COLLEEN M. KENNEDY
Assistant U.S. Attorneys
501 I Street, Suite 10-100
Sacramento, CA  95814

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>MICHAEL CAREY CLEMANS<br><br>        Defendant. | CASE NO.  15-CR-00227-JAM<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>DATE: JANUARY 23, 2018<br>TIME: 9:00AM<br>COURT: HON. JOHN A. MENDEZ |

The United States recommends the Court sentence defendant Michael Clemans to life in prison, consistent with the recommendation of the U.S. Probation Office.  A life sentence, while severe, is the only sentence that is sufficient but not greater than necessary to achieve the goals of 18 U.S.C. § 3553(a).  Clemans is precisely the type of person for whom a life sentence exist, a remorseless child-sex-predator who poses an urgent, persistent, and grievous risk to all children for the rest of his life.  As this Court is aware, the nature and circumstances of Clemans' crimes are extreme and aggravated.  He pursued those crimes even after his arrest on lesser state charges.  Clemans' own words, introduced at trial, make clear that he raped at least three minor girls during the period of the crimes for which he was convicted, one as young as 13 years old.  Clemans also meticulously planned with his co-conspirators the sexual exploitation and future rapes of other minor girls, including girls 10 years old or younger.  Three of his victims testified against Clemans at trial.  Only a life sentence will protect those victims and the larger community from Clemans, adequately punish him for his extraordinary crimes, and provide necessary specific and general deterrence—considerations that outweigh all others in this case.  Accordingly, and for the following reasons, the Court should sentence Clemans to life in prison.

1

## I.   RELEVANT PROCEDURAL HISTORY

2       On or about July 24, 2015, the United States Attorney's Office for the Eastern District of

3   California filed a Complaint charging Clemans with attempted production of child pornography and

4   conspiracy to produce child pornography (18 U.S.C. §§ 2251(a), (c), and (e)); and attempted receipt of

5   child pornography (18 U.S.C. §§ 2252(a)(1)).  CR 1-4.  The Court ordered Clemans detained and he

6   has remained in custody since.  CR 5.

7       On or about November 19, 2015, a grand jury returned an Indictment charging Clemans with

8   conspiracy to produce child pornography (18 U.S.C. §§ 2251(c) and (e)); buying of children (18 U.S.C.

9   § 2251A(b)(1)); attempted production/production of child pornography (18 U.S.C. §2251(c)); and

10   receipt of child pornography (18 U.S.C. 2252(a)(2)).  CR 16.  At his arraignment on or about December

11   3, 2015, Clemans entered a plea of "not guilty."  CR 18.

12       On November 15, 2016, after the conclusion of pretrial litigation, the Court scheduled trial for

13   August 21, 2017.  CR 35.  On or about June 22, 2017, the grand jury returned a Superseding Indictment

14   charging Clemans with attempted travel/travel with intent to engage in illicit sexual conduct (18 U.S.C.

15   § 2423(b) and (e)) (Count One); conspiracy to travel with intent to engage in illicit sexual conduct (18

16   U.S.C. § 2423(b) and (e)) (Count Two); conspiracy to produce child pornography (18 U.S.C. §§

17   2251(c) and (e)) (Count Three); buying of children (18 U.S.C. § 2251A(b)(1)) (Count Four); attempted

18   production/production of child pornography (18 U.S.C. §2251(c)) (Count Five); and receipt of child

19   pornography (18 U.S.C. 2252(a)(2)) (Count Six).  CR 16.  On July 17, 2017, Clemans entered a plea of

20   "not guilty."  CR 42.  On July 18, 2017, the Court rescheduled the trial for August 28, 2017.  On

21   August 24, 2017, the grand jury returned a Second Superseding Indictment that charged Clemans with

22   the same offenses but clarified certain allegations.  CR 79.

23       On August 28, 2017, the first day of trial, Clemans entered guilty pleas—without a written or

24   other agreement with the government—to three of the six charges against him: (1) Count Three –

25   conspiracy to produce child pornography (18 U.S.C. §§ 2251(c) and (e)); (2) Count Five – attempted

26   production/production of child pornography (18 U.S.C. §2251(c)); and (3) Count Six – receipt of child

27   pornography (18 U.S.C. 2252(a)(2)).  Clemans' plea was supported by a factual basis that the parties

28

1   agreed was adequate but that did not contain the details of his offenses or reflect its full scope.  See CR

2   81.[1]  On September 5, 2017, the jury convicted Clemans on the remaining charges: (4) Count One –

3   attempted travel/travel with intent to engage in illicit sexual conduct (18 U.S.C. § 2423(b) and (e)); (5)

4   Count Two – conspiracy to travel with intent to engage in illicit sexual conduct (18 U.S.C. § 2423(b)

5   and (e)); and (6) Count Four – buying of children (18 U.S.C. § 2251A(b)(1)).  The Court scheduled

6   sentencing for January 23, 2018.

7                          **II.    SUMMARY OF THE EVIDENCE AGAINST CLEMANS**

8          **A.    Background**

9          In late 2014, investigators discovered evidence of Clemans' criminal child-exploitation

10   activities through referrals from Yahoo! and others business entities.  Clemans was then a 54-year-old

11   U.S. citizen living in Bangkok, Thailand, and working as a pilot for a Thai airline.  A subsequent

12   international investigation revealed Defendant's participation in criminal conspiracies, between June

13   2014 and July 2015, with Philippine nationals including Lyan Tandeg ("Tandeg"), to produce child

14   pornography (Count Three) and to travel from the United States to Manila with the intent to engage in

15   illicit sexual conduct with young girls secured by Tandeg (Count Two).  In the execution of those

16   conspiracies, Clemans also engaged in additional criminal offenses, including buying of children with

17   knowledge that they would be portrayed in sexually explicit images (Count Four), the production of

18   images of child pornography by Tandeg at Clemans' direction (Count Five), and receipt of images of

19   child pornography delivered by Tandeg (Count Six).

20          In sum, the charges in Counts Two through Six describe a scheme in which Clemans and

21   Tandeg agreed that Clemans would send money to Tandeg, who, in exchange and in response to

22   Clemans' offer, would locate minor girls in the Philippines, take custody over those girls, take them to

23   a property Clemans and Tandeg rented for that purpose, make sexually explicit photos of them, and

24

25

26          [1] The Court accepted the Clemans' proposed factual basis for his plea but agreed to modify it at the
    government's request.  A copy of the final modified version does not appear on the docket.  However, the
27   transcript of Clemans' plea hearing memorializes those modifications.  See CR 100 at 16:6-24:25.

28

                                                                    Sentencing Memorandum
                                                                    United States v. Clemans
                                                                    2:15-CR-00227-JAM

send the photos to Clemans over the Internet for Clemans to review and identify girls whom he desired to travel to Manila to rape. Clemans was particularly interested in young virgins and instructed Tandeg to take photographs of the girls she found that would permit him to inspect their vaginas for the presence of a hymen. Tandeg also agreed to preserve the virginity of certain girls Clemans identified as girls whom he particularly desired to travel to Manila to rape. As part of their agreement, Clemans paid Tandeg more than $5,000, and funded the purchase a digital camera, a computer, and other items.

The investigation also revealed that Clemans engaged in another scheme with separate individuals beginning in September 2013, in which he traveled from the United States to Manila for the purpose of engaging in illicit sexual contact with minors, including an eleven-year-old girl, after requesting and receiving pornographic images of minors whom Clemans expected to rape (Count One).

### B.       The 2014-2015 Criminal Conduct: Counts Two Through Six

Clemans used his Yahoo! email and instant messenger account—"spitzinu@yahoo.com"—to communicate with co-conspirators and others, including Tandeg, who used the email and instant messenger account "lyantandeg@rocketmail.com." Among other things, Clemans and Tandeg communicated about the specific age ranges of minor girls in whom Clemans was sexually interested, the precise amounts Clemans would pay Tandeg for her efforts to accomplish their criminal goals, and where and how Tandeg would recruit victims. For example, to minimize parental interference, Clemans instructed Tandeg to locate girls who were orphans, victims of typhoons, or were otherwise vulnerable. From June 2014 through July 2015, Clemans sent more than $5,700 to the Philippines in furtherance of the crimes for which he was convicted. During the same period, Tandeg completed several sexually explicit photoshoots of multiple pre-pubescent girls at Clemans' instruction.

On or about April 27, 2015, Clemans returned to the United States on a flight into San Francisco International Airport, where U.S. Customs and Border Protection officers discovered images of child pornography on his iPad tablet.[2] Clemans gave written consent to search his devices, and

---

[2] Clemans' name had been placed on an FBI/HSI list based on Yahoo!'s reporting of suspicious activity,

Sentencing Memorandum
United States v. Clemans
2:15-CR-00227-JAM

1   agreed to answer questions from investigators.  In a recorded interview, Clemans stated, among other

2   things, that he downloaded the child pornography images from various Chinese websites, that he had

3   no fantasies to have sex with eight-year-old girls, that he had never paid money to obtain child

4   pornography, and that he would never download child pornography again.  Clemans also said that when

5   he visited the United States he stayed at his family's residence in Sacramento.  He was arrested at the

6   airport on state charges of possession of child pornography.

7        Additional investigation revealed that certain of the images on Clemans' iPad were newly-

8   created images of child pornography that Tandeg had recently produced for him as part of their

9   conspiracy and in pursuit of their other criminal goals.  Metadata extracted from those images showed

10  that the images were made on November 9, 2014.  Those images are identical to images sent via instant

11  messenger chats between Tandeg and Clemans.  Chats between them on November 9, 2014 discuss a

12  photoshoot in the "James Bond" room at a Philippine hotel.  The backgrounds in certain of the images

13  match the images of a "James Bond" room advertised by the Hotel Sogo in Angeles City in the

14  Philippines.

15       After his release on bond, while in the United States, Clemans continued to take steps in

16  furtherance of the conspiracies, and continued to instruct Tandeg regarding the additional crimes for

17  which he was convicted.  Multiple times in May 2015, Clemans logged into his Yahoo! account from

18  an IP address that traced back to his mother's home, where he was residing during the pendency of his

19  state criminal proceedings.  During those chat sessions, Clemans told Tandeg about his arrest and told

20  her that if convicted, he would not live in the United States any longer.  He said he wanted to have sex

21  with Tandeg and the minor girls featured in the child pornography she was creating at his instruction.

22  He also asked Tandeg to send him images of a particular minor girl Tandeg had recently photographed.

23  After receiving those files, Clemans told Tandeg that the girl was not a virgin because he could not see

24  her hymen in the photos.  In May 2015, Clemans also sent Tandeg money via Western Union.

25  _____

26

27  which resulted in him being referred to secondary screening at the airport.

28

1    On July 24, 2015, agents executed a federal search warrant at the home of Clemans' mother.

2    Investigators seized numerous digital devices and arrested Clemans on a federal criminal complaint.

3    Later, investigators also obtained and executed an additional warrant to search electronic devices that

4    Clemans' father had shipped to the same residence after he visited Bangkok to collect those items at

5    Clemans' instruction.  A forensic review of those devices revealed 14,494 images and 173 videos

6    depicting of child pornography (totaling 27,469 total images).

7    After his arrest on federal charges, Clemans gave consent to investigators to assume control of

8    his Yahoo! account to communicate with his co-conspirators.  In undercover efforts, law enforcement

9    agents were able to develop contact with Tandeg.  On November 4, 2015, Nate Sanger ("Sanger"), a

10   former American law enforcement agent who resides in Manila and is employed with a non-

11   governmental organization there, agreed to assist the Philippine National Bureau of Investigation

12   ("NBI") and pretended to be a "friend" of Clemans who wanted to help "clean things up" for Tandeg.

13   Tandeg, along with her friend Shellina Atad ("Atad") and an unidentified Filipino male, showed up to

14   meet Sanger and an undercover NBI agent with whom Sanger was working.

15   After doing some counter-surveillance, the unidentified Filipino male left the scene and Tandeg

16   and Atad got into a car with Sanger and the NBI agent.  Tandeg told Sanger that for money, he could

17   take pornographic pictures of a girl she identified as "Angel."  However, Tandeg told Sanger he could

18   not have sex with Angel.  Tandeg also produced a thumb drive, which she said she had been keeping

19   for Clemans.[3]  Sanger viewed the contents of the thumb drive on a laptop in the car and determined it

20   contained images of child pornography, some of which matched images that had been previously sent

21   to Clemans in online photo accounts.

22   Sanger and the NBI agent asked to see one of the victims in person and Tandeg arranged for

25   [3] An analysis of this thumb drive revealed it contained over 3,000 images of minor girls, the majority of
26   which depicted those girls nude or in various stages of undress.  In some images, the girls appear to simulate sex
     acts.  Other images are extreme close-ups of young girls' vaginas and anuses.  Tandeg had shared nearly all of
27   these photos with Clemans in electronic storage spaces they set up together.  Adding these images to those
     recovered from Clemans' other electronic devices yields approximately 30,000 images of child pornography.

28

6

Sentencing Memorandum
United States v. Clemans
2:15-CR-00227-JAM

1   Angel to come up to the car.  The child's appearance matched that of a child also identified as "Angel"

2   in chats between Clemans and Tandeg and in images depicting child pornography.  Thereafter, NBI

3   agents arrested Tandeg and Atad, who were later convicted in the Philippines for child exploitation

4   crimes.  Tandeg was interviewed and, in summary, stated she had taken sexually explicit photos at

5   Clemans' direction, and then sent him the photos.  She said that parents had given her temporary

6   custody and control of their children and she had used those children to make child pornography for

7   Clemans.  In exchange, Clemans sent Tandeg money.

8       Investigators located three of the child victims who posed in sexually explicit photos for Tandeg

9   at Clemans' direction, including Angel.  All three minor victims travelled to the United States from the

10  Philippines to testify against Clemans at trial.  At the time of Clemans' crimes, the victims were 7, 9,

11  and 10 years old.

12      **C.     The 2013 Criminal Conduct: Count 1**

13      The investigation also revealed that in September 2013 Clemans communicated with another

14  Philippine national named Nelia Cruz ("Cruz") about his desire to travel from the United States to

15  Manila to engage in illicit sexual conduct with young girls.  After receiving sexually explicit images of

16  children from Cruz and identifying victims, including an eleven-year-old girl, and after settling on a

17  meeting place with Cruz, Clemans travelled to Manila from the United States to rape his victims.

18  However, Cruz failed to appear at their pre-arranged meeting place.  Clemans repeatedly contacted

19  Cruz and told her he was in Manila and ready to have sex with the young girls she had identified.

20  Eventually, Clemans abandoned his efforts with Cruz and turned to a different contact, Juvy Malicdem

21  ("Malicdem"), who also sent him sexually explicit images of minors whom he could select for sexual

22  conduct.  Clemans sent Malicdem money via Western Union and arranged to have sex with two girls

23  under the age of 16 that she provided for him.

24      **D.     Clemans' Admissions That He Raped Minor Girls and His Plans To Rape Others**

25      At trial, the government admitted exhibits collecting relevant chats and emails between

26  Clemans and Cruz, Malicdem, Tandeg, and others all discussing Clemans' desire for sex with virgin,

27  minor girls.  See CR 84 at Gov. Trial Exhibits 37.5 through 52.  Excerpts from certain of those trial

28

7

exhibits are attached to this memorandum.  See Gov. Ex. 1.  Those excerpts set forth the detail with which Clemans described his depraved desires.  See id.  For example, concerning the 2013 conduct charged in Count One:

- On September 9, 2013, while Clemans' was in the U.S., he asked Cruz for photos of girls between the ages of 8 and 17 but insisted they must have "shaved pussies."  Clemans offered to pay Cruz for photos of "virgins" but insisted the girls must "be available to rent next month."  He offered to pay Cruz $50 to rent a virgin "overnight," and $200 to rent a virgin "for more than one day."  Ex. 1 at 37.5-004, 37.5-007, 37.5-0012.

- On November 5, 2013, Clemans tells Cruz that a six-year-old "might be too small for intercourse but added, "maybe anal … would be okay."  He agreed with Cruz that the better age range might be "8 to 14."  Clemans told Cruz, "usually girls that are 9 and under are difficult to have sex with," but "most girls have sex by 10."  Clemans also stated he "will be doing anal with the girls … will be gentle," but did not "want any complaints."  Cruz stated she could obtain girls for vaginal sex, Clemans insisted, "the girls I have will have to do anal too.   Ex. 1 at 39-002, 39-004.

- On November 11, 2013, Clemans wanted to make sure Cruz knows the types of girls he likes and that he wants "anal …with no complaints."  He said, "I want to do a lot of business with you if you can really provide me with young."  Ex. 1 at 39-005.

- On November 12, 2013 Clemans responded to a photo of a girl Cruz describes as "11 years old [] not yet period," and stated "she is the type of girl I am looking for."  Clemans assured Cruz he would come to Manila, and says, "the girls have to be ready to go. . . . and I don't want any trouble from the young . . . no arguing . . . they have to be ready for fucking. :)  . . . .I will want anal as well."  Clemans paid Cruz for photos and gave her pickup instructions and a tracking number for the money transfer.  After sending the money, Clemans told Cruz "I want [the 11-year-old] as my first girl."  Ex. 1 at 39-011-39-016.

- On November 13-14, 2013, Cruz had failed to appear at their meeting and Clemans was angry.  Cruz told him she did not think she could get the girl she promised and offered different girls.  Clemans asked, "How old?"  Cruz says she can get ages 12 through 16.  Clemans said, "Nelia – At this point I am not asking for photos. . . . I want to be clear that I am here for a reason.  Not for photos.  Is there a misunderstanding?"  Cruz agree to meet him that afternoon.  Clemans said, "See you then, but I will want to fuck today.  I only have a few days here.  I am not going to waste a day."  Ex. 1 at 39-023-39-024.

Sentencing Memorandum
United States v. Clemans
2:15-CR-00227-JAM

- On November 14, 2013, after she again failed to show up, Cruz said, "I can get young girls I hve [sic] but they want only play." Clemans said, "I don't play. I fuck." Clemans arranged a meeting for the next morning and reminded Cruz he "needs[ed] a healthy young girl 10 – 16", "virgin", "nice figure", "pretty face", "tight pussy", and "anal." He concluded, "It is easy to find." Clemans stated, "When I fuck … it is not 1 fuck and good bye." He said he would "need the girl for a minimum of 8 hours," after which, Cruz would have to "provide a new one." Ex. 1 at 39-025-39-029.

- Cruz again failed to show up and Clemans turned to another criminal partner, Juvy Malicdem. On November 15, 2013, Malicdem offered "my girl 14 15 . . . I told you I reserve for you." Clemans asked if she had photos of the girls and Malicdem sent them. After Clemans reviews the photos, he agreed to pay her for the two girls. They agreed to meet and to go to a hotel. Clemans instructed her "Make reservations for all night and you pick the girls up in the morning. . . . Make sure the girls understand what anal is. . . . And that they shave their pussies." He told her "Do not share my name Juvy." Ex. 1 at 40-40-12.

- On November 16, 2013, Cruz reached out to Clemans and asked "did umeet ypung girls? [sic]" Clemans responded: "Yes. With much success! :x"

- On November 20, 2013, Clemans and Malicdem chatted again. Clemans said, "I wanted to chat with you . . . what were the girls you gave me called again?" Malicdem responded that the girls' names were "K[] and E[]." Clemans said "K[] was the younger? . . . She was perfect . . . not virgin but perfect body. I really enjoyed her. . . . The second was not as friendly. . . . I enjoyed myself." Malicdem asks "why shy type?" and Clemans responded "no E[] did not want to fuck . . . she did not want to be there . . . and she was not a virgin either ☹" Malicdem asked "you not fuck her?" and Clemans said "yes . . . but not virgin . . . it is ok . . . but neither were virgin. . . . I need a true virgin Juvy." Ex. 1 at 40-13-40-14.

Concerning the 2014-2015 conduct charged in Counts Two though Six:

- On June 25, 2014, Clemans told Tandeg he was "looking for girls 10-16," and he would be visiting Manila often. Clemans stated, "I will need both photos and sex with these girls eventually." He went on to outline an express, five-point plan in which (1) he would buy a camera for Tandeg to use; (2) rent a place; (3) pay girls $50 for 200 for sexually explicit photos and "more if I choose to have sex with them; (4) pay Tandeg for each photo session she managed; and (5) stay at the rental when in Manila. Tandeg agreed. Ex. 1 at 41-008-41-010.

- On June 30, 2014, Clemans clarified, "Maybe you misunderstood me Lyan. I am sorry if I gave you the wrong impression here. I do want photos of the girls but I also want sex with them. I can get photos anytime off the internet." Ex. 1 at 41-33.

- On July 27, 2014, Clemans encouraged Tandeg to hire help to recruit minor girls for sex and compares taking custody of the girls for photos and sex to "renting a car." Ex. 1 at 42-55.

- On August 23, 2014, while discussing with Tandeg an older girl who had been raped by her father, Clemans stated, he knew "that a girl 7 years can have sex," and observed, "Angel is 10 years" old. Ex. 1 at 43-003.

- On September 9, 2014, Clemans told Tandeg he wanted to "stay with a girl for one or two full days only," and did not "want to rush to break their hymens." He stated, "Afterwards, I need you to take photos of us." He stated that he was "looking for girls that are homeless that will not argue and have no obligation but to have sex." Clemans stated that if he was "delayed," he would rather have sex with the girls in Thailand," and that he could "get the same ages there." He insisted that when "I have sex with Angel, I do not plan on breaking her hymen in 5 minutes." Ex. 1 at 43-012.

- On September 12, 2014, Clemans told Tandeg "I want you to find out about Nicole's situation with her having sex now. If Angel is saying no maybe we can get Nicole. Would her parents agree to 100 USD for two days with her? I think Nicole is ready." He cautioned Tandeg that would "not pay a model unless she is willing to have sex." He stated, "I hope Nicole will reconsider. I would like to do more photos with her if she agrees to do vaginal and anal sex during my next visit. I want to have a photosession of us together having sex for my collection of photos." Ex. 1 at 44-023-44-024.

- On September 17, 2014, Tandeg told Clemans Nicole's parents had agreed to accept $225 for her virginity and sex over three days. Clemans orders Tandeg to take more photos of Nicole and to use "oil", "light pink lipstick", to do her hair "short." He stated Nicole "must open herself up to me," which he said meant "spreading her legs and pussy wider." He stated he did not want Nicole's "body so secret to me anymore." He told Tandeg to pose Nicole "doggie style," like she "did with Angel in the shower." Ex. 1 at 44-027.

- On September 25, 2014, Clemans asked Tandeg is Angel is "for sale." After discussion over price, Clemans agreed to pay $580 for her virginity. He warned, "It might take me three months to get there to visit," and stated "once I pay in full, there will be no more payments." He stated, "I will need Angel and Nicole ready for me. … I will need both the girls available to me for as long as I want during my visit … It might be a couple of weeks and [they] will not be able to go home at night." Clemans agreed to send the money for Angle and concluded with, "Once I pay the money in full, Angel is our[s] to do as we please." Ex. 1 at 44-036-45-024.

- On October 20, 2014, Clemans changed his mind temporarily about raping Angel, and worried that doing so would injure her. He stated he had not had sex with an 11-year-old, but admitted to having sex with "maybe just a 13 year old." Later, Clemans decided that, "If Angel is available

Sentencing Memorandum
United States v. Clemans
2:15-CR-00227-JAM

and you think she is able to have sex with me, I will buy her."  Ex. 1 at 45-028-45-041.

- On April 26, 2015, Clemans asked Tandeg about birth control pills.  He asked: "So, if I wanted to get pulls for the girls I fuck, do I have to buy from Amazon.com or can I buy through a pharmacy there?"  Tandeg told Clemans she would buy the pills for him.  Ex. 1 at 51-015.

- In June 2015, after Clemans was arrested in the US, he continued to communicate with Tandeg, who told him about a photoshoot she completed with Angel and Ishin, the third of three victims who testified against Clemans at trial.  He continued to plan to visit Tandeg as they had previously discussed and suggested a visit later in June, July, or August.  He said, "I could come for 4 or 5 days."  He told Tandeg, "I want to make love with you and the girls.  I think it will be more comfortable for them."  Tandeg agreed to deliver photos from the new shoot using a new electronic storage website.  Ex. 1 at 52-005-52-016.

- On July 17, 2015 (days before his arrest on federal charges), Clemans told Tandeg he planned to return to Thailand or go to visit Tandeg in the Philippines "around the first of September," following a hearing in his state criminal case in which he expected his passport to be returned.  Clemans stated, "I won't have a lot of time but maybe we can arrange for a week with a few of the girls."

### III.   SENTENCING CALCULATION

#### A.   Statutory Maximum Sentences

1.   Count One: 18 U.S.C. § 2423(b) and (e) – Travel and Attempted Travel with Intent to Engage in Illicit Sexual Conduct

The maximum sentence that the Court can impose on Count One is not more than 30 years, a fine of $250,000, a term of supervised release of no less than 5 years and up to life, and a special assessment of $100.

2.   Counts Two: 18 U.S.C. § 2423(b) and (e) – Conspiracy to Travel with Intent to Engage in Illicit Sexual Conduct

The maximum sentence the Court can impose on Counts Two is not more than 30 years, a fine of $250,000, a term of supervised release of no less than 5 years and up to life, and a special assessment of $100.

3.   Count Three: 18 U.S.C. § 2251(c) and (e) – Conspiracy to Produce Child Pornography

The maximum sentence the Court can impose on Counts Three is not less than 15 years imprisonment and up to 30 years, a fine of up to $250,000 a term of supervised release of no less than 5

Sentencing Memorandum
United States v. Clemans
2:15-CR-00227-JAM

years and up to life, and a special assessment of $100.

       4.      <u>Count Four: 18 U.S.C. § 2251A(b)(1) – Buying of Children</u>

The maximum sentence the Court can impose on Count Four is no less than 30 years and up to life imprisonment, a fine of $250,000, a term of supervised release no less than 5 years and up to life, and a special assessment of $100.

       5.      <u>Count Five: 18 U.S.C. § 2251(c) – Attempted Production/Production of Child Pornography</u>

The maximum sentence the Court can impose on Count Five is no less than 15 years and up to 30 years, a fine of $250,000, a term of supervised release no less than 5 years and up to life, and a special assessment of $100.

       6.      <u>Count Six: 18 U.S.C. § 2252(a)(2) – Receipt of Child Pornography</u>

The maximum sentence the Court can impose on Count Six is no less than 5 years and up to 20 years, a fine of $250,000, a term of supervised release no less than 5 years and up to life, and a special assessment of $100.

      **B.**      **<u>Guidelines and Criminal History Calculation</u>**

      1.      <u>Guideline Calculation Reached by the U.S. Probation Office</u>

The U.S. Probation Office ("USPO") has prepared a Presentence Investigation Report ("PSR") to assist the Court in imposing sentence. CR 108. After grouping the multiple counts in the manner required under the Guidelines, the USPO calculated Clemans' combined adjusted offense level as 50. See PSR at ¶¶ 28-83. Thereafter, by operation of law, the USPO adjusted the total offense level to 43. <u>Id.</u> at ¶ 84.

      2.      <u>Criminal History Calculation Reached by the U.S. Probation Office</u>

The PSR calculates Clemans' Criminal History Score as 0 points (<u>see</u> PSR ¶¶ 92-94) and, therefore: Criminal History Category ("CHC") I. <u>See</u> PSR ¶ 94.

      3.      <u>Applicable Sentencing Range under U.S. Probation Office Calculation</u>

Based on a Total Offense Level of 43 and a CHC of I, the PSR calculates an applicable sentencing range of life in prison. <u>See</u> PSR at pg. 4.

## IV.   U.S. PROBATION OFFICE'S SENTENCE RECOMMENDATION

The USPO recommends the statutory maximum sentence on each Count of conviction:  (i) 360-months on Counts One, Two, Three, and Five; (ii) a life sentence on Count Four; (iii) and 240-months on Count Six; all to run concurrently for a total sentence of life in prison.  See PSR at pg. 29 (Sentencing Recommendation).  The USPO also recommends and a life term of Supervised Release on each Count.  Id.  The USPO's sentencing recommendation is justified by its conclusion that Clemans:

> …at a glance has a led law abiding life. However, there is another side to him which was unknown by most, the side that traveled around the world seeking minor female victims for sex; specifically, virgins.  One might say the 2013 and 2014 incidents were the first of such occurrences for the defendant, but when you read through the chats between the defendant and the "mamasan's", it appears the defendant knew what he was doing and it would not be [surprising] if he has participated before in this type of behavior. It is unnerving to think of how long he may have been seeking out and having sex with children and how many other victims there might be.
>
> [Clemans] was very specific in what he wanted. He asked for certain poses of the children and at one point commented on the location of the child stating, "I like her in the doggie style position against the shower wall, so that she has no were to go." This type of criminal behavior escalates and one of the most disturbing things about the [Clemans'] conduct is one can see his thought process through the chats and emails. He is very articulate and methodical in how he outlines and verbalizes his fantasies with the victims. Even when talking about how young one of the victims is and the fact that he might hurt her, he dismisses it. Further, [Clemans] specially asks for orphans or victims of the typhoon in order to get the minor victims to comply with his demands. While he did not actually obtain this type of victim, although he thought they were orphans, one can see his intention, as he previously noted paying for sex with children. Additionally, despite being put on notice by law enforcement after his arrest in San Francisco for possessing child pornography, the defendant continued the aforementioned behavior. …
>
> Despite [his other] accomplishments, [Clemans] is a danger to society and puts the public, specifically, minor girls at direct risk. Therefore, based on the severe nature and circumstances of the offense which resulted in a total offense level of 50, seven levels over the highest allowed offense level, and the personal history and characteristics of [Clemans], and to protect the public from future crimes [by Clemans], a sentence of life imprisonment is recommended.…

Id.

As set forth in the PSR, the USPO found no basis for a variance from the applicable Guideline sentencing range on the basis of any of the factors enumerated in 18 U.S.C. § 3553(a).  See PSR ¶¶ 154-156.

Sentencing Memorandum
United States v. Clemans
2:15-CR-00227-JAM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.   GOVERNMENT'S SENTENCE RECOMMENDATION

The United States concurs with the recommendation of the USPO and respectfully recommends that the Court sentence Defendant to the statutory maximum term for each Count of conviction: (i) 360-months on Counts One, Two, Three, and Five; (ii) a life sentence on Count Four; (iii) and 240-months on Count Six; all to run concurrently for a total sentence of life in prison.  The United States also recommends a life term of Supervised Release on each Count, and imposition of the special conditions recommended by the USPO on pages thirty through thirty-two of the PSR.

The United States' sentencing recommendation is rooted in its application of the facts of this case to the considerations enumerated in 18 U.S.C. § 3553(s).  As set forth in more detail below, a total sentence of life advances the goals and interest of the § 3553(a) factors.  Such a sentence is also sufficient but not greater than necessary to achieve justice in this case.  Most important, however, a sentence of life in prison properly accounts for the enormous weight and aggravated nature of the facts and circumstances in this extraordinary case.  Accordingly, the United States respectfully recommends the Court sentence Clemans to life in prison, consistent with the recommendation of the USPO.

### A.   Defendant's History and Characteristics

The United States' sentencing recommendation accounts for the positive factors among Clemans' history and characteristics, including: (i) this is Clemans' first felony conviction; (ii) Clemans' personal history includes service as a non-commissioned officer in the U.S. Army between 1980 and 1984; and (iii) Clemans maintained gainful and consistent employment throughout his adult life.  See PSR ¶¶ 113-130, pg. 29 (Justification).  However, the extreme facts of Clemans' criminal conduct stand out most among his history and characteristics and outweigh any positive attributes from his past.  See 18 U.S.C. § 3553(a)(1).

Indeed, the most striking fact about Clemans' history and characteristics is his relentless and meticulous pursuit of sex with children, since at least 2013, and what that personality trait signals for Clemans' future.  The trial record includes hundreds of pages of exhibits memorializing discussion between Clemans and his co-conspirators and criminal partners in which Clemans details his desire for explicit images of and sex with children.  See e.g., Ex. 1.  Those messages also demonstrate

1  Clemans' clear inability to control his conduct and his inability to conform his behavior even while

2  under external supervision.

3  As set forth above, even after Clemans was arrested on local charges for possession of child

4  pornography in April 2015, he continued to communicate with Tandeg about their various

5  conspiracies, including his conspiracy to travel to Manila to rape Angel, Nicole, and others. Mere

6  weeks after his arrest, Clemans could not resist asking Tandeg to send him new images in June 2015.

7  Clemans' compulsive need to possess and view child pornography is troubling. Yet, when coupled

8  with his particular desire for original images of very young virgins, that compulsion crowds out

9  nearly any other positive characteristics. The final ingredient of Clemans' toxic stew of negative

10  personal characteristics is his desire and willingness to physically victimize children for his sexual

11  pleasure. That trait is like a moon that has passed in front of the light from any of Clemans' positive

12  characteristics and leaves only darkness. As reflected in Clemans' own words, if given the chance he

13  will force sex with young girls even when they resist him.[4] Those negative personal characteristics

14  eclipse any positive traits Clemans may have demonstrated in the past, and they strongly weigh in

15  favor of a life sentence.

16  **B.   Nature, Circumstance, and Seriousness of Defendant's Offense**

17  The nature, circumstances, and seriousness of Clemans' crimes are deeply troubling and

18  difficult to overstate. See PSR at ¶¶ 5-18. Even in summary, Clemans' criminal conduct is nearly as

19  shocking as if set out in granular detail. The highlights are a kaleidoscope of disturbing child

20  exploitation and willful criminal conduct. To be sure, Clemans' direction of Tandeg to create sexually

21  explicit images of Angel, Nicole, Ishin, and others, renders him as culpable as if he performed the acts

22  himself. Moreover, Clemans was not satisfied with the sexually explicit photos alone. He wanted

23

24  _____

25

26  [4] For example, in a November 20, 2013, chat Clemans reported that one of two underage girls Malicdem
   arranged for him to have sex with "was not as friendly" and "did not want to fuck" and "did not want to be there."
   Clemans told Malicdem that he had sex with her anyway. Ex. 1 at 40-13-40-14. He did not elaborate on the
27  nature of the coercion he applied to make the girl do what he wanted her to do.

28

much more.  His agreement with Tandeg, like his earlier agreements with Cruz and Malicdem, focused on his desire to rape young girls—but only young girls Clemans' was persuaded, through photographic evidence, were virgins.

In 2013, Clemans succeeded in his goal of raping two young girls but he complained that he did not believe they were virgins.  See Ex. 1 at 40-13-40-14.  His first choice was sex with an 11-year old (with whom Clemans also planned to have anal sex) but Cruz did not deliver and Clemans resorted to arrangements with Malicdem.  See Ex. 1 at 39-011-39-016.  In 2014 and 2015, with Tandeg's help, Clemans relentlessly pursued his plan to rape minor girls.  He reviewed hundreds of photos of girls to decide which among them he wished to rape.  He settled on Angel and Nicole and paid Tandeg to reserve each girl's virginity.  He discussed in careful detail where and how he would rape those girls, and insisted that he have several days with each.  He told Tandeg that he expected her to photograph the experience and, on some occasions, that he expected her to participate.  Clemans might have been successful in his pursuit of Angel and Nicole if not for his arrest in April 2015.  Even after that arrest and only weeks before his arrest by federal investigators, Clemans continued to plan with Tandeg to travel to the Philippines to rape Angel and Nicole.

In his many chats, Clemans also wrote of his other sexual encounters with young girls, including that he had sex with a girl as young as 13.  See Ex. 1 at 45-035.  In another chat, on September 9, 2014, Clemans hinted that he had experience raping minor girls in Thailand.  See Ex. 1 at 43-12.  As the USPO noted, Clemans' chats raise the inference that he might have been engaged in similar conduct before the record established by his Yahoo! chats.  The evidence makes it difficult to know the true scope of the terror Clemans might have inflicted on little girls throughout South Asia.  Of course, the Court should sentence Clemans only for the crimes for which he was convicted.

While hardly the most egregious aspect of his crimes, Clemans' conduct included amassing a library of child pornography of approximately 30,000 images.  A significant percentage of Clemans' library included the original material that led his discussions with Cruz, Malicdem, and Tandeg.  The investigation also revealed Clemans was separately chatting with more than 57 people using his Yahoo! account and requested and received images of child pornography from at least 50 of those people.  See

PSR at ¶ 6.  Clemans' participation in the sexual abuse of live victims dwarfs the fact that he possessed an extensive library of child pornography.  Yet, receipt of child pornography is not a victimless crime, and Congress has observed that the Government has a "compelling state interest in protecting children from those who sexually exploit them, including both child molesters and child pornographers." Protect Act of 2003 at § 501.[5]  The Supreme Court agrees.  New York v. Ferber, 458 U.S. at 757 ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance.").  The government has a compelling interest in ensuring that the criminal prohibitions against child pornography remain enforceable and effective.  Ferber, 458 U.S. at 760 ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product.").

By any standard, Clemans' criminal conduct in this case is severe.  Indeed, only a small number of child exploitation cases in any federal district include conduct and facts as lurid, willful, and disturbing as those in this case.  Fewer still involve a defendant eligible for a life sentence based on such conduct and the absence of meaningful mitigating facts.  Clemans urges the Court to vary from the applicable sentencing range on the basis of his modest assistance to investigators.  The Court should decline to do so because the modest assistance Clemans provided is outweighed by the extreme nature, circumstances, and seriousness of his crimes.

After his arrest on federal charges in July 2015, Clemans agreed to the request of the government to turn over the password to his Yahoo! account, which he had been using to communicate with his co-conspirators and others.  Clemans did so without a written agreement and without any promise of cooperation credit from the government.  Investigators used Clemans' password to access his account and pose as Clemans in discussions with Tandeg.  Those agents persuaded Tandeg to meet

---

[5] Pub. L. No. 108-21, § 501(10)–(14), 117 Stat. 650, 677–78 (2003) (codified as amended in scattered sections of 18, 28, and 42 U.S.C. (2006)).

in the Philippines with local investigators and an American posing as Clemans' friend.  The operation

resulted in Tandeg's arrest and the arrest of another co-defendant, Shellina Atad.  Tandeg and Atad

pled guilty in the Philippines and were sentence to 15 years in prison.  The operation also led to the

rescue of a live minor victim (Angel) and the identification of two other minor victims (Nicole and

Ishin).  All three of those victims later travelled to the US and testified against Clemans.

Like the USPO, the government recommends no credit for Clemans' delivery of his password to

investigators.  The government concedes that, in the absence of a 5K motion, the Court can rely on

Clemans' modest assistance under 3553(a) to vary downward from the applicable sentencing range (but

not below any applicable mandatory minimum sentence, see Melendez v. United States, 518 U.S. 120,

125-26 (1996)).  The Court should not do so.  On one hand, a small variance may slightly advance the

policy interest in incentivizing defendants to assist investigators.  On the other hand, however, the

egregious facts of this case far outweigh the value of Clemans' modest assistance.  Investigators in this

case had Tandeg's email address and were able to make contact with her without Clemans' help.  Being

able to pose as Clemans hastened their operation against Tandeg but was not solely responsible for it.

Clemans' assistance was not substantial and is far outweighed by his shocking criminal conduct.[6]

Clemans' modest assistance does not warrant a variance from the applicable sentencing range.  Rather,

the disturbing nature and circumstances of his crimes and their seriousness outweigh all other

considerations, and weigh strongly in favor of a life sentence.  See 18 U.S.C. § 3553(a)(1) and

(a)(2)(A).

## C.   Need to Promote Respect for the Law and Provide Just Punishment

Unlike many defendants who come before this Court (but similar to many child pornography

offenders), Clemans appears for sentencing with no history of lawlessness and no criminal convictions.

---

[6] Clemans provided his password as requested.  Yet, he could have done more.  He could have proffered the
details of his offenses.  He could have provided information about his 2013 criminal conduct with Cruz and
Malicdem, and helped investigators try to locate them and his victims.   He could have offered a complete
recitation of any additional criminal conduct.  He elected not to do so.  Rather, he chose to do only enough to
support a claim that he assisted investigators, but also preserve his defenses for trial.

1    However, the absence of a criminal history is not, on its own, a mitigating factor.  Rather, the

2    Guidelines take into account a defendant's criminal history, and an applicable sentencing range

3    acknowledges the relative culpability of different defendants with different criminal histories.

4    Clemans' engagement in a multi-year hunt across the Internet and South Asia for disturbing images of

5    child pornography and in search of as many children to rape as he could arrange, signals a profound

6    lack of respect for the law.  Clemans' conduct makes clear he was willing to gamble he could disregard

7    the law with impunity and, if ever caught, avoid significant punishment.

8          Additionally, the brazen nature and significant scope of Clemans' first foray into criminal

9    conduct demonstrates the need for a sentence that emphatically promotes respect for the law and

10   provides just punishment.  Clemans criminal conduct was extensive.  He conducted it while traveling

11   between the United States and South Asia.  He relied on the Internet to communicate with his co-

12   conspirators and other criminal partners.  He relied on the global banking network to make payments to

13   them.  He tried to protect his identity.  He avoided hotels with security cameras.  He devoted

14   incalculable hours on his criminal work.  Indeed, the effort required of Clemans to develop and

15   maintain relationships with more than 50 child pornography providers, over years, and to focus his

16   attention on those able to place him in a room with young victims is difficult to comprehend.  Such a

17   sustained effort demonstrates Clemans' willingness to embrace a criminal idea and nurture it to its

18   worst outcome, which, in the absence of adequate deterrence, portends a dark future.

19         As set forth above, even after his initial arrest, Clemans demonstrated a flagrant disregard for

20   the law.  Rather than stop his criminal conduct, he persisted in planning to travel from the United States

21   to the Philippines for sex with Angel and Nicole.  He also refused (or was unable) to stop collecting

22   images of child pornography, and urged Tandeg to send him new images of their victims—which she

23   did.  Clemans appears simply unable to control his criminal behavior, even after law enforcement

24   intervention.  A life sentence will promote respect for the law and provide just punishment for

25   Clemans' crimes.  See 18 U.S.C. 3553(a)(2)(A).

26   ///

27   ///

28

Sentencing Memorandum
United States v. Clemans
2:15-CR-00227-JAM

**D.     Need to Provide Deterrence and to Protect the Public from Further Criminal Conduct by Defendant**

A life sentence is sufficient but not greater than necessary to provide specific and general deterrence to Clemans and others who might contemplate participation in a similarly brazen and outrageous course of criminal conduct.  See 18 U.S.C. § 3553(a)(2)(B) and (C).  Clemans' conduct during the years he actively searched for and collected almost 30,000 images of child pornography, raped at least two minor girls, and planned the sexual exploitation and rape of at least two other minor girls, demonstrates his willingness to persist in long-term criminal conduct despite grave personal risk and the destructive consequences of his actions.  His conduct also clearly demonstrates that he prefers to reserve to his own judgment which laws matter and which laws don't; which laws he will follow and which laws he will ignore.  His conduct demonstrates that, notwithstanding his past law-abidingness, he will simply do as he pleases when it comes to the sexual exploitation of children.  On that front, Clemans has made clear he is his own law.  Only a life sentence will protect Clemans' past victims and deprive him of any further opportunity to harm other children.

**E.     Need To Avoid Unwarranted Sentencing Disparities**

The first step to avoiding unwarranted sentencing disparities is to calculate and apply the appropriate guidelines range.  United States v. Treadwell, 593 F.3d 990, 1013 (9th Cir. 2010) ("[The Court] correctly calculated and adhered to the appropriate Guidelines range, which in itself serves the purpose of avoiding sentencing disparities.") (citing Gall v. United States, 552 U.S. 38 at 54 (2007)).  The Ninth Circuit routinely and frequently upholds within-guidelines sentences as being reasonable in child pornography cases.  See United States v. Mikulak, No. 14-50352, 2015 WL 5438992 (9th Cir. Sept. 16, 2015); United States v. Sanders, 558 Fed. App'x 734 (9th Cir. 2014); United States v. Rice, 540 F. App'x 782 (9th Cir. 2013); United States v. Mills, 518 F. App'x 540 (9th Cir. 2013); United States v. Maggio, 499 F. App'x 696 (9th Cir. 2012); United States v. Frantz, 485 F. App'x 890 (9th Cir. 2012); United States v. Grigsby, 469 F. App'x 589 (9th Cir. 2012); United States v. Shigley, 451 F. App'x 705 (9th Cir. 2011); United States v. Maier, 639 F.3d 927 (9th Cir. 2011); United States v. Aguirre, 448 F. App'x 670 (9th Cir. 2011); United States v. Alfaro, 446 F. App'x 840 (9th Cir. 2011);

1  United States v. Psick, 434 F. App'x 646 (9th Cir. 2011); United States v. Aglony, 421 F. App'x 756

2  (9th Cir. 2011); United States v. Anthony, 421 F. App'x 674 (9th Cir. 2011); United States v. Richards,

3  414 F. App'x 911 (9th Cir. 2011); United States v. Carlson, 395 F. App'x 413 (9th Cir. 2010); United

4  States v. Blinkinsop, 606 F.3d 1110 (9th Cir. 2010).

5        In this case, the correct application of the Guidelines yields the sentencing range calculated by

6  the USPO.  The Court should reject any request from Clemans' for a downward variance from the

7  applicable sentencing range.  Nothing in the facts of this case support such a reduction.  Thus, a

8  reduction would result in an unwarranted sentencing disparity with similarly-situated defendant (as rare

9  as they might be), and frustrate the goals of the 3553(a) factors.  Accordingly, the Court should impose

10  a life sentence, as recommended by the government and the USPO.

11                          **VII.    CONCLUSION**

12        For the foregoing reasons, the United States respectfully recommends that the Court sentence

13  Clemans to the statutory maximum sentence on each Count of conviction:  (i) 360-months on Counts

14  One, Two, Three, and Five; (ii) a life sentence on Count Four; (iii) and 240-months on Count Six; all to

15  run concurrently for a total sentence of life in prison.  The United States also recommends and a life

16  term of Supervised Release on each Count of conviction, and imposition of the special conditions

17  recommended by the USPO in the PSR.  A total sentence of life in prison is sufficient but not greater

18  than necessary to advance the goals and interests of the sentencing factors set forth in 18 U.S.C. §

19  3553(a).

20   DATED: January 16, 2018                           Respectfully Submitted,

21
                                                      McGREGOR W. SCOTT
22                                                    United States Attorney
                                           By:
23                                                    */s/ André M. Espinosa*
24                                                    ANDRÉ M. ESPINOSA
                                                      COLLEEN M. KENNEDY
25                                                    Assistant U.S. Attorneys

26

27

28
                                   21                          Sentencing Memorandum
                                                              United States v. Clemans
                                                              2:15-CR-00227-JAM