IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

            Plaintiff,

                                Case No. 2:15-cr-00227
      vs.

                                Sacramento, California
MICHAEL CAREY CLEMANS,          August 30, 2017
                                9:00 a.m.

            Defendant.
_____ /

JURY TRIAL - DAY 2
BEFORE THE HONORABLE JOHN A. MENDEZ
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:       OFFICE OF UNITED STATES ATTORNEY
                      501 I Street, Suite 10-100
                      Sacramento, California 95814
                      BY:  ANDRE M. ESPINOSA
                            COLLEEN M. KENNEDY
                            Assistant U.S. Attorneys

For the Defendant:        NOLAN BARTON & OLMOS
                      BY:  DANIEL B. OLMOS
                      600 University Avenue
                      Palo Alto, California 94301

Court Reporter:           DIANE J. SHEPARD, CSR 6331, RPR
                      Official Court Reporter
                      501 I Street, Rm 4-200
                      Sacramento, California 95814
                      (916) 554-7460

Proceedings reported by mechanical stenography, transcript
produced by computer-aided transcription.

1                            I N D E X

2     GOVERNMENT WITNESSES                                PAGE

3     **ANDREW WARD**
      DIRECT EXAMINATION BY MR. ESPINOSA                  239
4     CROSS-EXAMINATION BY MR. OLMOS                      250

5     **NATHAN MARK SANGER**
      DIRECT EXAMINATION BY MS. KENNEDY                   255
6     CROSS-EXAMINATION BY MR. OLMOS                      267
      REDIRECT EXAMINATION BY MS. KENNEDY                 270
7
      **J.U.**
8     DIRECT EXAMINATION BY MS. KENNEDY                   275
      CROSS-EXAMINATION BY MR. OLMOS                      291
9
      **E.S.**
10    DIRECT EXAMINATION BY MS. KENNEDY                   294
      CROSS-EXAMINATION BY MR. OLMOS                      309
11
      **M.Q.**
12    DIRECT EXAMINATION BY MS. KENNEDY                   311
      CROSS-EXAMINATION BY MR. OLMOS                      328
13
      **SCOTT MEDLIN**
14    DIRECT EXAMINATION BY MR. ESPINOSA                  330

15

16

17

18

19

20

21

22

23

24

25

```
 1
                  GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE
 2     No.                     Description                     Page

 3     92     Michael Clemans - U.S. Passport                  246
       92.5   Excerpts - Michael Clemans's U.S. Passport       246
 4     87     iPad DN6G33DDDFJ0                                 249
       88     Photo of Lyan Tandeg                             260
 5     89     Photo of Shellina Atad                           260
       90     Photo of Tandeg, Atad and M.Q. in Manila         266
 6     91     Photo of Tandeg and M.Q. in Manila               267
       96     Certificate of Live Birth of J.U.                277
 7     33     Image, x_011044ee.jpg                            290
       32     Image, x_000118e.jpb                             291
 8     97     Certificate of Live Birth of E.S.                295
       35     Image, James Bond room Sogo.jpg / internet       303
 9     31     Image, M*** and E*** Bond Room E.jpg             309
       95     Certificate of Live Birth of M.Q.                312
10     34     Image, M*** Motorcycle Edit.jpg                  328

11     1      Photo - 700 Blackmer Circle 7/24/15              333
       2      Photo - 700 Blackmer Circle 7/24/15
12     3      Photo - 700 Blackmer Circle 7/24/15
       4      Photo - 700 Blackmer Circle 7/24/15
13     5      Photo - 700 Blackmer Circle 7/24/15
       6      Photo - 700 Blackmer Circle 7/24/15
14     7      Photo - 700 Blackmer Circle 7/24/15
       8      Photo - 700 Blackmer Circle 7/24/15
15     9      Photo - 700 Blackmer Circle 7/24/15

16     86     Western Digital external HD WMC300163553         337

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Good morning.  Outside the presence of the

2     jury on the record.  I'll take up, first, the motion in limine

3     regarding co-conspirator statements that I took under submission

4     on Monday.

5          I have reviewed a number of cases including the following

6     cases:  U.S. vs. Gypsum, Supreme Court case; U.S. vs. Taylor, a

7     Ninth Circuit case; U.S. vs. Saavedra, a Ninth Circuit case;

8     U.S. vs. Wentz, another Ninth Circuit case; and U.S. vs.

9     Sandoval-Villalvazo.

10         There is language in each of those cases that the Government

11    has relied on in arguing that the co-conspirator statements of

12    Miss Tandeg can or should be used against Mr. Clemans in this

13    case.  Mr. Olmos has argued that his client clearly withdrew

14    from the conspiracy as of the date that he executed the Consent

15    to Assume Online Identification.  That's dated actually

16    August 11, 2015.

17         The problem with the cases relied on by the United States is

18    that they are easily distinguishable, and that this case before

19    the Court, Mr. Clemans's case, presents a unique set of facts.

20    None of the cases relied on by the Government, even though they

21    contain language such as that statements made by an unarrested

22    co-conspirator who is still operating in furtherance of the

23    ongoing conspiracy may be introduced against the arrested

24    conspirator, Mr. Clemans was the arrested conspirator, but none

25    of these cases involve the situation that's before this Court in

1     this case.  And that is the Government sought the arrested

2     conspirator's cooperation, and at no time did the Government

3     tell Mr. Clemans, warn Mr. Clemans, or inform Mr. Clemans that

4     any statement made by Miss Tandeg might be used against him at

5     trial.

6          The problem with the cases relied on by the Government is

7     they don't really discuss what is the Fifth Amendment issue

8     that's present in our case.  And that is, as Mr. Olmos pointed

9     out, he knew when he signed this form on behalf of his client,

10    and when his client agreed to cooperate with the Government, he

11    knew there were Fifth Amendment implications.

12         But there was no warning, no discussion, no waiver, in a

13    sense, similar to Miranda warnings that are given when someone

14    is going to make a confession.  And that's what concerns the

15    Court most about the Government's argument that they should

16    still be able to use Miss Tandeg's statements against

17    Mr. Clemans when Mr. Clemans, in effect, agreed to cooperate and

18    give this information to the Government.

19         There is no language at all that comes close to a Fifth

20    Amendment warning, an advisement that, by the way, even though

21    you're cooperating with us, we may still use any evidence we

22    gather from Miss Tandeg against you, statements.

23         And that's the big concern for the Court, so.  None of the

24    cases relied on by the Government are applicable, and I think as

25    a matter of fairness, a matter of protecting Mr. Clemans's

1    constitutional rights, you cannot, the Government cannot, under

2    this situation, when they get someone to cooperate with them and

3    then turn around and try to use statements obtained as a result

4    of that cooperation against the person who is cooperating.  That

5    that simply is not warranted, not fair, and should not be,

6    frankly, encouraged without sufficient warning to the defendant.

7         So for all those reasons, again, given, I think, the unique

8    set of facts in this case, the Court is going to deny the

9    Government's motion in limine, grant the defendant's motion in

10   limine.  And so any statement made by Miss Tandeg that the

11   Government wishes to use in this case made after August 11th --

12   I'm sorry -- August 11th, 2015, is when you signed the

13   agreement -- yeah, that's right -- any statement made after

14   August 11th, 2015, by Miss Tandeg that the Government

15   anticipated using in this case cannot be used as part of this

16   case.

17        Any questions?

18             MR. OLMOS:  I have one question, Your Honor.  I hope I

19   know the answer to it.

20             THE COURT:  I know -- sorry to interrupt -- there was

21   a period of time -- I think he was arrested on July 24th.  So I

22   don't know if there were statements between July 24th and

23   August 11th, maybe not, but, those, I believe the Government

24   could use.  Anything after August 11th I don't think they would

25   be authorized to use.  Go ahead.

1           MR. OLMOS:  I just want to make sure that if I elicit

2    testimony from Agent Schofield or others about Mr. Clemans's

3    cooperation, his agreement to cooperate, that I'm not somehow

4    opening the door for any of these statements that we're talking

5    about.

6           THE COURT:  No.  Not at all.  Questions from the

7    United States?

8           MR. ESPINOSA:  Well, Your Honor, just for the sake of

9    clarity, the Court's ruling concerns her statements, Tandeg's

10   statements.  Of course we don't anticipate an objection to

11   examination questions about what was done in the enforcement --

12          THE COURT:  Absolutely.  You can get into that.  You

13   can't ask the question of the agent that went over, you know,

14   "you asked her this, what did she say in response?"  You can ask

15   the question, "what did she do in response?"  But you can't ask,

16   "what did she say?"

17     Okay.  You wanted to bring up some other matters before we

18   brought the jury in?

19          MS. KENNEDY:  Yes, Your Honor.  Just a few quick

20   matters regarding the minor witnesses that are expected to

21   testify today.  The first is regarding the seating arrangement

22   over there.

23     As we discussed on Monday, we do want to have a support

24   person come in per the Court's earlier ruling for each of the

25   minors.  And there appears to be a chair down next to the box

1   where we could have the mothers of each of girls sit during

2   testimony.  Because we do need space in the box for the

3   interpreter as well.  So we're trying to figure out where

4   everyone is going to sit.

5           THE COURT:  Well, normally, we put the interpreter

6   almost next to the witness or slightly behind the witness in the

7   jury box.  Some interpreters stand.  Other interpreters sit.

8   It's up to the interpreter.

9           MS. KENNEDY:  These interpreters have requested to

10  sit, and so we can try to find or if the Court has a small chair

11  or stool or something that we can put next to the witness's

12  chair.  That's their request.

13          THE COURT:  We'll try to find something for them.

14          MS. KENNEDY:  Also then during the preparation of the

15  minors for their testimony, it became clear that it would be

16  helpful for them to use dolls, if necessary, during the more

17  difficult portions of the testimony, and so we would ask the

18  Court's indulgence to allow us to do that if it becomes clear

19  that it's going to be helpful to the witnesses.

20          THE COURT:  Sure.  That's done all the time.

21      And, again, if you want the witnesses to simply face you --

22  the other thing I will allow both lawyers to do is, with child

23  witnesses, you don't necessarily have to stick to the podium.

24  So if you want -- both sides -- if you want to get a little

25  closer to the child so maybe they are just looking at you, if

1    they just focus on the lawyer.  Just as long as the interpreter

2    can hear them.  It's really the interpreter that's got to face

3    the jury and interpret what the child is saying.

4         Tell the interpreters to make sure that they need -- if the

5    child gives what I think starts to sound like a long answer,

6    they need to cut the child off.  Hopefully these interpreters

7    have interpreted enough to know that.

8         But if you're going to move away from the podium, just make

9    sure that Diane can hear you.  She'll let you know.  And if we

10   need to use a hand mic, we will do that.

11            MS. KENNEDY:  Thank you, Your Honor.

12        And then the only other matter was regarding the issues of

13   using the girls' initials during testimony.  And we wanted to

14   ask if the Court would perhaps give a short instruction to the

15   jury on that issue.  That they won't hear the minor's real names

16   and also regarding the presence of the their mothers during

17   testimony.

18            THE COURT:  Sure.  Let me know when they are going to

19   testify, and we will do that.

20            MS. KENNEDY:  Thank you.

21            MR. OLMOS:  Your Honor, quickly?

22            THE COURT:  Go.

23            MR. OLMOS:  On the where I should stand with the minor

24   victims.  I agree with the Court.  I found it useful in my

25   career to get closer.  I have also found that if I stand closer,

1    I can look like I'm trying to intimidate them.  So I would like

2    to ask the Court's permission to sit in a chair.  I, frankly,

3    don't know how many questions I'm going to have for these girls,

4    but if I can sit in one of those black chairs that's in front, I

5    would like the Court's indulgence to do that.

6            THE COURT:  You mean in front of the child?

7            MR. OLMOS:  Exactly.

8            THE COURT:  Okay.  I'll also tell the jurors that

9    normally lawyers question from the podium, but with these

10   witnesses I'm allowing them to come into the well a little

11   further.

12           MR. OLMOS:  Thank you.

13           THE COURT:  Sit or stand.  Whatever you want.

14           MS. KENNEDY:  Thank you, Your Honor.

15           THE COURT:  See if the jury is here and bring them in,

16   and we will start with the opening statements.

17       Ms. Kennedy or Mr. Espinosa?  Who is going to give the

18   opening?

19           MR. ESPINOSA:  I will, Your Honor.

20           THE COURT:  Okay.

21       (Jury in. 9:18 a.m.)

22           THE COURT:  Good morning.  Mr. Vine is going to hand

23   out notebooks for you.  I hope you all got a good night's sleep.

24   If there are any arguments for fights over seats, then I'll

25   resolve the argument.  Flip of the coin.

1        All right.  As I told you on Monday, we will begin this

2   morning with opening statements.  Opening statements are not

3   evidence, but simply the lawyers will present to you what they

4   believe the evidence will show in this case.  Opening statements

5   are in the order of the United States.  And then the defense,

6   again, the party does not have to make an opening statement.

7   They can reserve their right.

8        For the United States, Mr. Espinosa.

9            MR. ESPINOSA:  Yes, Your Honor.

10      Good morning, ladies and gentlemen.  The defendant in this

11  case, Michael Carey Clemans, wanted sexually explicit photos of

12  underage girls.  He wanted those girls to be virgins, and he

13  wanted sex with those girls.  Girls as young as eight years old.

14  So he found partners in the Philippines to help him get what he

15  wanted.

16      He sent those partners money for close-up photographs of the

17  genitals of underage girls so that he could inspect them to try

18  to determine whether the girls were virgins or not.  When he

19  found girls that he liked, he planned to travel to the

20  Philippines for sex with them.  But when he found girls that he

21  liked the most, he went further.  He offered to buy those girls.

22  He offered to pay for and did pay to reserve the virginity of

23  those girls for future trips for sex and to make sexually

24  explicit photographs of those underage girls.

25      That's what this case is about, ladies and gentlemen, and

1    that's what the evidence will show during the course of this

2    trial.  The evidence will show that Michael Carey Clemans was a

3    commercial pilot.  He worked in Thailand, but he traveled home

4    to Sacramento regularly.  And when he was home, he stayed at his

5    mother's house here in Sacramento.

6        In late August and early September of 2014, Clemans was

7    home, visiting his mother.  During that period, he used his

8    Yahoo account to exchange chat messages with a woman in the

9    Philippines.  He asked that woman, Nelia Cruz, to collect for

10   him images of underage girls and deliver them to him.  He also

11   asked Nelia to help him find underage girls to have sex with

12   during his visit to the Philippines.

13       During his chats with Nelia, Clemans asked for photos of

14   girls as young as eight years old.  He told Nelia he wanted

15   virgins.  He negotiated with Nelia over price.  He offered to

16   pay $200 for no less than 12 hours with an underage girl.

17       He asked to see photos of Nelia's apartment.  He asked if

18   she had a mattress, and if she had a shower.  He told her that

19   he didn't want problems with the police.  Clemans and Nelia

20   arranged a meeting place in the Philippines at a mall called

21   Market Market in Manila.

22       Clemans told Nelia he would send her his flight information

23   in a few weeks, and that over the next few weeks they would plan

24   more.  He told her he was traveling first to Bangkok, Thailand,

25   but then on to the Philippines.  And he told her that he would

1   pay her later.

2       The evidence will show that after those discussions with

3   Nelia, Clemans left the United States from his mother's house on

4   or about September 10th, 2013.  Now, during his trip, he and

5   Nelia continued to discuss the details of his plan.

6       He told Nelia that he didn't want to fight with any underage

7   girls about having sex with them on the hard floor of her

8   apartment.

9       After Clemans reached Bangkok, he and Nelia continued to

10  plan.  In early October, he asked Nelia to find two or three

11  girls, and he made clear that he intended to have sex with them.

12      They again agreed to meet at Market Market in Manila.

13  Clemans sent Nelia $45 and instructed her to send him photos of

14  naked, underage girls, virgins, so that he could select from

15  them.

16      Nelia complied.  And from the photos that she sent, Clemans

17  selected a girl named BB, who Nelia told him was 12 years old.

18  After he received that information, he replied "good age."

19      He asked for photos of BB with her legs spread open so that

20  he could inspect her to determine whether she was a virgin.  He

21  sent Nelia more money and asked for more photos of other

22  underage girls.

23      In mid-October, Clemans told Nelia that he would arrive in

24  the Philippines in ten days.  Clemans also told Nelia that he

25  expected to have anal sex with the underage girls that she found

1    for him with no complaints.  And Nelia agreed to arrange that

2    for Clemans, and they again confirmed their meeting at Market

3    Market in Manila.

4        Nelia sent Clemans a photo of a girl that she called Jessa

5    who she told Clemans was 11 years old and had not yet had her

6    period.  Clemans replied, "she is the type of girl I'm looking

7    for."  And he agreed to pay $200 to Nelia for sex with Jessa.

8        The evidence will show that in mid-November 2013, Clemans

9    did what he said he would do back in September.  He travelled to

10   the Philippines to have sex with the underage girls that Nelia

11   found for him.  But when Clemans arrived at Market Market as

12   they had planned, Nelia never showed up.  Clemans was angry.

13   Over the next few days, he and Nelia chatted more, and Nelia

14   explained that the underage girls that she had found for him had

15   refused to have anal sex with him.  Nelia offered to meet

16   Clemans with Jessa and a third girl, Holly, but only for play

17   and not for sex.  Clemans declined, and he told Nelia, "I am

18   here to fuck a virgin."

19       Approximately seven months later, in June 2014, Clemans was

20   again using his Yahoo account to chat with another woman in the

21   Philippines, a woman named Lyan Tandeg.  Clemans wanted the same

22   thing from Lyan that he wanted from Nelia.  He wanted sexually

23   explicit photos of underage girls.  He wanted those girls to be

24   virgins, and he wanted sex with those underage girls.  He sent

25   Lyan money for close-up photos of the genitals of these underage

1    girls so that he could inspect them to see if they were virgins.

2    He wanted to pick, among those photos, the girls he liked the

3    most.  And when he found those girls, he agreed with Lyan to

4    travel to the Philippines to have sex with those underage girls.

5        The evidence will show that Clemans worked to make sure Lyan

6    delivered exactly what he asked for and what he wanted.  Clemans

7    gave Lyan very careful instructions.  He sent her money to buy

8    an expensive camera and a computer.  He told her to look for

9    vulnerable girls whose parents would not give them any problems.

10   Girls like orphans.  He described the poses that he wanted the

11   girls to take in Lyan's photos, and he sent Lyan images as

12   examples of poses for her to copy.

13       He told Lyan how the girls should be dressed, how their hair

14   should look, how their bodies should look, and the faces that

15   they should make in the photos.

16       During this trial, you'll see some of disturbing photos that

17   Lyan made for Clemans.  Lyan followed Clemans's instructions and

18   found underage girls to photograph for him, including three

19   particular girls who they called Angel, Nicole, and Ishin.  At

20   Clemans's direction, Lyan took those girls and other girls to

21   hotels and other locations and made sexually explicit

22   photographs of them for Clemans.

23       Over the course of a year, Clemans used his Yahoo account to

24   exchange hundreds of chat messages with Lyan detailing what he

25   wanted and evaluating the photos that she sent him.

1          The evidence will show in Clemans's own words what he wanted

2     from Lyan and what he wanted from the girls that she found for

3     him.  You'll see the specific agreement between Clemans and Lyan

4     in numbered bullet points, and you'll see in Clemans's own words

5     that he planned with Lyan to travel to the Philippines to have

6     sex with and take sexually explicit photos of underage girls.

7          The evidence will also show that Clemans paid Lyan Tandeg

8     money, and that he paid money to others.  Specifically, the

9     evidence will show that Clemans paid Lyan money to reserve the

10    virginity of Angel and Nicole.  And you'll see during this

11    trial, again, in Clemans's own words, that he paid Lyan $250 for

12    Nicole's virginity and $500 for Angel's.

13         And those payments, those offers, came with clear

14    instructions.  He told Lyan that the payments also bought future

15    sexually explicit photo shoots with both girls.

16         During this trial, you'll hear testimony from those three

17    girls.  The girls that they called Angel, Nicole and Ishin.  And

18    those girls will tell you about their interaction with Tandeg

19    and the photos that she took of them.

20         You'll also see chats during this trial describing money

21    transfers.  Those money transfers were in the form of Western

22    Union transfers.  And you'll see evidence that the funds used to

23    pay for those transfers came directly from the defendant's bank

24    account here in Sacramento.

25         The evidence will show that Clemans sent Lyan Tandeg more

1    than $5,700 in less than one year, all linked to Clemans's

2    request for sexually explicit photos of underage girls and his

3    agreement with Tandeg to travel to the Philippines to have sex

4    with those underage girls.

5        Now on April 27, 2015, Clemans came home to visit his mom in

6    Sacramento.  And when he arrived at the airport in San

7    Francisco, he was referred to what's called secondary

8    inspection, and his iPad was searched.  That search revealed the

9    presence of more than a dozen images of child pornography

10   including images of Angel and Nicole.  Clemans was arrested on

11   state charges, but he was released, and he went home to

12   Sacramento where he continued chatting with Lyan from his mom's

13   house.

14       He asked Lyan -- he continued to ask Lyan for photos of

15   Angel, Nicole and Ishin, and he continued to plan his travel to

16   the Philippines for sex with those girls.

17       On July 24th, 2015, FBI agents arrested Clemans on federal

18   charges, and they searched his mother's home.  During that

19   search, they recovered an external hard drive, which also

20   contained images of Angel and Ishin, sexually explicit images of

21   those girls.

22       Now during the course of this trial, you're going to hear

23   that after Clemans's arrest on federal charges, he gave the FBI

24   control over his Yahoo account.  He gave them his password.  And

25   the FBI used that account to locate and arrest Lyan Tandeg and

1    another co-conspirator, Shellina Atad, in the Philippines.

2    During the course of this trial you will hear about the

3    operation that led to the arrest of these two people.

4        Now, ladies and gentlemen, this has just been a sketch of

5    the facts that the Government will offer during this trial

6    supporting the charges against the defendant.

7        And those charges as, you've been informed, are attempted

8    travel and travel for the purpose of illicit sexual conduct in

9    2013.  That charge relates to the travel and chat exchanges

10   between the defendant and Nelia Cruz that began this

11   presentation.

12       The remaining two charges, conspiracy to travel for the

13   purpose of illicit sexual conduct and buying of children, relate

14   to the facts that you heard concerning Clemans's chats with Lyan

15   Tandeg and his agreement to travel for sex with minors in the

16   Philippines and to buy minor girls for future sexually explicit

17   photo shoots.

18       Now during the course of this trial, you will hear and see

19   various exhibits and testimony.  And after you've heard all the

20   evidence, my colleague, Colleen Kennedy, will stand up and give

21   you a closing argument that will weave together the facts with

22   the law that the judge will instruct you controls in this case.

23       And after that presentation, we will ask you to return the

24   only verdict that the evidence will support, and that's a

25   verdict of guilty on all counts.  Thank you.

1          THE COURT:  Thank you.  Mr. Olmos, do you wish to make

2   an opening statement at this time?

3          MR. OLMOS:  Yes.  Thank you, Your Honor.

4          THE COURT:  Okay.

5          MR. OLMOS:  The first thing that I want to do is thank

6   you.  I want to thank you for being here, and I want to thank

7   you for agreeing to be fair.  And I know that wasn't an easy

8   promise for you to give when you raised your right hand, given

9   what you know about this case, given the awful images and

10  language that you're going to see and hear about.  Some of which

11  Mr. Espinosa just described to you.

12     I know it wasn't easy for you given that my client is

13  responsible for using that unspeakable language and for

14  requesting that those photographs be taken and sent to him.

15     It wasn't an easy promise for you to make, and I don't think

16  it's going to be an easy promise for you to keep, but I'm

17  confident that you will.  I'm confident that you will even

18  knowing that you're going to see and hear evidence of very

19  vulnerable young girls being violated.

20     You're going to hear that these kids were violated by having

21  their pictures taken on the other side of the world in a city

22  called Port Angeles in the Philippines by a woman named Lyan

23  Tandeg.  She took pictures of those poor kids without their

24  clothes on.  She made them pose in truly disgusting ways.  She

25  violated them.  And you're going to hear those poor little girls

1    talk about that in this courtroom.

2        And you're going to hear that Miss Tandeg did those

3    despicable things to these young girls because my client asked

4    her to.  It was his idea.  He sent her money.  He asked for

5    those pictures, and she sent them to him just like he asked.

6        About these things that my client did, that Mr. Clemans did,

7    the evidence is overwhelming.  It's uncontroverted.  It's going

8    to be awful for you to see and hear.  I'm admitting that to you

9    now.  And I'm admitting that to you knowing fully well that

10   you're not going to be able to ignore it; you're not going to be

11   able to get past it; you're not going to be able to overlook it.

12   It will affect you deeply.  I know it will.

13       But through all that, I'm going to ask you in this case to

14   focus as much as you can, okay, with a clear head, as

15   dispassionately as possible, as fairly as you can muster, on the

16   evidence that the Government won't show you, on the evidence

17   that you won't see.

18       And the first thing that I want to emphasize is this.  When

19   those poor little girls walk into this courtroom, all three of

20   them, it will be the first time in their lives that they have

21   ever laid eyes on my client.  He has never met them.  He has

22   never spoken to them.  He has never touched them.  He has never

23   laid a single finger on those girls.  They live, as I said, in

24   and around a city called Port Angeles, and there is no evidence

25   that my client even went anywhere near that city, or that he

1    ever made specific plans to go.

2        The evidence will show that for the past several years, at

3    all times relevant to this case, Mr. Clemans was a commercial

4    airline pilot, as Mr. Espinosa said.  He was based in Bangkok.

5    He had been there for several years.  He was a United States

6    citizen, but for about a decade had been living in Asia.

7        And he spent a lot of his time on the internet, chatting.

8    These chats are disturbing.  You have just heard a small sample

9    of them, and you're going to hear a lot of them during this

10   trial.  And you are not going to be able to understand how those

11   words could come from the mind of a human being.  You're not.

12       You're going to hear evidence that Mr. Clemans was chatting

13   with countless people on the internet using this language.  More

14   than 50 of them sent Mr. Clemans child pornography over the

15   internet.  A couple dozen of them Mr. Clemans specifically

16   requested it.  Sometimes people send that stuff to you without

17   requesting it, but Mr. Clemans did.  He asked for it from about

18   two dozen.

19       But half those people he asked for it affirmatively, he told

20   them, just like he told Miss Tandeg, I'm coming to the

21   Philippines to have sex with those little girls.  At least

22   eleven people he said that to.  He never did.  Just like

23   Miss Tandeg never planned to, never made an itinerary, but he's

24   talking about it, talking about going to the Philippines from

25   his home in Thailand, using awful disgusting language, boasting

1    to all these strangers about what he was planning to do.

2        But you're not going to hear any evidence in this courtroom

3    that he ever did.  There is going to be lots of evidence that

4    Mr. Clemans requested those pictures, and he certainly took

5    action on that, right, paid money; he asked for specific poses;

6    he acted on that; he acted on those requests.  But on the

7    travel, he never did.

8        Actually meeting girls, touching girls, you're not going to

9    hear from a single victim witness or anybody that he actually

10   did.  Words, disgusting boasts, internet chatter, promises, but

11   no evidence of actual criminal actions for the three charges

12   that the Government is trying to prove to you in this trial.

13       And I want to move to those charges now.  Okay.  The first

14   one, Count 1, is going to be that 2013 November trip from

15   Bangkok to the Philippines.  Mr. Clemans did travel from Bangkok

16   to the Philippines for work in November 2013.  There is not

17   going to be any dispute about that.

18       The first thing I want to say to you with respect to that

19   count is that there is no evidence that that trip had anything

20   to do with the United States.  Mr. Clemans had been here a

21   couple months prior, visiting his mother, like he did once or

22   twice a year, and then he flew back to his home in Bangkok,

23   where he lived, and went back to work.

24       He flew the next month, in October, to Laos, and then back

25   to the Philippines -- or I'm sorry -- back to Thailand, and then

1    in November, the next month, did in fact fly to Manila.

2        So there is absolutely no connection, no nexus, whatsoever,

3    that you're going to hear about in this trial that that trip in

4    November from Bangkok to Manila had any connection whatsoever to

5    the United States.  And that's going to be important in this

6    case.  It's going to be important in this trial for reasons that

7    you will understand later.

8        Second, there is no evidence, other than Mr. Clemans's

9    disgusting internet chatter, that he met with a girl when he was

10   in Manila.  You're not going to hear from a victim, a witness,

11   nobody even that saw Mr. Clemans in the Philippines; nobody that

12   saw him with a girl; nobody that saw him with anybody.  And

13   you're not going to hear from anybody that Mr. Clemans violated

14   them in any way back in 2013 in the Philippines.

15       And the Government is going to face a similar evidentiary

16   affliction on Count 2.  That's the travel that they are alleging

17   in 2014-2015.  Okay.  That year of chatter with Lyan Tandeg that

18   Mr. Espinosa just described to you.

19       Again, you're going to see tons of evidence of these

20   internet chats, instant messages, and e-mails.  But you're going

21   to see no evidence that Mr. Clemans ever made a specific

22   agreement to go.

23       To convince Tandeg to take pictures of these poor little

24   girls, send them to him?  Absolutely.  There is lots of evidence

25   of that, but there is no evidence that Mr. Clemans ever made a

1    plan to go.  There is no itinerary; there is no plane ticket;

2    there is no planned visit; they never talked about a specific

3    date for him to go; they didn't talk about a specific month for

4    him to go; they never talked about a year for him to go.

5         During this year, Mr. Clemans was flying all around Asia.

6    You're going to see evidence of that.  But he never flew to the

7    Philippines.  He never once traveled to the Philippines to touch

8    any of these girls.  And he never made any specific agreement

9    to.  And he certainly never acted on it.  And, finally, this

10   Count 4, buying children.  That is a horrific idea.  I can

11   acknowledge that.

12        And, ladies and gentlemen, you've given your oath only to

13   consider the evidence that's presented before you, but I could

14   see some of you recoil when you first heard what that charge

15   was, and that's understandable.

16        And, again, I want to emphasize to you that Mr. Clemans

17   never went anywhere near these girls.  You're going to hear no

18   evidence that he did.  But, most importantly here, you're not

19   going to hear any evidence that he bought.  You're never going

20   to hear evidence that he or anybody else ever had custody or

21   control of these kids.

22        Miss Tandeg took these kids and took pictures of them, but

23   these kids' parents, who are going to be in this courtroom,

24   never lost custody of those kids.  The Government has no

25   evidence to prove that they did.  Those parents were lied to.

1    They were deceived.  But they never lost custody or control of

2    their children.

3        There is no evidence in this trial that you're going to hear

4    that Mr. Clemans bought anything other than pictures of those

5    kids.

6        And I know that this was maybe an unusual opening statement

7    for me to give, right, defense attorneys generally don't

8    acknowledge in opening statement how many awful things their

9    clients did or how many awful things they said.  And for the

10   most part, we are not going to challenge the Government's

11   evidence in this case.  I'm not going to try to explain it away.

12   Not going to try to trick you.  I'm not going to spend hours and

13   hours cross-examining these witnesses, trying to get them to

14   admit to some little inconsistency.

15       But I am going to ask you to consider one piece of evidence

16   that I think weaves through what I've been talking to you about,

17   and it's something that Mr. Espinosa, himself, acknowledged when

18   he talked to you.

19       Not long after Mr. Clemans was arrested the second time at

20   his mom's house, the Government approached him and asked him for

21   his help.  They asked him to allow them to take on his internet

22   persona in an effort to save these kids so that law enforcement

23   could travel to that dark underworld that Mr. Clemans had been

24   operating in and save these kids.

25       Mr. Clemans was made no promises in exchange for his

1    cooperation, wasn't given anything, wasn't offered anything.

2    And, yet, he agreed.  He gave law enforcement his password and

3    identifying information so that they could go, fly to the

4    Philippines, and get these kids.  And thankfully, that's what

5    they did.

6        In other words, the cornerstone of the Government's case,

7    the testimony of these three kids, was made possible because

8    Mr. Clemans did the right thing.  This was no longer the

9    disgusting internet chatter in this dark underworld of the

10   internet with nameless, faceless people, and kids you've never

11   seen.  It became real.  And once he understood that, that these

12   were real kids, he did the right thing.

13       What Mr. Clemans did in paying his accomplice in the

14   Philippines to take pictures of these kids and send them to him

15   was despicable.  You're not going to hear any argument from me

16   that it wasn't.  That the violation of these kids that you're

17   going to hear from today is unspeakable.

18       But the Government doesn't have any evidence that it can

19   show you in this trial that my client is actually guilty of the

20   three charges that you're here to hear about.

21       So I want to finish where I started, which is I am hopeful

22   that you can be fair in spite of what you hear, to consider

23   carefully all the evidence that you hear and see in this

24   courtroom, but, also, to carefully consider the evidence that

25   you don't see, to think about the evidence that you won't hear.

1    Because it's that evidence, under a cloud of all of the horror

2    that you're going to hear about and see, it's the evidence that

3    the Government can't show you that is important.  It's

4    substantial, significant, and it will be conclusive of the

5    Government's efforts to prosecute my client for these three

6    charges.  Thank you.

7               THE COURT:  All right.  The United States may call its

8    first witness.

9               MR. ESPINOSA:  Your Honor, the Government calls

10   Detective Andrew Ward.

11        (Government witness, **ANDREW WARD**, sworn in.)

12               THE CLERK:  Please state your full name and spell your

13   last name for the record.

14               THE WITNESS:  My first name is Andy, A-n-d-y.  Last

15   name is Ward, W-a-r-d.

16                              DIRECT EXAMINATION

17   BY MR. ESPINOSA:

18   Q.  Good morning.

19   A.  Good morning, sir.

20   Q.  Where are you currently employed?

21   A.  The San Mateo County Sheriff's Office.

22   Q.  How long have you worked there?

23   A.  I've been a peace officer for the past ten years.

24   Q.  Are you assigned to any particular group at the San Mateo

25   County Sheriff's Office?

1    A.  Yes, sir.

2    Q.  What group is that?

3    A.  I'm a detective assigned to the San Francisco Airport

4    Bureau.

5    Q.  All right.  What are your duties under your assignment to

6    the airport bureau?

7    A.  I conduct follow-up investigations, essentially, on any

8    crime that occurs at the San Francisco Airport.

9    Q.  Were you assigned to the airport bureau in April of 2015?

10   A.  Yes, sir.

11   Q.  And during that period, were you working on April 27, 2015?

12   A.  Yes, sir.

13   Q.  Did you participate in an investigation at that time, on

14   that day of Michael Clemans?

15   A.  Yes, I did.

16   Q.  What happened that day to cause your investigation of

17   Michael Clemans?

18   A.  I received a call from my supervisor, Lieutenant Matsura, at

19   the sheriff's office.  He requested that I meet him down in the

20   U.S. Customs area within the international terminal for an

21   investigation.

22   Q.  Did you respond?

23   A.  Yes, sir.

24   Q.  When you got there, what happened?

25   A.  He told me that U.S. Customs had contacted a passenger that

1    was in possession of child pornography.

2    Q.  Did you meet that --

3           MR. OLMOS:  Move to strike, Your Honor.  Limiting

4    instruction on the hearsay.

5           THE COURT:  Sustained.  That last answer will be

6    stricken.  The jury will disregard.

7    Q.  BY MR. ESPINOSA:  When you responded to Lieutenant Matsura's

8    call, did you meet a person?

9    A.  Yes, I did.

10   Q.  Was he the person being investigated?

11   A.  Yes, he was.

12   Q.  Did you learn that person's name?

13   A.  Yes, sir.

14   Q.  What was that person's name?

15   A.  Michael Clemans.

16   Q.  All right.  What was being investigated by Lieutenant

17   Matsura that day?

18          MR. OLMOS:  Objection.  Lack of foundation.

19          THE COURT:  Sustained.  Talk about what he did.

20   Q.  BY MR. ESPINOSA:  Were you asked to participate in the

21   investigation?

22   A.  Yes, sir.

23   Q.  What did you do?

24   A.  I met with Agent Wang with the Homeland Security

25   Investigations.  I also met with an officer with U.S. Border and

1    Protection by the name of Officer Carter.

2    Q.  Did you view any evidence at that time?

3    A.  Yes, sir, I did.

4    Q.  What did you look at?

5    A.  I looked at an iPad.

6    Q.  Did you look at anything specific on that iPad?

7    A.  Yes, I did.

8    Q.  What did you look at?

9    A.  Officer Carter showed me images which were on the device.

10   Q.  Now in the performance of your duties, have you been

11   required to and viewed images of child pornography?

12   A.  During the course of my employment, yes, sir.

13   Q.  All right.  And you're familiar with the nature and

14   character of those kind of images?

15   A.  Yes, sir.

16   Q.  Now the images you saw on the iPad you looked at that day,

17   on April 27th, 2015, were they consistent with the images you

18   viewed in your previous experience of child pornography?

19   A.  Yes, sir.

20   Q.  In general, without specific detail, in general what did the

21   images you viewed that day depict?

22   A.  Depicted young girls that were pre-pubescent, approximately

23   10 years of age, and they were naked, and the genitalia was a

24   focal point of the image.

25            MR. OLMOS:  Strike regarding age.  Lack of foundation.

1          THE COURT:  Overruled.

2   Q.  BY MR. ESPINOSA:  After you viewed those images, did you

3   discuss further the iPad and images with the owner of the iPad?

4   A.  Yes, I did.

5   Q.  Who was that person?

6   A.  That was Michael Clemans.

7   Q.  All right.  During your discussion with Clemans, did you ask

8   him where he was employed?

9   A.  Yes, I did.

10  Q.  What did he tell you?

11  A.  He told me he was an airline pilot.

12  Q.  Did you ask him where he worked?

13  A.  Yes, I did.

14  Q.  How did he respond?

15  A.  He said that he worked for an airline based in Asia.  It was

16  not an airline that I recognized as a domestic airline carrier

17  at SFO.

18  Q.  Do you recall whether he named the country in Asia?

19  A.  I believe he said Thailand.

20  Q.  Did he indicate how long he had been working as a pilot in

21  Thailand?

22  A.  For a couple years.

23  Q.  Did you ask him about whether he knew of the images of child

24  pornography on the iPad?

25  A.  Yes, I did.

1    Q.  How did he respond?

2    A.  He told me he had downloaded them off the internet.

3    Q.  Did he tell you where he was going that day?

4    A.  Yes, sir.  He did.

5    Q.  Where did he say he was going?

6    A.  He told me he was going with his family to Sacramento.

7    Q.  Did he have a passport with him?  Or did you view a

8    passport, I should say?

9    A.  Yes, sir.  I did.

10   Q.  Could you tell from your viewing what country issued the

11   passport?

12   A.  Yes, sir.  It was a United States Passport.

13   Q.  All right.  After you spoke with Clemans -- Mr. Clemans that

14   day and viewed those images, what did you do next concerning

15   Mr. Clemans?

16   A.  I placed him under arrest.

17   Q.  Did you seize any evidence during your investigation that

18   day?

19   A.  Yes, sir.

20   Q.  All right.  I want to show you what's been marked for

21   identification as Government's Exhibit 92.  Your Honor, may I

22   approach?

23          THE COURT:  You may.  Is this one of the exhibits

24   that's already been stipulated to, Mr. Olmos?

25          MR. OLMOS:  92?

```
1                THE COURT:  Yes.

2                MR. ESPINOSA:  I believe it is, Your Honor.

3                MR. OLMOS:  I think there's been a stipulation

4     regarding authenticity.

5                THE COURT:  Okay.

6     Q.  BY MR. ESPINOSA:  Detective Ward, do you recognize that bag

7     that I put in front of you, Exhibit 92?

8     A.  Yes, sir.

9     Q.  What is that?

10    A.  It's a San Mateo County Sheriff's Office evidence envelope.

11    Q.  And do you recognize your name anywhere on that?

12    A.  Yes, sir.

13    Q.  Did you complete and fill that bag with evidence?

14    A.  Yes, I did.

15    Q.  Will you open that bag up, please?

16    A.  Yes, sir.

17    Q.  Will you just take a moment and flip through the item in

18    that bag, and review it, and look up when you're done.

19    A.  Yes, sir.

20    Q.  Have you ever seen that item before?

21    A.  Yes, I have.

22    Q.  When did you last see that item?

23    A.  When I seized it at the San Francisco Airport.

24    Q.  Is it in substantially the same condition that it was when

25    you saw it that day?
```

 1   A.  Yes, sir.

 2           MR. ESPINOSA:  Your Honor, Government moves to admit

 3   Exhibit 92.

 4           THE COURT:  What is it?

 5           THE WITNESS:  Sir, it's United States Passport.

 6           THE COURT:  Any objection?

 7           MR. OLMOS:  No, Your Honor.

 8           THE COURT:  92 is admitted.

 9       (Government Exhibit 92 admitted into evidence.)

10           MR. ESPINOSA:  Thank you, Your Honor.  One moment,

11   Your Honor.  Your Honor, may I approach?

12           THE COURT:  You may.

13   Q.  BY MR. ESPINOSA:  Detective Ward, will you open that binder

14   in front of you to the tab marked 92.5, please.

15           THE COURT:  Are you going to put it up on the screen?

16   It's admitted so you can publish.

17       (Government Exhibit 92.5 admitted into evidence.)

18           MR. ESPINOSA:  Can we publish 92.5?  Have you flipped

19   through those images --

20           THE COURT:  Excuse me.  Sorry to interrupt.  Anything

21   on your screens yet?  Okay.  Got it.

22   Q.  BY MR. ESPINOSA:  Are those images consistent with the

23   images in the U.S. Passport, Exhibit 92?

24   A.  Yes, sir.

25   Q.  All right.  Let's look at Exhibit 92.5.  Look at just the

1    bottom half, please.  Detective Ward, from this page of the

2    passport can you tell who the passport is issued to?

3    A.  Yes, sir.

4    Q.  Who is it issued to?

5    A.  Michael Carey Clemans.

6    Q.  In the upper right-hand corner there's a passport number,

7    what's that number?

8    A.  Passport number is 422061787.

9    Q.  Does the passport list Mr. Clemans's nationality?

10        THE COURT:  It's admitted, Mr. Espinosa.  He doesn't

11   have to read what's already admitted.

12        THE WITNESS:  It does, sir.

13   Q.  BY MR. ESPINOSA:  And also lists his birthday, is that

14   right, there, May 26, 1960?

15   A.  Correct.

16   Q.  And finally it lists his place of birth in Texas, isn't that

17   right?

18   A.  Yes, sir.

19   Q.  There's also a photograph on that page in the upper left, is

20   that right?

21   A.  I'm sorry.  Could you repeat the question, please?

22   Q.  There is a photograph of a person on that page?

23   A.  Yes, sir, there is.

24   Q.  Do you recognize that photograph as the person you saw on

25   April 27th, 2015?

1    A.  Yes, it is.

2    Q.  Do you see that person in the courtroom today?

3    A.  Yes, sir.  I do.

4    Q.  Can you just identify him by article of clothing?

5    A.  Seated to my left, wearing a light-blue blazer, white shirt

6    and a tie.

7            MR. ESPINOSA:  Your Honor, may the record reflect that

8    the witness has identified the defendant.

9            THE COURT:  The record will reflect.

10   Q.  BY MR. ESPINOSA:  Detective Ward, did you seize any other

11   evidence on April 27th, 2015?

12   A.  Yes, sir, I did.

13   Q.  I want to show you another exhibit.  Your Honor, may I

14   approach?

15           THE COURT:  You may.

16   Q.  BY MR. ESPINOSA:  Detective Ward, will you take a moment and

17   look at that item marked Government's Exhibit 87.  I want to

18   first ask you about that bag.  What is that bag?

19   A.  It's another San Mateo County Sheriff's Office evidence

20   envelope.

21   Q.  Does it bear your signature as well?

22   A.  Yes, sir.  It does.

23   Q.  Do you recall packing that bag with the item you just

24   opened --

25   A.  Yes, sir.

1   Q.  -- and you just removed from it?

2   A.  Yes, sir.

3   Q.  What is that item?

4   A.  It's an iPad.

5   Q.  Have you seen that iPad before?

6   A.  Yes, I have.

7   Q.  When was the last time you saw it?

8   A.  Back in 2015.

9   Q.  Is it in substantially the same condition as it was when you

10  saw it back in 2015?

11  A.  Yes, sir.

12          MR. ESPINOSA:  Your Honor, Government moves to admit

13  Exhibit 87.

14          THE COURT:  Objection?

15          MR. OLMOS:  No, Your Honor.

16          THE COURT:  Admitted.

17      (Government Exhibit 87 admitted into evidence.)

18  Q.  BY MR. ESPINOSA:  Detective Ward, can you take a look at

19  that iPad and just confirm, is there is a serial number on the

20  back of that iPad?

21  A.  Yes, sir, there is.

22  Q.  Is that number DN6G33DDDFJO?

23  A.  Yes, sir.

24  Q.  All right.  Detective Ward, after you collected that iPad as

25  evidence, what did you do with it?

Direct Examination

1  A.  I obtained a search warrant to search the iPad.

2  Q.  Did you execute that search warrant?

3  A.  Yes, I did.

4  Q.  How did you do that?

5  A.  I delivered the iPad along with the search warrant to

6  Detective Andy Armando, who is a detective with the San Mateo

7  County Sheriff's Office.

8  Q.  Were you present during Armando's work with the iPad?

9  A.  Once I initially gave it to him, he told me it was going to

10  take a significant time so I left it with him.

11  Q.  Did you eventually retrieve it from him?

12  A.  Yes, sir.

13  Q.  Did he also provide the content of the iPad to you in some

14  separate form?

15  A.  Yes, sir.

16  Q.  How did he provide that?

17  A.  DVD.

18  Q.  What did you do with that DVD and the iPad after he returned

19  it to you?

20  A.  Booked it back into evidence.

21        MR. ESPINOSA:  No further questions, Your Honor.

22        THE COURT:  Cross-examination.

23        MR. OLMOS:  Thank you, Your Honor.

24                    CROSS-EXAMINATION

25  BY MR. OLMOS:

1    Q.  Morning, sir.

2    A.  Morning, sir.

3    Q.  I'm Daniel Olmos.  I'm Mr. Clemans's attorney.  I'm going to

4    ask you a few questions.  Okay?

5    A.  Yes, sir.

6    Q.  How long have you been working at the airport bureau?

7    A.  Specifically at the airport for five and a half years.

8    Q.  And Mr. Espinosa was showing you pictures of Mr. Clemans's

9    passport and the passport itself, right?

10   A.  Yes, sir.

11   Q.  Exhibit 92, correct?

12   A.  Yes, sir.

13   Q.  I imagine in your line of work you've looked at a lot of

14   passports, haven't you?

15   A.  Yes, sir.

16   Q.  You're familiar with their contents, right?

17   A.  I would say so, yes, sir.

18   Q.  Okay.  Because that's what you have to do in your job,

19   right, you have to look at passports sometimes?

20   A.  Yes, sir.

21   Q.  Right.  And you're aware that passports contain records of

22   individuals who arrive and leave countries, right?

23   A.  Yes, they do.

24   Q.  And when they arrive into a country, they get a stamp, and

25   when they leave a country they get a stamp?

1    A.  Yes, sir.

2    Q.  And there are controls, aren't there, at airports, who

3    examine passports regarding ensuring that the individual who

4    gives them the passport is actually the owner of that passport,

5    right?

6    A.  Yes, sir.

7    Q.  I would like you to look at a particular page of

8    Mr. Clemans's passport.  So you can take out evidence Item 92,

9    please.

10   A.  Sir, from the book or the actual passport?

11   Q.  Well, you know what, I'm going to publish a page of it so

12   from 92.5.

13   A.  Yes, sir.

14        THE COURT:  Which page, Mr. Olmos?

15        MR. OLMOS:  Page 4, Your Honor.  I would like to

16   direct the witness and the Court's attention, and it should be

17   on your screen.

18        THE WITNESS:  Yes, sir.

19   Q.  BY MR. OLMOS:  So do you see that?

20   A.  Yes, I do.

21   Q.  That's page 4 of Exhibit 92.5, and that appears to you, sir,

22   to be a true and correct depiction of Mr. Clemans's passport,

23   doesn't it?

24        THE COURT:  A page from it.

25        MR. OLMOS:  A page from it.

```
 1              THE WITNESS:  Yes, sir.

 2   Q.  BY MR. OLMOS:  Now, if you look at the right side of the

 3   page, from page 4, you see a red stamp that says L-A-O-P-D-R; do

 4   you see that?

 5   A.  Yes, I do.

 6   Q.  And you're aware that that is a stamp from the country of

 7   Laos, isn't it?

 8   A.  I don't know that LAO represents that, but I recognize that

 9   as a country stamp.  Yes, sir.

10   Q.  That's a country stamp?  It is in your experience?

11   A.  That's my understanding of what it is.

12   Q.  Now, the country stamp has an arrival entry, doesn't it?

13   A.  Yes, sir.  It does.

14   Q.  And what's -- and that arrival entry for that country stamp

15   is October 7, 2013, isn't it?

16   A.  Correct sir.

17   Q.  And if you look directly to the right of that, there is a

18   departure stamp; do you see that?

19   A.  Yes, sir, I do.

20   Q.  From the same country, right?

21   A.  Yes, sir.

22   Q.  And that's a departure stamp which says October 8th, doesn't

23   it?

24   A.  Yes, it does.

25   Q.  Of 2013?
```

1    A.   Yes, sir.

2    Q.   Okay.  So the owner of this passport, Michael Clemans, on

3    October 7th, 2013, arrived in the country of Laos, right?

4    A.   I believe so based on the stamp, sir.

5    Q.   And then the next day, October 8th, he left, right?

6    A.   Yes, sir.

7    Q.   And if we -- can you publish page 7, please, of the same

8    exhibit.  Thank you very much.

9         This is page 7 of the same passport, isn't it, sir?

10   A.   Yes, sir.

11   Q.   And if you look at the purple stamp on the left-hand page,

12   that's another country stamp, isn't it?

13   A.   Yes, sir.

14   Q.   And that's a country stamp for the country of Thailand,

15   right?

16   A.   Correct, sir.

17   Q.   And we just discovered in looking at page 4 that Mr. Clemans

18   departed Laos on October the 8th, right?

19   A.   Yes, sir.

20   Q.   And it appears from this stamp that on October the 8th, that

21   same day, he arrived back in Thailand, right?

22   A.   Yes, sir.

23   Q.   I'll pass the witness.  Thank you, sir.

24   A.   Thank you.

25              THE COURT:  Any redirect?

```
1              MR. ESPINOSA:  No redirect, Your Honor.

2              THE COURT:  Thank you very much for being here.  You

3      are excused.  You may call your next witness.

4              MS. KENNEDY:  Government calls Nate Sanger, Your

5      Honor.

6         (Government witness, NATHAN MARK SANGER, sworn in.)

7              THE CLERK:  Please state your full name and spell your

8      last name for the record.

9              THE WITNESS:  Nathan Mark Sanger.  Nathan is

10     N-a-t-h-a-n.  Mark is M-a-r-k.  Sanger is S-a-n-g-e-r.

11                        DIRECT EXAMINATION

12     BY MS. KENNEDY:

13     Q.  Morning, Mr. Sanger.

14     A.  Good morning.

15     Q.  Where do you work?

16     A.  I work for International Justice Mission in the Philippines.

17     Q.  What type of work does that organization do in the

18     Philippines?

19     A.  We're a human rights organization, and in the Philippines we

20     focus on partnering with local law enforcement on sex

21     trafficking case work.

22     Q.  How long have you worked for that organization?

23     A.  Since 2012.

24     Q.  And have you been in the Philippines that entire time?

25     A.  Since December of 2012 I have been.
```

1    Q.  What's your current position with International Justice

2    Mission?

3    A.  I'm the director of investigation and law enforcement

4    development for the Philippines offices.

5    Q.  What type of work does that entail?

6    A.  It entails assisting with investigations along with

7    identifying the structural needs of Philippine law enforcement

8    and then advocating through Congress and other entities to

9    obtain those needs.

10   Q.  In that position, what type of law enforcement efforts do

11   you focus on specifically?

12   A.  We focus on partnering with units that are involved in

13   combatting sex trafficking in the Philippines.

14   Q.  Was the work that you do any different back in November of

15   2015?

16   A.  It was.  We had a slight change.  So in -- when I first got

17   there, 2012, and still in 2015, we were focusing on traditional

18   sex trafficking case work, which is, to say, the trafficking

19   that happens in the bars and on the streets.

20      In 2016, we made a change to primarily focusing on online

21   sexual exploitation of children, which still generally falls

22   under sex trafficking laws in the Philippines.

23   Q.  Focusing back on October and November of 2015, how did the

24   type of work that you do specifically differ, if at all, from

25   what you do today?

1    A.  So the primary difference is we're dealing with

2    facilitators, so those facilitators in the Philippines producing

3    child explicit images and material and sending them to customers

4    abroad; whereas, in the past we were dealing with facilitators

5    in a bar or on the street for in-person meetings.

6    Q.  In the fall of 2015 and in the winter of 2015, were you

7    involved at all in investigations in any field office of

8    International Justice Mission?

9    A.  Yes.  In two separate offices, both our Manila field office

10   and our Pampanga field office.

11   Q.  During that work, did you work in tandem with Philippine law

12   enforcement?

13   A.  I did.

14   Q.  Did you sometimes participate in undercover operations with

15   Philippine law enforcement?

16   A.  Yes.

17   Q.  At some point in 2015 did you become involved in an

18   investigation related to Michael Clemans?

19   A.  I did in October of 2015.

20   Q.  How did you become involved in that investigation?

21   A.  I was invited to a meeting with the FBI and Ron Aguto.  Ron

22   Aguto worked for the National Bureau of Investigation in the

23   Philippines.  He was in charge of the cybercrime division.

24   Q.  And was there any particular suspect in the Philippines that

25   was the target of that investigation?

1   A.   Yes.  Michael Clemans -- or, sorry -- in the Philippines,

2   Lyan Tandeg.

3   Q.   What was the purpose of the operation that you were

4   discussing?

5   A.   We were targeting the Filipino side of the overall

6   investigation, which was Miss Tandeg.

7   Q.   What did you hope to achieve with that operation?

8   A.   We hoped to obtain images that she had previously sent to

9   Mr. Clemans along with establish violations of the law in the

10  Philippines against her.

11  Q.   What was your role in that operation?

12  A.   I was the undercover operative for the National Bureau of

13  Investigation.

14  Q.   What did you do in that role as an undercover operative?

15  A.   I contacted Miss Tandeg first by e-mail and then by cell

16  phone, and then I eventually met with her in person.

17  Q.   When you were communicating with Tandeg, did you reveal your

18  true identity or did you adopt a different identity?

19  A.   I adopted a different identity.  Identity of Scott that was

20  established by the FBI.

21  Q.   Who was Scott in this undercover identity?

22  A.   He was a friend of Mr. Clemans.

23  Q.   Did you begin these undercover communications with Tandeg or

24  had someone else already begun them?

25  A.   The FBI had already begun the communication.

1   Q.  Do you recall the date you began communicating with Tandeg?

2   A.  November 3rd, 2015.

3   Q.  And you mentioned a meeting.  Can you tell us how that

4   unfolded in the operation?

5   A.  Yes.  I met with Miss Tandeg at a Starbucks located in a

6   mall called SM Clark in Angeles City, Pampanga.  I had arranged

7   to meet with her through text messages.  She was going to bring

8   me a USB drive with explicit images of children along with

9   Angel, which is one of the identified victims, and a second

10  unidentified victim.

11      On that date, I arrived before her.  I texted her that I was

12  in the Starbucks.  About ten minutes later there was two

13  Filipino females loitering outside of the Starbucks.  I

14  recognized that that was Lyan.  So I met with them there.  She

15  introduced Shellina Atad to me.

16          THE COURT:  Stop there.  We're getting into a

17  narrative.  Ask another question.

18  Q.  BY MS. KENNEDY:  Mr. Sanger, what date did that meeting take

19  place at the Starbucks?

20  A.  November 4th, 2015.

21  Q.  Would you please open the binder that's sitting in front of

22  you there and turn to Exhibit 88.

23  A.  Okay.

24  Q.  Do you recognize the person in this photograph?

25  A.  I do.  That's Lyan Tandeg.

1   Q.  Is this a true and accurate depiction of Tandeg as she

2   appeared to you in November of 2015?

3   A.  It is.

4          MS. KENNEDY:  Move to admit Exhibit 88, Your Honor.

5          THE COURT:  Any objection?

6          MR. OLMOS:  No, Your Honor.

7          THE COURT:  It's admitted.  You can publish if you

8   want.

9      (Government Exhibit 88 admitted into evidence.)

10  Q.  BY MS. KENNEDY:  Please publish Exhibit 88, please.

11     Could you please turn to Exhibit 89 in the binder in front

12  of you.

13  A.  Okay.

14  Q.  Do you recognize the person in that photograph?

15  A.  Yes.  That's Shellina Atad.

16  Q.  Is that a true and accurate depiction of Atad as she

17  appeared to you in November of 2015?

18  A.  It is.

19          MS. KENNEDY:  Government moves to admit Exhibit 89.

20          THE COURT:  Any objection?

21          MR. OLMOS:  No, Your Honor.

22          THE COURT:  Admitted.  You can publish.

23     (Government Exhibit 89 admitted into evidence.)

24  Q.  BY MS. KENNEDY:  Did Tandeg and Atad bring anyone else with

25  them to the meeting that day?

1    A.   They did.

2    Q.   Who did they bring?

3    A.   Angel.

4    Q.   Was Angel with them when they first arrived at the

5    Starbucks, or did she come later?

6    A.   She came later.

7    Q.   Did she come on her own, or did someone go and retrieve her?

8    A.   Lyan Tandeg went and retrieved her.

9    Q.   Do you know where Angel was when Tandeg went to get her?

10   A.   I know the area she was but not specifically.

11   Q.   How long did it take Tandeg to retrieve Angel?

12   A.   About a minute.

13   Q.   It appeared to you that Angel was very nearby?

14   A.   Yes.  It appeared to me that she was very close.

15   Q.   What happened next?

16   A.   I purchased -- actually, I gave money for Shellina to

17   purchase food for Angel.  I had a conversation with Lyan while

18   they were purchasing food.  And when they came back, we moved to

19   the undercover vehicle that I was in.

20   Q.   Who suggested moving to the vehicle?

21   A.   I did.

22   Q.   Without telling us what you said, who suggested moving to

23   the vehicle?

24   A.   I did.

25   Q.   Was there a reason you wanted to do that?

1    A.   Yes.   In the Philippines, under Philippine law, for them to

2    make a custodial arrest, the Philippine law enforcer needs to

3    have first-hand knowledge of an ongoing crime, and so I wanted

4    to move her to that vehicle because my driver was an undercover

5    NBI agent, and so he needed to observe and hear any violations

6    of the law that I might see.

7    Q.   Did you get into the car?

8    A.   I did.

9    Q.   Who else got in the car with you?

10   A.   I got into the front passenger seat, Lyan, Shellina and

11   Angel all got into the back seat of the car.

12   Q.   What happened after that?

13   A.   Lyan handed me a USB drive.  I put it into the computer that

14   was provided by NBI.  I opened the drive.  There was a folder

15   with several sub-folders.  I clicked on the first folder and saw

16   pictures of Angel posing clothed, fully clothed.  The second

17   photo I got to was her in her panties.  I clicked on another

18   photo, and it was Angel, and she was fully exposed.  Her vagina

19   was exposed.

20   Q.   In the course of your duties at International Justice

21   Mission, have you ever seen images of child pornography before?

22   A.   Yes.

23   Q.   Were there any images in the folder structure you described

24   that you would describe as child pornography?

25   A.   Yes.

1    Q.  Could you tell how many images there were?

2    A.  No.  When I got to the image, I just described I shut the

3    computer and moved on.

4    Q.  And in the course of your work, do you regularly handle

5    investigations involving young girls of various ages?

6    A.  Yes.

7    Q.  Based on your experience, could you tell the approximate age

8    of the girl in the images you were looking at?

9    A.  Less than 10 years old.

10    Q.  What happened after you looked at those images?

11    A.  I began to talk about the reason for our meeting beyond

12    those images --

13              THE COURT:  Mr. Sanger, sorry to interrupt.  Just so

14    I'm clear, and the jury is clear, the images that you were

15    looking at, were they images of the girl that they identified as

16    Angel?

17              THE WITNESS:  Yes.

18              THE COURT:  So the girl in the car?

19              THE WITNESS:  Yes, I believed them to be, yes.

20              THE COURT:  Go ahead.

21    Q.  BY MS. KENNEDY:  Did it appear to you that the girl in the

22    images was the same as the girl that Tandeg and Atad had brought

23    with them to the meeting?

24    A.  Yes.  And I believe, if I remember correctly, the folder was

25    actually labeled "Angel."

1    Q.   Based on your experience, did you have any opinion as to how

2    old the girl was that Tandeg and Atad brought with them to the

3    meeting?

4    A.   Yes.  I believe she was less than 10 years old.

5    Q.   What happened next?

6    A.   I asked them what I could do with Angel.

7    Q.   Without saying anything that anyone said, what happened next

8    in the course of the operation?

9    A.   After I established what I could and couldn't do with Angel,

10   I paid them for the USB drive along with what they told me I

11   could do with Angel.

12       And then the NBI agent sitting next to me gave the good buy

13   signal indicating the arrest team to come in.  As they came in,

14   I left the vehicle and moved away from that scene.

15   Q.   Do you know what happened to the thumb drive with the images

16   on it?

17   A.   It was left in the vehicle with Agent Chris Paz.

18   Q.   That's the NBI agent, is that right?

19   A.   Correct.

20   Q.   Do you know what happened to Angel at the end of the

21   operation?

22   A.   I do.  Our after-care team and legal team, along with DSWD,

23   which is basically CPS of the Philippines, entered the crime

24   scene.  They removed Angel, put a shawl over her shoulders, and

25   took her to a separate van, while Lyan and Shellina were

1   escorted to a separate arrest vehicle.

2   Q.  What did you do with the phone that you had been using to

3   exchange text messages with Tandeg?

4   A.  I gave it to NBI.

5   Q.  Did you later try to obtain copies of your text messages

6   with Tandeg?

7   A.  I did.  Myself and my organization attempted to get the cell

8   phone along with text messages.

9   Q.  Were you successful in doing that?

10  A.  We were not.

11  Q.  Did you make any recording of your meeting with Tandeg and

12  Atad?

13  A.  I did.  I had an undercover camera operating while I met

14  with them.

15  Q.  Was it both an audio and video recording?

16  A.  Yes, it was.

17  Q.  Have you had an opportunity to review that recording since

18  the meeting took place in November 2015?

19  A.  Yes, I have.

20  Q.  Could you please open the binder in front of you and turn to

21  Exhibit 90.  Do you recognize this image?

22  A.  I do.

23  Q.  What is this?

24  A.  Images from us walking from that Starbucks to my undercover

25  vehicle.  You can see Shellina Atad is closest to me, and then

 1  Lyan Tandeg, followed by Angel.

 2  Q.  Does this appear to be a still of the recording you made on

 3  that day?

 4  A.  It does.

 5  Q.  Is this a fair and accurate representation of that portion

 6  of the meeting as captured in your recording?

 7  A.  It is.

 8          MS. KENNEDY:  Government moves to admit Exhibit 90.

 9          THE COURT:  Just one photo, right?

10          MS. KENNEDY:  That's right.

11          THE COURT:  Any objection?

12          MR. OLMOS:  No, Your Honor.

13          THE COURT:  Admitted.  You can publish.

14      (Government Exhibit 90 admitted into evidence.)

15  Q.  BY MS. KENNEDY:  And just to assist the jury in looking at

16  this, can you please, again, point out who the individuals are

17  in the photo?

18  A.  Yes.  The person on the front right side of the photo is

19  Shellina Atad; in the middle, the adult is Lyan Tandeg; and in

20  the back, the child is Angel.

21  Q.  Please open the binder -- or you have the binder open -- and

22  turn to Exhibit 91, please.  Do you recognize that image?

23  A.  I do.

24  Q.  Does that appear to be another still image from the

25  recording you made?

1    A.   It does.

2    Q.   Is this a fair and accurate representation of that meeting

3    as captured in your recording?

4    A.   It is.

5              MS. KENNEDY:  Government moves to admit Exhibit 91.

6              THE COURT:  Any objection?

7              MR. OLMOS:  No, Your Honor.

8              THE COURT:  Admitted.  You can publish.

9         (Government Exhibit 91 admitted into evidence.)

10   Q.   BY MS. KENNEDY:  Do you recognize the people depicted in

11   this image?

12   A.   I do.  The one closest is Lyan Tandeg, and the child behind

13   her is Angel.

14   Q.   What portion of your meeting is shown here?

15   A.   This is as we're entering the undercover car.  So just --

16   the car is to my right -- or the camera is right, and that's

17   where we're walking toward.

18             MS. KENNEDY:  Nothing further.

19             THE COURT:  Cross-examination.

20             MR. OLMOS:  Thank you, Your Honor.

21                       CROSS-EXAMINATION

22   BY MR. OLMOS:

23   Q.   Morning, Mr. Sanger.

24   A.   Good morning, sir.

25   Q.   My name is Daniel Olmos.  I'm Mr. Clemans's attorney.

1           When was the first time you became aware of my client?

2      A.   In October of 2015.

3      Q.   It was your understanding that the FBI had -- well, strike

4      that.

5           You became aware of my client through the FBI, is that

6      correct?

7      A.   That's correct.

8      Q.   Now, when they -- was it your understanding that prior to

9      October that the FBI had been in contact, direct contact with

10     Miss Tandeg?

11     A.   That's my understanding, yes.

12     Q.   Okay.  And can you describe your understanding of how the

13     FBI had been in contact directly with Miss Tandeg?

14     A.   My understanding is that they had done an account takeover,

15     and that they were attempting to locate where Miss Tandeg

16     actually resided.

17     Q.   When you say "an account takeover," what do you mean, sir?

18     A.   I mean that they had voluntarily gotten Mr. Clemans's

19     account information, that he had agreed to allow them to pose as

20     him.

21     Q.   And it was through that -- your understanding was that it

22     was through that that the FBI was able to locate Miss Tandeg, is

23     that right?

24     A.   It was through that and introducing a second undercover from

25     that account to locating Miss Tandeg.

1    Q.   And the second undercover was this Scott person, right?

2    A.   Correct.

3    Q.   And that was what you were doing in your capacity as a

4    worker in the -- an NGO worker in the Philippines, right?

5    A.   Yes.

6    Q.   But preceding that, the FBI had located Miss Tandeg through

7    the use of that online identity, right, that was your

8    understanding?

9    A.   They had located her online identity but not her physical

10   location.

11   Q.   Okay.  And how did they locate her physical -- how was her

12   physical location identified?

13   A.   Through the meeting on November 4th.

14   Q.   Which you set up through Scott, right?

15   A.   Correct.

16   Q.   Now, do you have an understanding of prior to your knowledge

17   of Mr. Clemans in October of 2015 how long the FBI had been

18   communicating with Miss Tandeg?

19   A.   Prior to my contact with Miss Tandeg I read the e-mails, but

20   I don't remember how long they were communicating.

21   Q.   Okay.  But before you were involved in the case, right?

22   A.   Correct.

23   Q.   Okay.  And through your investigation, Mr. Sanger, what was

24   your understanding of the relationship between Miss Atad and

25   Angel?

1    A.   Can you ask me that one more time?

2    Q.   Sure.  Through your investigation back in 2015, what was

3    your understanding of the relationship between Miss Atad,

4    Miss Tandeg's accomplice, and Angel?

5    A.   Through my investigation, what I was told by Miss Atad was

6    that she was the cook at the facility that Angel and the other

7    girls were from, and she told me Lyan was the one --

8    Q.   I'm asking -- I don't want to ask -- I would like to move to

9    strike, Your Honor.

10       I'm not asking for what anybody told you.  I'm asking what

11   your understanding was.  Can you just characterize it that way?

12            THE COURT:  Answer will be stricken.  Jury will

13   disregard.  Just give us your understanding.

14            THE WITNESS:  My understanding was that she was the

15   cook at the facility that Angel was from at the time of the

16   meeting, but we could never confirm that any facility existed.

17   Q.   BY MR. OLMOS:  But you understood that there was some

18   pre-existing relationship, personal relationship between Angel

19   and Miss Atad, right?

20   A.   Correct.

21            MR. OLMOS:  Thank you for the important work you do,

22   sir.  I have no further questions, Your Honor.

23            THE COURT:  Redirect?

24            THE WITNESS:  Thank you.

25                      REDIRECT EXAMINATION

1   BY MS. KENNEDY:

2   Q.  Mr. Sanger, just to be clear, you just said that you

3   understood there was some sort of personal relationship between

4   Angel and Atad.

5       Are you referring to Atad's status as a cook at this

6   supposed facility or something more than that?

7   A.  No.  I'm referring to her access to Angel through the

8   facility.

9   Q.  Do you have any personal knowledge about what Atad's

10  specific relationship was with Angel?

11  A.  No.  Not specific.

12          MS. KENNEDY:  Thank you.

13          THE COURT:  Anything further?

14          MR. OLMOS:  No, Your Honor.

15          THE COURT:  Thank you very much for being here.

16  Appreciate you coming.  We'll take a morning recess at this

17  time.  During this break and all breaks please do not discuss

18  the case among yourselves, don't discuss the case with anyone.

19  Any violation of these admonitions should be reported to the

20  Court.  And also do not do any independent investigation of

21  anything involved with this case.  We'll come back at 10:45 a.m.

22      (Jury out.  10:33 a.m.)

23          THE COURT:  Outside the presence of the jury.  Just

24  real quick, Mr. Espinosa and Ms. Kennedy.  Mr. Espinosa you used

25  first names in your opening.  Would you prefer to use first --

1    just have the child witnesses use their first name?  I mean,

2    which one is Angel, which initial?  Is she M.Q., J.U. or E.S.?

3              MR. ESPINOSA:  Angel is M.Q.  These are names that --

4    although the word Angel appears in M.Q.'s full name.  It's not

5    her name.  It's the name that Clemans and Tandeg were using.

6              THE COURT:  Wouldn't it be easier to identify her, at

7    least to the jury, just have her identify herself as Angel?

8              MS. KENNEDY:  It likely would be.  We were just going

9    to avoid using names at all during our direct of the minors.

10             THE COURT:  Except they were used in opening so

11   probably be easier to avoid confusion.

12             MS. KENNEDY:  The other two names I would note for

13   Your Honor, Nicole and Ishin, that Mr. Espinosa mentioned, are

14   not those two victims' real names in any sense.  They are just

15   fake names.

16             THE COURT:  Would they testify that they recognize

17   that that's their fake name?

18             MS. KENNEDY:  They do not know those names, Your

19   Honor.

20             THE COURT:  What Mr. Vine is going to do is use the

21   oath that we discussed.  And then thinking this through, I would

22   ask them just to -- or maybe I'll have you have them just state

23   -- what do you want them to do, just state their initial or --

24             MS. KENNEDY:  We were planning to have them -- we

25   talked to Mr. Vine yesterday about them signing their names

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

1    instead of saying anything out loud.  That's what we've

2    instructed them.

3            THE COURT:  Well, are they going to sign in English?

4    That's a funny question but --

5            MS. KENNEDY:  I believe that they use the same

6    characters that we use here so their name would be legible for

7    the Court.

8            THE COURT:  How about we just stipulate as to -- which

9    order are you calling them in?

10           MS. KENNEDY:  J.U. will be first, followed by E.S.,

11   followed by M.Q.

12           THE COURT:  J.U., then E.S., and then M.Q.?

13           MS. KENNEDY:  Yes.

14           THE COURT:  Then I think what I'll do, after Mr. Vine

15   swears in the witness, we will ask the parties to stipulate that

16   this witness will be identified throughout as J.U.  Okay?

17           MR. ESPINOSA:  That's appropriate.

18           THE COURT:  Is that agreeable, Mr. Olmos?

19           MR. OLMOS:  Absolutely.

20           MR. ESPINOSA:  Your Honor, we may be able to work out

21   a broader stipulation for later that just identifies who is who.

22   M.Q. equals Nicole, etc.

23           THE COURT:  Or you can do it through questioning.  Who

24   is your next witness?

25           MS. KENNEDY:  Next witness will be J.U.

```
 1              THE COURT:  The child witness.  Okay.  So when the

 2    jury returns, then I'll explain to them what's going to go on

 3    with the support person and the interpreter.

 4         Is the interpreter here?

 5              MS. KENNEDY:  They are out in the hallway.

 6              THE COURT:  We'll try to find a chair, and we will try

 7    to get this set up.  See you at 10:45 a.m.

 8         (Break taken.  10:37 a.m. - 10:50 a.m.)

 9         (Jury in.  10:57 a.m.)

10              THE COURT:  All right.  All jurors are present.  All

11    parties are present.

12         Ladies and gentlemen, the next three witnesses will be the

13    three minor children that the lawyers talked to you about in

14    their opening statements.  Because we set up courtrooms for

15    child witnesses a little differently, just so you're clear, each

16    child is going to use an interpreter.

17         So this is the interpreter.  Ma'am, will you introduce

18    yourself, please.

19              THE INTERPRETER:  Good morning.  My name is Nancy

20    Klement, and I am one of the interpreters.  And my main -- there

21    is two dialects, Tagalog, which is the main language in the

22    Philippines, and Pampango, which is my dialect and the dialect

23    of the child as well.

24              THE COURT:  So she will be interpreting the child's

25    answers from the child's native language into English.  We will
```

1    identify each child only by initials.  So this child will be

2    identified as J.U., correct?

3              MS. KENNEDY:  That's right.

4              THE COURT:  And then there's -- with each child the

5    Court always allows a support person.  So the person sitting

6    next to the witness stand is a support person for the child.

7    Okay.  Mr. Vine, you may swear in our next witness.

8              THE CLERK:  Do you promise that everything that you

9    say or tell us in court will be the truth?

10             THE WITNESS:  Yes, sir.

11        (Government witness, **J.U.**, sworn in.)

12             THE COURT:  Okay.  And if the interpreter would make

13   sure you keep that mic close to you.  Ms. Kennedy, go ahead.

14        The other thing.  I'm allowing the lawyers to -- normally I

15   require them to stay at the stand, but, again, with witnesses

16   who are children, I'll allow the lawyers to come in a little

17   further.  If, again, we can't hear the lawyers' questions, if

18   the court reporter can't hear, we'll have you use a hand mic,

19   too.

20                       DIRECT EXAMINATION

21   BY MS. KENNEDY:

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  Can you tell us how old you are now?

25   A.  I'm 13 years old.

1    Q.  Thank you.  Is this your mom who is here with you today?

2    A.  Yes, ma'am.

3    Q.  Where do you live?

4          THE COURT:  I'm sorry.  I'm actually having a hard

5    time hearing.  I think the jury may have a hard time hearing

6    your questions.

7       Do you have another hand mic, Mr. Vine?  It's on the stand.

8    Thank you so much.

9    Q.  BY MS. KENNEDY:  Where do you live?

10         THE COURT:  Ask that question again.

11   Q.  BY MS. KENNEDY:  Where do you live?

12   A.  I live in Tarlac, which is another town.

13   Q.  Where is Tarlac?  What country is that in?

14   A.  Philippines.

15   Q.  Have you ever been to America before?

16   A.  It's my first time, ma'am.

17   Q.  Have you ever been on an airplane before you came here for

18   your testimony today?

19   A.  This is my first time.

20   Q.  Are you a little bit nervous to testify today?

21   A.  Yes, ma'am.

22   Q.  You told us you were 13 years old.  Can you tell us your

23   birth date?

24   A.  March 31st, 2004.

25   Q.  Thank you.  I'm going to show you a document.  For the

 1   record, this has been marked as Government's Exhibit 96.  I'm

 2   going to hand this to you.

 3       Can you take a look at that and tell me if you recognize

 4   that?

 5   A.  Birth certificate.

 6   Q.  Thank you.  Does that look like an accurate copy of your

 7   birth certificate as you know it?

 8   A.  Yes, ma'am.

 9           MS. KENNEDY:  Your Honor, Government moves to admit

10   Exhibit 96 as a -- pursuant to stipulation of the parties.

11           THE COURT:  Hopefully -- my copy actually has the

12   name.

13           MS. KENNEDY:  It's redacted.

14           THE COURT:  It is redacted?

15           MS. KENNEDY:  Yes.

16           THE COURT:  With the redaction, 96 will be admitted.

17       (Government Exhibit 96 admitted into evidence.)

18   Q.  BY MS. KENNEDY:  Can we please publish Exhibit 96.

19       Do you see that this birth certificate shows your birthday

20   as March 31, 2004?

21   A.  Yes, ma'am.

22   Q.  Thank you.  Do you know what you are here to testify about

23   today?

24   A.  Yes, ma'am.

25   Q.  What is that?  Can you tell us?

Direct Examination

1    A.  I'm here to tell what happened to us.

2    Q.  Did you have some pictures that were taken of you that the

3    authorities have asked you some questions about?

4    A.  Yes, ma'am.

5    Q.  Were some of those pictures taken when you didn't have any

6    clothes on?

7    A.  Yes, ma'am.

8    Q.  How many times did this happen to you?

9    A.  One time.

10   Q.  How old were you when that happened?

11   A.  I was 11 years old.

12   Q.  Who took pictures of you when you didn't have any clothes

13   on?

14   A.  It's Auntie -- means an older sister -- Auntie Lyan.  That's

15   the same.

16   Q.  Who was it who first came to you and asked you to take

17   pictures?

18   A.  Auntie Lyan.  Lyan is the first person.

19   Q.  Was there anyone who came to you first, before the pictures

20   were taken, to ask you to come with her to take pictures?

21   A.  Yes, ma'am.

22   Q.  Who was that?

23   A.  Auntie Sheila.

24   Q.  Did you know Lyan before these pictures were taken?

25   A.  No, ma'am.

1    Q.  Did you know Sheila before these pictures were taken?

2    A.  Yes, ma'am.

3    Q.  How did you know Sheila?

4    A.  The brother of my mom was the husband of Sheila.

5    Q.  Did you ever spend any time alone with Sheila before these

6    pictures were taken?

7    A.  No, ma'am.

8    Q.  Where were you when Sheila first came to talk to you about

9    pictures?

10   A.  We were at my grandmother's house.

11   Q.  Was anyone there with you?

12   A.  Yes, ma'am.

13   Q.  Who was that?

14   A.  Mary Angel.

15           THE COURT:  Who?  I'm sorry?  What was the answer?

16           THE INTERPRETER:  Mary Angel.

17           THE COURT:  Okay.

18   Q.  BY MS. KENNEDY:  What were you and Mary Angel doing when

19   Sheila came?

20   A.  We were playing.

21   Q.  Are you related to Mary Angel?

22   A.  No.  We're not.  We're just friends.

23   Q.  When Sheila came to you, did she come to talk to just you or

24   to you and Mary Angel?

25   A.  She was talking to Angel first.

1  Q.  At some point did she talk to you?

2  A.  Angel ask for her to go with them because they were going to

3  go to --

4         THE INTERPRETER:  Sorry.  Let me ask her --

5     Angel ask her if she wants to come because they're doing

6  pictorials.  They're going to do pictorials.

7  Q.  BY MS. KENNEDY:  Did anyone say to you anything more about

8  what these pictorials were?

9  A.  Nothing more.

10  Q.  Did you hear what Sheila said to Angel when she was talking

11  to her?

12  A.  No, I did not.

13  Q.  Do you know whether Sheila talked to your mom or anyone else

14  in your family?

15  A.  No.

16  Q.  What happened after that?

17  A.  She went and -- I went and got clothes for the pictorial.

18  Q.  Did anyone ask you to get clothes?

19         THE INTERPRETER:  I'm sorry, counsel?

20  Q.  BY MS. KENNEDY:  Did anyone ask you to get clothes?

21  A.  No.  Nobody told me.  I was just, you know, to go.

22  Q.  What happened after you went and got clothes?

23  A.  After I got my clothes, I went and told my mom and then we

24  left.

25  Q.  What did you say to your mom?

1   A.  I told my mom that we're going to go and take some pictures,

2   and then my mom said, "no, don't go," and then she said,

3   "please, can I go?" because Sheila will be there anyway.

4   Q.  Was anyone else -- well, you said that you left after you

5   got clothes.  Who was with you when you left?

6   A.  Okay.  I left with Sheila and Angel and the mom of Mary

7   Angel, and then we got dropped off at one place.

8   Q.  You said with Sheila and Angel and with Angel's mother, is

9   that what you said?

10  A.  They were in the beginning, but then the mother of Mary

11  Angel got drop off, and Mary Angel's brother, both of them got

12  dropped off to sapa sagala (phonetic), which is a river.  Sapa

13  is a river.

14  Q.  And then who continued on after those people were dropped

15  off?

16  A.  Correction.  I'm sorry.  One of the child was the child of

17  Sheila.  So it was Mary Angel's mom, and one of the child of

18  Sheila that got drop off.

19  Q.  After they were dropped off, then what happened?

20  A.  So we just went on to our little trip, and then we got into

21  the house of Lyan.

22  Q.  Who was on that little trip with you?

23  A.  It was Auntie Sheila, myself, and Mary Angel.

24  Q.  You said you went to the house of Lyan, is that right?

25  A.  Yes, ma'am.

1   Q.   How did you get there?

2   A.   We got into a jeepney, a public transportation.

3   Q.   Do you know who paid for the jeepney?

4   A.   Tita Sheila paid.

5   Q.   Had you ever been to Lyan's house before?

6   A.   It was my first time.

7   Q.   Did you know where Lyan's house was?

8   A.   No, I don't know.

9   Q.   Do you know whether it was close to your house or far away

10  from your house?

11  A.   It's far.

12  Q.   What happened when you got to Lyan's house?

13  A.   When we got to Sheila and Lyan's house, they talk for a

14  little bit, and then they told us to go downstairs with our

15  clothes on -- with clothes on, and then we were told to take our

16  clothes off, with just underwear on, and then take the picture,

17  and after that they told us to remove our underwear as well.

18  Q.   When you got to Lyan's house, was there anyone else there?

19  A.   There were two other people.  One of them was a relative

20  of --

21          THE INTERPRETER:  I don't know.  Let me ask.  Let me

22  clarify because she said --

23          THE COURT:  No.  Just clarify.

24          THE WITNESS:  Lyan's sister.  And there were two

25  people.  One of them was Lyan's sister and another person.  They

1    were by the door outside.

2    Q.  BY MS. KENNEDY:  Had you ever seen either of those people

3    before that day?

4    A.  No, I haven't.

5    Q.  You said that they were taking your picture.  Who was taking

6    your picture, who was it who had the camera?

7    A.  Lyan took the pictures.

8    Q.  What was Sheila doing while Lyan was taking pictures?

9    A.  She was directing us.  She was telling us what to do.

10   Q.  Was she telling you how to pose?

11   A.  Yes, ma'am.

12   Q.  Was Lyan saying anything while this was happening?

13   A.  No.  No.

14   Q.  You said that you were downstairs in the house.  Were you

15   downstairs the entire time, or did you go to other places in

16   Lyan's house?

17   A.  After that, we went upstairs, and we went to Lyan's bedroom.

18   Q.  Is that when they asked you to take your clothes off?

19   A.  We didn't have any clothes on.  When we started downstairs

20   up to upstairs, we didn't have any clothes on.

21   Q.  Thank you.  Did Lyan, or Sheila, or anyone else there tell

22   you why they were taking these pictures of you?

23   A.  No, they did not.

24   Q.  When Sheila was instructing you, can you tell us what kinds

25   of things was she saying?

1    A.  She told us to pose while naked, and for me and Angel to

2    pose while naked.

3    Q.  Was Angel with you the whole time that you were at Lyan's

4    house?

5    A.  Yes, ma'am.

6    Q.  Was Sheila saying the same things to you and Angel, or was

7    she telling you to do different things?

8    A.  When we were asked to pose, we were always together doing

9    the posing.  No different.

10   Q.  Did Sheila ask you and Angel to touch each other?

11          THE INTERPRETER:  I'm sorry, counsel, what was that?

12   Q.  BY MS. KENNEDY:  Did Sheila ask you and Angel to touch each

13   other?

14   A.  Yes, ma'am.

15   Q.  Can you tell us what she asked you to do?

16          THE INTERPRETER:  She's a little bit shy.  She's

17   embarrassed.

18   Q.  BY MS. KENNEDY:  I understand.  Would it be helpful for you

19   if you had one or two dolls to show us what happened?

20   A.  Yes, ma'am.  Yes.

21   Q.  Would you like to use one or would you like to use two?

22   A.  Two.

23          THE COURT:  Do you need water or anything?

24          MS. KENNEDY:  May the record reflect I'm handing two

25   dolls to the witness.

1          THE COURT:  The record will so reflect.  With a child

2    witness, also, I'll give you leeway in terms of leading.  I know

3    you're very careful and appreciate your direct examination so

4    far, but if you want to sort of direct a little.  That's fine.

5          MS. KENNEDY:  Thank you, Your Honor.  I appreciate

6    that.

7    Q.  BY MS. KENNEDY:  I know that this is a little bit

8    embarrassing for you, and it's hard to do, but could you try to

9    show us on these dolls how Sheila was asking you and Angel to

10   pose together?

11   A.  Yes, ma'am, okay.

12         THE INTERPRETER:  Did you want her to put it over

13   here?

14         MS. KENNEDY:  However is easiest for her to show.

15         THE INTERPRETER:  She start undressing one of the

16   dolls.

17         MS. KENNEDY:  It's okay.  You don't need to take off

18   the dresses.  We understand that you were naked at that time.

19         THE COURT:  Ask her the question again as to what you

20   want her to demonstrate.

21         THE INTERPRETER:  She's --

22   Q.  BY MS. KENNEDY:  If you can, just please show us, using the

23   dolls, how Sheila asked you and Angel to pose?

24   A.  (Indicating.)  I'm having a little tough time.

25   Q.  BY MS. KENNEDY:  I understand.  Why don't I ask you.  Can

Direct Examination

1    you tell us, did Sheila ask you and Angel to spread your legs?

2    A.  Yes, ma'am.

3    Q.  Did she ask you to touch yourself between your legs?

4    A.  When she spread her legs, Angel was told to come near her

5    private part.  So near but not touching.  But Angel was down

6    there.

7    Q.  Thank you.  Did Sheila ask you to put anything on your body?

8    A.  Yes, ma'am.

9    Q.  What was that?

10   A.  We were given oil to apply to each other's body.  Me and

11   Angel.

12   Q.  Did she tell anything about what faces to make while the

13   pictures were being taken?

14   A.  No, ma'am.

15   Q.  While you were at Lyan's house, did anyone ever offer to let

16   you use the phone to call your mom or anyone?

17   A.  No.  We were not.

18   Q.  Did you feel like you could have called your mom if you

19   wanted to?

20   A.  I don't think so.

21   Q.  If you had been able to leave the house, would you have

22   known how to get home from Lyan's house?

23   A.  Yes.

24   Q.  What happened after the photo shoots were all done?

25   A.  Okay.  When we were done, we were asked to get dressed.  And

1    when we were on our way out, I saw that Lyan gave an envelope to

2    Sheila with lots of cash, like 500 pesos or something, a whole

3    bunch, cash.

4    Q.  Did Sheila give you any money?

5    A.  Yes, ma'am.

6    Q.  How much did she give you?

7    A.  300.

8         THE COURT:  300 what?

9         THE INTERPRETER:  Pesos.

10   Q.  BY MS. KENNEDY:  While your pictures were being taken, did

11   Lyan or Sheila ever tell you that you could leave if you wanted

12   to?

13   A.  No.  They did not.

14   Q.  Did you feel that you were free to leave Lyan's house if you

15   wanted to?

16        MR. OLMOS:  Objection.  Asked and answered.

17        THE COURT:  Overruled.

18        THE WITNESS:  I don't think so.

19   Q.  BY MS. KENNEDY:  Did Sheila or Lyan ever say anything to you

20   about whether you could tell anyone about these pictures being

21   taken?

22   A.  Yes.  They told us to not tell anyone.

23   Q.  How did you get home when you left Lyan's house?

24        THE INTERPRETER:  I'm sorry, counsel?

25   Q.  BY MS. KENNEDY:  How did you get home when you left Lyan's

1     house?

2     A.  Sheila took us home and drop us off to that little river and

3     then she took off.

4     Q.  Do you know whether Sheila ever gave any of your family

5     members any money?

6              MR. OLMOS:  Objection.  Lacks foundation.

7              THE COURT:  Sustained.  You don't have to answer that.

8     Q.  BY MS. KENNEDY:  Do you know what happened to the pictures

9     that Sheila and Lyan took of you?

10    A.  No, I don't know.

11    Q.  Did you ever see Lyan again after that day?

12    A.  No more.

13    Q.  I'm going to show you a few pictures now.  Okay.

14    A.  Yes, ma'am.

15             MS. KENNEDY:  Exhibit 88.

16    Q.  BY MS. KENNEDY:  Do you recognize this person?

17    A.  Yes, ma'am.

18    Q.  Who is that?

19    A.  Lyan.

20    Q.  Could you bring up Exhibit 89, please.  Do you recognize

21    that person?

22    A.  Yes, ma'am.

23    Q.  Who is that?

24    A.  That's Auntie Sheila.

25    Q.  Do you remember when you were interviewed about a year or so

```
1    ago about having your picture taken?

2              THE INTERPRETER:  She wants repeat.

3    Q.  BY MS. KENNEDY:  Yes.  Do you remember when you were

4    interviewed about a year or so ago about this time when your

5    pictures were taken?

6              THE COURT:  Change the word interview to something she

7    might understand.  A little easier.  Ask the question again.

8    Q.  BY MS. KENNEDY:  Do you remember when someone from the

9    authorities talked to you about a year ago about these pictures?

10   A.  Yes, ma'am.

11   Q.  And do you remember that they showed you some pictures of

12   yourself?

13   A.  Yes, ma'am.

14   Q.  Do you remember that we also showed you some of those

15   pictures yesterday?

16   A.  Yes, ma'am.

17   Q.  For the record I'm handing the witness what's been marked as

18   Government's Exhibit 33.  Do you recognize this picture?

19   A.  Yes, ma'am.

20   Q.  Who is that in the picture?

21   A.  Me.

22   Q.  Do you know where you are in that picture?

23   A.  Yes, ma'am.

24   Q.  Where were you then?

25   A.  At Lyan's house.
```

1   Q.  Does that look like an accurate picture of something that

2   you recall happening during that photo shoot with Lyan and

3   Sheila?

4   A.  Yes, ma'am.

5          MS. KENNEDY:  Move to admit Government's Exhibit 33,

6   Your Honor.

7          THE COURT:  Any objection?

8          MR. OLMOS:  No, Your Honor.

9          THE COURT:  33 is admitted.

10      (Government Exhibit 33 admitted into evidence.)

11  Q.  BY MS. KENNEDY:  Who took this picture of you?

12  A.  Yes, ma'am.

13  Q.  Who took this picture of you?

14  A.  Lyan.

15  Q.  And who directed you how to pose in this picture?

16  A.  Auntie Sheila.

17  Q.  I'm going to show you just one more picture, okay?

18  A.  Yes, ma'am.

19  Q.  Handing the witness what's been marked as Government's

20  Exhibit 32.  Do you recognize this picture?

21  A.  Yes, ma'am.

22  Q.  Who is that in the picture?

23  A.  Myself.

24  Q.  Where were you in this photo?

25  A.  Lyan's house.

```
1    Q.  Is that an accurate picture of what you recall happening

2    when you were at Lyan's house?

3    A.  Yes, ma'am.

4    Q.  Move to admit Exhibit 32, Your Honor?

5           THE COURT:  Objection?

6           MR. OLMOS:  No.

7           THE COURT:  32 is admitted.

8       (Government Exhibit 32 admitted into evidence.)

9    Q.  BY MS. KENNEDY:  Who took this picture of you?

10   A.  Also Lyan.

11   Q.  And who told you how to pose?

12   A.  Auntie Sheila.

13          MS. KENNEDY:  Thank you.  Nothing further, Your Honor.

14          THE COURT:  Any questions, Mr. Olmos?

15          MR. OLMOS:  Just a few, Your Honor.

16          THE COURT:  Okay.

17                      CROSS-EXAMINATION

18   BY MR. OLMOS:

19   Q.  I just have a few questions for you, okay?

20   A.  Yes, sir.

21   Q.  When you were 11 and these pictures were taken, who were you

22   living with?

23   A.  At our house, at our home.

24   Q.  And who lived there with you?

25   A.  My mom and dad.
```

1    Q.  And you had known Sheila your whole life, right?

2    A.  Only when she and my uncle married.

3    Q.  Do you remember when she married your uncle?

4    A.  No, I don't remember.

5    Q.  When your Auntie Sheila and Lyan took you away from your

6    house that day to take the pictures, do you remember was it the

7    morning or was it the afternoon?

8    A.  In the morning.

9    Q.  And you knew you were going to go back home at the end of

10   the day, right?

11   A.  Yes, I do.

12   Q.  And you said your Auntie Sheila dropped you off at the river

13   after the photos were taken, right?

14   A.  Yes, sir.

15   Q.  And from the river you went home?

16   A.  Yes, I did.

17   Q.  Back to stay with your mom and dad, right?

18   A.  Yes.

19   Q.  And when your Auntie Sheila dropped you off at the river,

20   was it still light outside?

21   A.  Yes.

22            MR. OLMOS:  Nothing further, Your Honor.  Thank you.

23            THE COURT:  Anything further?

24            MS. KENNEDY:  No, Your Honor.

25            THE COURT:  Okay.  Thank you very much for being here.

1   We appreciate you coming.  Okay.  You're done.  You don't have

2   to answer any more questions.  Okay.  She may step down with her

3   mom.  Let me see the lawyers at sidebar.

4       (Begin sidebar conference.)

5           THE COURT:  Do you want to try to start on your next

6   witness or give everybody a break and start earlier in the

7   afternoon like start at around 1:00 or so.

8           MS. KENNEDY:  A little break might be nice.

9           THE COURT:  Are you okay with that?  Okay.  Let's do

10  that.

11      (End sidebar discussion.)

12          THE COURT:  We're going to send you off to lunch a

13  little earlier and start a little earlier in the afternoon.

14  Give you an earlier break.  Sometimes it helps, if you want to

15  eat, to get there a little earlier.

16      Again, as with all breaks, please don't discuss the case

17  with anyone.  Don't discuss the case among yourselves, no

18  independent investigation or research.  Report any violations of

19  these admonitions to me immediately.  And I will ask you to come

20  back -- we're going to try to start a little before 1:00 so

21  let's, if you can, get back about 10 minutes to 1:00, 5 minutes

22  to 1:00, and we'll get you in here and start at 1:00.  Thank

23  you.  See you at 1:00.

24      (Jury out.  11:39 a.m.)

25      (Lunch break taken.  11:39 a.m. to 12:58 p.m.)

```
 1              (Jury in.  12:58 p.m.)

 2              THE COURT:  All right.  All jurors are present.  All

 3     parties are present.  The next witness, we will refer to her as

 4     E.S., is on the stand.  Can the interpreter please state your

 5     name for the record.

 6              THE INTERPRETER:  My name is Miguel Salangsang,

 7     registered court interpreter in Pampango, 700742, and court

 8     approved Tagalog interpreter in San Diego Superior Court.

 9              THE COURT:  Do you want to spell your last name for

10     us?

11              THE INTERPRETER:  Salangsang, S-a-l-a-n-g-s-a-n-g.

12              THE COURT:  Thank you.  Again, as with the other

13     witnesses, besides the interpreter there is also a support

14     person for E.S. here as well.  Mr. Vine.

15              THE CLERK:  You do promise that everything that you

16     say or tell us in court will be the truth?

17              THE WITNESS:  Yes.

18              THE COURT:  Ms. Kennedy.

19          (Government witness, **E.S.** sworn in.)

20                          DIRECT EXAMINATION

21     BY MS. KENNEDY:

22     Q.  Good afternoon.

23     A.  Good afternoon.

24     Q.  Can you tell us how old you are now?

25     A.  12 years old.
```

1    Q.   You have a birthday coming up soon, don't you?

2    A.   Yes.

3    Q.   When is your birth date?

4    A.   September 2, 2004.

5    Q.   I'm going to hand you a document.  For the record, I'm

6    handing the witness Government's Exhibit 97.  Take a look at

7    that, please, if you would.  Do you recognize that document?

8    A.   Yes.

9    Q.   What is it?

10   A.   Birth certificate.

11   Q.   Is this, as far as you can tell, an accurate copy of your

12   birth certificate?

13   A.   Yes.

14          MS. KENNEDY:  Move to admit Government's Exhibit 97.

15          THE COURT:  Again, with the redaction?

16          MS. KENNEDY:  That's right, Your Honor.

17          THE COURT:  Any objection?

18          MR. OLMOS:  No, Your Honor.

19          THE COURT:  All right.  It is admitted.

20       (Government Exhibit 97 admitted into evidence.)

21   Q.   BY MS. KENNEDY:  And does this birth certificate show your

22   birthday as September 2, 2004?

23   A.   Yes.

24   Q.   Where do you live?

25   A.   Tarlac, Maligaya.

1    Q.  What country is that in?

2    A.  What?

3    Q.  Is that in the Philippines?

4    A.  Yes.

5    Q.  Is this your first time in America?

6    A.  Yes.

7    Q.  And did your mom come with you on this trip as well?

8    A.  Yes.

9    Q.  Is your mom here with you today in court?

10   A.  Yes.

11   Q.  Are you nervous to testify today?

12   A.  A little bit.

13   Q.  Do you know why you're here to testify?

14   A.  To tell the truth.

15   Q.  Are you here to talk to us about some pictures that were

16   taken of you?

17   A.  Yes.

18   Q.  And were some of those pictures when you had your clothes

19   off?

20   A.  Yes.

21   Q.  How many times did that happen?

22   A.  Two times.

23   Q.  When did that happen?

24   A.  I don't remember.

25   Q.  Do you remember how old you were when you had these pictures

1   taken?

2   A.  11 years old.

3   Q.  Who was it who took pictures of you without your clothes on?

4   A.  Elder sister Lyan.

5   Q.  And who was it who first came to you and asked you to come

6   and do this?

7   A.  Auntie Sheila.

8   Q.  Did you know Sheila before this happened?

9   A.  Yes.

10  Q.  How do you know her?

11  A.  Through my uncle.

12  Q.  How often did you see Sheila before you had these pictures

13  taken?

14  A.  During her son's birthday -- son's birthday.

15  Q.  During Sheila's son's birthday?

16  A.  Yes.

17  Q.  Was that about once a year?

18  A.  Yes.

19  Q.  Had you ever gone anywhere alone with Sheila before you had

20  your picture taken?

21  A.  No.

22  Q.  Where were you when Sheila first came to you and asked you

23  to do this?

24  A.  In our house.

25  Q.  Did she come to you to talk to you about it, or did she go

1    to a member of your family?

2    A.  She approached my grandmother.

3    Q.  Were you there when Sheila talked to your grandmother?

4    A.  Yes.

5    Q.  Do you know what she said to your grandmother?

6    A.  No.

7    Q.  Did Sheila say anything to you about what was happening?

8    A.  None.

9    Q.  The first time this happened, what happened after Sheila

10   talked to your grandmother?

11   A.  She asked permission from my grandmother.

12   Q.  What happened after that?

13   A.  We left, and she brought us with her.

14   Q.  When you say "us," was there someone else with you?

15   A.  Oh, her companion, elder sister Lyan.

16   Q.  Going back to when you and Sheila left from your

17   grandmother's house, was there anybody else with you then?

18   A.  None.

19   Q.  And what happened next when you left?

20   A.  We went to the hotel.

21   Q.  Do you know what hotel it was?

22   A.  Sogo is the name.

23   Q.  Do you know where that hotel was?

24   A.  At Dau.

25   Q.  In Dau?

1    A.   Yes.

2    Q.   Had you ever been to the Hotel Sogo before?

3    A.   First time.

4    Q.   Was that close to your home, or was that far away from your

5    home?

6    A.   Far.

7    Q.   What happened when you got to the hotel the first time this

8    happened?

9    A.   We had photo shoots.

10   Q.   You mentioned Lyan.  When did you first meet Lyan?

11   A.   When they met each other with Sheila.

12   Q.   Was that when you arrived at the hotel or before then?

13   A.   When we went.

14   Q.   Had you ever met Lyan before you arrived at the hotel that

15   day?

16   A.   No.

17   Q.   Did you know who she was?

18   A.   I met her through Auntie Sheila.

19   Q.   On that day or at a time before that day?

20   A.   That day.

21   Q.   Was there anyone else there the first time you went to the

22   Hotel Sogo?

23   A.   None.

24   Q.   What happened when you got there; did you go up into a hotel

25   room?

 1    A.   Yes.

 2    Q.   What happened next?

 3    A.   She asked me to lie down on the bed.

 4    Q.   Was that when you had clothes on or when you had clothes

 5    off?

 6    A.   First, I had my clothes on.

 7    Q.   And then at some point did someone ask you to take your

 8    clothes off?

 9    A.   The second time.

10    Q.   Okay.  So you're talking about the second time you had your

11    pictures taken, is that right?

12    A.   Yes.

13    Q.   The first time you had your pictures taken, was it only with

14    clothes on, or did you take your clothes off at some point?

15    A.   With clothes on.

16    Q.   Who was taking your picture?

17    A.   Lyan.

18    Q.   What was Sheila doing while Lyan was taking the pictures?

19    A.   What?

20    Q.   Was Sheila doing anything while Lyan was taking your

21    pictures in the hotel room?

22    A.   She was coaching me to do this.

23    Q.   Was she telling you how to pose your body?

24    A.   Yes.

25    Q.   The first time, when you had your pictures taken with

1    clothes on, what happened when the photos were done?

2    A.  We left from Sogo and went home.

3    Q.  How did you get home?

4    A.  Through the bus.

5    Q.  Was someone with you when you went home on the bus?

6    A.  Auntie Sheila.

7    Q.  Did Sheila give you any money the first time?

8    A.  Yes.

9    Q.  Then what happened the second time you had your picture

10   taken; how did that start?

11   A.  We went to the hotel, then went to the bed; I was asked to

12   take off my clothes.

13   Q.  How did you get to the hotel the second time?

14   A.  We went to Sogo with Auntie Sheila.

15   Q.  Did Sheila come and get you at your house the second time?

16   A.  Yes.

17   Q.  Did she say anything to you about what was going to happen?

18   A.  None.

19   Q.  Do you know if she said anything to anyone in your family

20   about what was going to happen?

21   A.  None.

22   Q.  Was anyone else with you and Sheila when you went to the

23   hotel the second time?

24   A.  Mary Angel.

25   Q.  Did you know Mary Angel before that day?

1    A.   Yes.

2    Q.   Is she a relative or is she a friend?

3    A.   Friend.

4    Q.   What happened when you got to the hotel the second time?

5    A.   We had pictures.

6    Q.   You had your picture taken?

7    A.   Yes.

8    Q.   Was Lyan also taking your picture the second time that you

9    were at the hotel?

10   A.   First and second.

11   Q.   First and second.  Was Sheila also telling you how to pose

12   your body the second time?

13   A.   Yes.

14   Q.   And this was the Hotel Sogo again the second time?

15   A.   Yes.

16   Q.   Were you in a hotel room at that hotel?

17   A.   Yes.

18   Q.   Do you remember what the room looked like?

19   A.   There was a mark.

20   Q.   There was a mark?

21   A.   There was a guy inscribed on the wall.

22   Q.   There was a mark on the wall that looked like a man?

23   A.   Yes.

24   Q.   Was it the same room both of the times that you went there

25   to have your picture taken?

 1    A.  Yes.

 2    Q.  I'm going to hand you something.  For the record, this is

 3    Government's Exhibit 35.

 4          THE COURT:  35.

 5    Q.  BY MS. KENNEDY:  Do you recognize that, what's in that

 6    picture?

 7    A.  Yes.

 8    Q.  What is that?

 9    A.  Inside the hotel.

10    Q.  Is that an accurate picture of what the hotel room looked

11    like when you were there with Lyan and Sheila?

12    A.  Yes.

13          MS. KENNEDY:  Move to admit Government's Exhibit 35,

14    Your Honor.

15          THE COURT:  Any objection?

16          MR. OLMOS:  No, Your Honor.

17          THE COURT:  Admitted.  You can publish.

18      (Government Exhibit 35 admitted into evidence.)

19    Q.  BY MS. KENNEDY:  You mentioned a mark on the wall.  Do you

20    see that mark that you were talking about in this picture?

21    A.  Yes.

22    Q.  Can you point it out or describe where it is in the picture?

23    A.  Here.  (Indicating.)

24          THE COURT:  She can actually touch the screen, if you

25    want.

1          MS. KENNEDY:  I see you touched the screen there.  Let

2    the record reflect that the witness touched the left-hand side

3    of the screen.

4          THE COURT:  Okay.

5    Q.  BY MS. KENNEDY:  The second time that you went to this hotel

6    room, when you went into the room, was Angel with you then?

7    A.  Yes.

8    Q.  What happened when you went into the room with Angel?

9    A.  We were asked to take off our clothes and sister Sheila ask

10   us to --

11   Q.  What did Sheila ask you to do?

12   A.  Take off our clothes and touch our --

13   Q.  Did she ask you to spread your legs?

14   A.  Yes.

15   Q.  And did she ask you to touch yourself between your legs?

16   A.  Yes.

17   Q.  Did she ask you and Angel to do the same things or different

18   things?

19   A.  The same.

20   Q.  When Sheila was instructing you, was Lyan saying anything?

21   A.  Lyan was telling Sheila that we should do that.

22   Q.  Was she telling Sheila how to instruct you?

23   A.  Yes.

24   Q.  Did Sheila ask you to put anything on your body?

25   A.  Baby oil.  She ask us to put it on.

1    Q.  When you were in the hotel room, were you always on the bed

2    or were you in different places?

3    A.  Different places.

4    Q.  Did you sometimes go in the bathroom?

5    A.  Yes.

6    Q.  Do you know how many pictures Lyan took of you?

7    A.  No.

8    Q.  Did Lyan or Sheila ever tell you why they were taking these

9    photos of you?

10   A.  No.

11   Q.  When you were at the hotel, did Lyan or Sheila ever tell you

12   that you could leave if you wanted to?

13   A.  We were just going to the hotel.

14   Q.  Once you got there, when you were in the hotel, did they

15   ever say to you that you could go if you wanted?

16   A.  No.

17   Q.  Did they ever offer to let you call your mom or call a

18   family member?

19   A.  No.

20   Q.  Did you feel like you were free to leave if you wanted to?

21   A.  Yes.

22   Q.  Did you feel like that if they -- if they let you, that you

23   and Angel could walk out and go home anytime?

24   A.  No.

25   Q.  Would you have known how to get home from the Hotel Sogo if

1    you left by yourself?

2    A.  No.

3    Q.  Had you ever been to that neighborhood by yourself before?

4    A.  No.

5    Q.  What happened after the second photo shoot with Angel was

6    over?

7    A.  We finished at the same time.  Then we went home.

8    Q.  How did you get home?

9    A.  We rode on the bus.

10   Q.  Who went with you, if anyone?

11   A.  Auntie Sheila.

12   Q.  Did Sheila or Lyan give you any money after the photos were

13   done?

14   A.  Yes.

15   Q.  How much did they give you?

16   A.  The second time, 300.

17            THE COURT:  Pesos, right?

18            THE WITNESS:  What?

19   Q.  BY MS. KENNEDY:  300 pesos?

20   A.  Yes.

21   Q.  Did they give Angel any money you that saw?

22   A.  Yes.

23   Q.  Do you know how much money they gave her?

24   A.  I did not see.

25   Q.  Did Lyan or Sheila say anything to you about whether you

1  could tell anyone about these photo shoots?

2  A.  Because Sheila instructed us not to tell the kids.  They

3  might imitate it.

4  Q.  Did you ever see Lyan again after these photo shoots?

5  A.  The last time, second time.

6  Q.  After the second time, you never saw her again?

7  A.  No.

8  Q.  Do you know what happened to the photos that Sheila and Lyan

9  took of you?

10  A.  No.

11  Q.  I'm going to show you a few pictures now.  Okay.  Can we

12  pull up Exhibit 88, please.  Do you recognize that person?

13  A.  Elder sister Lyan.

14  Q.  Is that the person who took pictures of you in the hotel?

15  A.  Yes.

16      THE COURT:  Is she saying elder sister?  Ask her.  Is

17  that what you said?

18  Q.  BY MS. KENNEDY:  What do you call Lyan, can you tell us

19  again?

20  A.  Lyan.

21  Q.  Okay.  When you use the word "Tita," can you tell us do you

22  use that only for relatives or for other people as well?

23  A.  Even to others.

24      THE COURT:  I just want to clarify.  I don't think

25  Lyan is her elder sister, you need to clarify that.

1   Q.  BY MS. KENNEDY:  If I didn't ask you that before, can you

2   tell us are you related to Lyan in any way?

3   A.  None.

4           THE COURT:  Okay.  Thanks.

5   Q.  BY MS. KENNEDY:  Is the word Tita that you use, is that a

6   term of respect for older women?

7   A.  Yes.

8   Q.  Can we pull up Exhibit 89, please.  Do you recognize that

9   person?

10  A.  That's Auntie Sheila.

11  Q.  Is that the person who instructed you how to pose when you

12  were in the hotel?

13  A.  Yes.

14  Q.  Do you remember about a year or so ago when you met with

15  some Americans who talked to you about your photo shoots?

16  A.  No.

17  Q.  At some point, did the authorities come and discuss with you

18  the pictures that you had taken?

19  A.  No.

20  Q.  When we met with you yesterday, do you remember that we

21  showed you some pictures?

22  A.  Yes.

23  Q.  I'm going to hand you something that is marked as

24  Government's Exhibit 31.  Do you recognize that picture?

25  A.  Yes.

1    Q.  Who is in that picture?

2    A.  Myself and Mary Angel.

3    Q.  Where are you in that picture?

4    A.  Here.  (Indicating.)

5    Q.  Was that picture taken in the hotel room?

6    A.  Yes.

7    Q.  That same hotel room that we have been talking about in the

8    Sogo hotel?

9    A.  Yes.

10   Q.  Does that look to you like an accurate picture of something

11   that happened during one of your photo shoots?

12   A.  Yes.

13           MS. KENNEDY:  Move to admit Government's Exhibit 31,

14   Your Honor.

15           THE COURT:  Objection?

16           MR. OLMOS:  No, Your Honor.

17           THE COURT:  31 is admitted.

18       (Government Exhibit 31 admitted into evidence.)

19   Q.  BY MS. KENNEDY:  Who was it that took this picture of you

20   and Angel?

21   A.  Lyan.

22           MS. KENNEDY:  Nothing further.  Thank you.

23           THE COURT:  Mr. Olmos, questions?

24           MR. OLMOS:  Very briefly.

25                       CROSS-EXAMINATION

1    BY MR. OLMOS:

2    Q.  I'm going to ask you a few questions, okay?

3    A.  Yes.

4    Q.  The second photo shoot where you had your clothes off --

5    A.  Yes.

6    Q.  -- after that photo shoot Sheila took you home, right?

7    A.  Yes.

8    Q.  And you knew that you were going back home while you were at

9    the hotel, didn't you?

10    A.  Yes.

11    Q.  And that's what happened, right?

12    A.  Yes.

13         MR. OLMOS:  Thank you very much.  Nothing further,

14    Your Honor.

15         THE COURT:  Anything further?

16         MS. KENNEDY:  Nothing further.

17         THE COURT:  Thank you very much for coming and being

18    with us this afternoon.  You are finished so you can go back

19    outside.  Okay.  Thank you.

20       All right, the United States may call your next witness.

21         MS. KENNEDY:  Government calls minor witness M.Q.,

22    Your Honor.

23         THE COURT:  M.Q.  All right.

24         MS. KENNEDY:  It will be just one more minute, Your

25    Honor.

```
 1              THE COURT:  Okay.

 2         (Pause in proceedings.)

 3         (Off-the-record discussion.)

 4              THE CLERK:  You do promise that everything you say or

 5    tell us in court will be the truth?

 6              THE WITNESS:  I do.

 7              THE COURT:  Okay.  This witness we will refer to as

 8    M.Q.

 9              MS. KENNEDY:  Good afternoon.

10         (Government witness, M.Q., sworn in.)

11                        DIRECT EXAMINATION

12    BY MS. KENNEDY:

13    Q.  Good afternoon.

14    A.  Good afternoon also.

15    Q.  Can you tell us how old you are now?

16    A.  Yes.

17    Q.  How old are you?

18    A.  10 years old.

19    Q.  When is your birthday?

20    A.  November 23, 2006.

21    Q.  Where do you live?

22    A.  In the Philippines.

23    Q.  Is this your first time in America?

24    A.  Yes.

25    Q.  Did your mom come here with you for your testimony?
```

Direct Examination of J.C.

1    A.  Yes.

2    Q.  Is she here in the courtroom today?

3    A.  Yes.

4    Q.  Had you ever been on an airplane before you came here for

5    your testimony?

6    A.  Not yet.

7    Q.  Are you at all nervous today to talk to us?

8    A.  No.

9    Q.  Good.  I'm going to hand you something which has been marked

10   as Government Exhibit 95.  Do you recognize what that is?

11   A.  Yes.

12   Q.  What is that?

13   A.  Certificate.

14   Q.  Is that a certificate that shows your birth?

15   A.  Yes.

16   Q.  Does that appear to be an accurate copy of your birth

17   certificate as far as you can tell?

18   A.  Yes.

19          MS. KENNEDY:  Move to admit Government's Exhibit 95,

20   Your Honor.

21          THE COURT:  Any objection?

22          MR. OLMOS:  No, Your Honor.

23          THE COURT:  95 is admitted.

24      (Government Exhibit 95 admitted into evidence.)

25   Q.  BY MS. KENNEDY:  Does this list your correct birth date of

1    November 23, 2006?

2    A.   Yes.

3    Q.   Do you know what you're here to testify about today?

4    A.   No.

5    Q.   Are you here to talk about some pictures that were taken of

6    you?

7    A.   Yes.

8    Q.   Did you have some pictures taken of you when you didn't have

9    any clothes on?

10   A.   Yes.

11   Q.   How many times did that happen to you?

12   A.   Four.

13   Q.   When did that happen, how old were you?

14   A.   Like 7.

15   Q.   Who was it who took pictures of you without your clothes on?

16   A.   Lyan.

17   Q.   When you had these pictures taken, were you by yourself or

18   were you with other girls?

19   A.   Yes.   There are.

20   Q.   You were with some other girls?

21   A.   Yes.

22   Q.   When you flew here from the Philippines for your testimony,

23   did you come with some other girls?

24   A.   Yes.

25   Q.   And were those some of the girls who you had your picture

1    taken with?

2    A.  Yes.

3    Q.  The first time this happened, who was it who approached you

4    about taking pictures?

5    A.  Shellina.

6    Q.  Did you know Shellina before this happened?

7    A.  Yes.

8    Q.  How did you know her?

9    A.  When we were living in their house.

10   Q.  Were you living together with Shellina, or were you living

11   in different houses?

12   A.  We were living in a different house.

13   Q.  Were you neighbors?

14   A.  Yes.

15   Q.  Before these four times when you had your picture taken, had

16   you ever gone anywhere alone with Shellina?

17   A.  Yes.

18   Q.  And this is before -- we talked about the four times that

19   you had pictures, is that right?

20   A.  Yes.

21   Q.  Okay.  And putting aside those four times, was there some

22   other time when you and Sheila were alone together -- Shellina?

23   A.  No.

24   Q.  Where were you the first time that Shellina came to talk to

25   you about taking pictures?

1   A.  In the hotel.

2   Q.  Before you got to the hotel, the first time that she ever

3   came up to you to try to get you to go with her, where were you

4   when that happened?

5   A.  Would you repeat that?

6   Q.  Yeah.  When Shellina first came up to you to talk about

7   going somewhere, going to the hotel, were you at your house or

8   were you at someone else's house or somewhere else?

9   A.  In our house.

10  Q.  Do you remember what Shellina said to you at your house?

11  A.  I don't remember.

12  Q.  Do you know whether she talked to your mom or talked to

13  anyone else in your family before she took you to go to the

14  hotel?

15  A.  She was talking to my mom.

16  Q.  Do you know what she said to your mom?

17  A.  No.

18  Q.  When you left with Shellina, what happened?

19  A.  She took pictures of me.

20  Q.  How did you get to the place where she took pictures of you?

21  A.  She took me from my mom.

22  Q.  Did you go on a bus, in a car, or some other way?

23  A.  Through the bus.

24  Q.  Was it just you and Shellina on the bus?

25  A.  Yes.

1    Q.   Where did you go that first time?

2    A.   In the hotel.

3    Q.   Do you know what hotel it was?

4    A.   Yes.

5    Q.   Do you know what it was called?

6    A.   Hotel.

7    Q.   All right.  Do you know where the hotel was?

8    A.   By SM.

9    Q.   Is SM -- is that a mall that was near the hotel that you

10   went to?

11   A.   Yes.

12   Q.   Is that close to where you live or far away from where you

13   live?

14   A.   Farther.

15   Q.   Do you remember how long it took you on the bus to get to

16   the hotel?

17   A.   No.

18   Q.   Have you ever been to that hotel before this time that you

19   went with Shellina?

20   A.   Yes.

21   Q.   Before the first time, out of the four times had you ever

22   been before that?

23   A.   No.

24   Q.   What happened when you got to the hotel the first time?

25   A.   She took pictures of me.

1  Q.  When you say she took pictures of you, who was that that

2  took your picture?

3  A.  Lyan.

4  Q.  Was Lyan there to meet you and Shellina at the hotel when

5  you got there?

6  A.  Yes.

7  Q.  Had you ever seen Lyan before then?

8  A.  Yes.  When she took picture of me.

9  Q.  And before the times that she took pictures of you, had you

10  ever met her before that happened?

11  A.  No.

12  Q.  Did you go up to a hotel room with Shellina and Lyan?

13  A.  Yes.

14  Q.  Do you remember what the hotel room looked like?

15  A.  No.  Not anymore.

16  Q.  You said Lyan was taking your picture, is that right?

17  A.  Yes.

18  Q.  While Lyan was doing that, what was Shellina doing?

19  A.  She was coaching me about the pose.

20  Q.  She was telling you how to pose your body?

21  A.  Yes.

22  Q.  Were any of the pictures taken with clothes on, or were they

23  all without clothes on?

24  A.  Without clothes on.

25  Q.  The first time that you had your picture taken, were there

1   any other girls with you then?

2   A.   Yes.

3   Q.   Who was with you the first time, do you remember?

4   A.   Ella.

5   Q.   Do you remember where you were in the hotel room when Lyan

6   was taking your picture?

7   A.   I don't remember.

8   Q.   Do you remember whether you were on the bed or if you were

9   other places in the hotel room?

10  A.   On the bed.

11  Q.   Were you ever in the bathroom in the hotel room?

12  A.   Yes.

13  Q.   Did Lyan or Shellina ever tell you why they were taking

14  these pictures of you?

15  A.   No.

16  Q.   We talked about the first time that you had your picture

17  taken.  So let's talk about the other times.  On those other

18  times did Shellina always come to your house to get you?

19  A.   No.

20  Q.   Were there other -- did she sometimes come to get you from

21  your house and sometimes from other places?

22  A.   From our house.

23  Q.   And the other times, after the first time, do you know

24  whether Shellina told your mom what was happening, why you were

25  leaving?

1              MR. OLMOS:  Objection, Your Honor.  Lacks foundation.

2              THE COURT:  Sustained.  You don't have to answer that.

3    Q.  BY MS. KENNEDY:  Okay.

4    A.  No.

5              THE COURT:  That answer will be stricken.  When I say

6    you don't have to answer, stop interpreting.  Go ahead.

7    Q.  BY MS. KENNEDY:  Did you go back to that same hotel after

8    the first time with Shellina?

9    A.  Not anymore.

10   Q.  Okay.  Do you remember any other locations where you had

11   pictures taken with Lyan and Shellina?

12   A.  Yes.

13   Q.  Where else did you have your picture taken?

14   A.  In the house of Lyan.

15   Q.  When you went to Lyan's house for your pictures, had you

16   ever been there before that?

17   A.  No.

18   Q.  During these four times that you had these pictures taken,

19   was it always Lyan taking the pictures or did someone else do

20   it?

21   A.  Lyan.  Only Lyan.

22   Q.  And during these four times, was Shellina always instructing

23   you how to pose or was she doing other things, too?

24   A.  Yes.

25   Q.  So Shellina was always instructing you how to pose?

Sanchez - Cross-Examination by Lyan

1  A.  Yes.

2  Q.  Do you remember whether Lyan was saying anything to Shellina

3  while she was giving you these instructions?

4  A.  None.

5  Q.  When Shellina was instructing you, was she giving different

6  instructions to you and any other girls, or was she telling you

7  to do the same thing?

8  A.  Different.

9  Q.  Was she telling the other girls how to pose their bodies,

10  too?

11  A.  Yes.

12  Q.  Do you remember Shellina telling you anything about what to

13  do with your face?

14  A.  None.

15  Q.  Do you know how many pictures Lyan took of you during these

16  four photo shoots?

17  A.  I don't know.

18  Q.  You told us about going to Lyan's house.  Do you know where

19  Lyan's house was?

20  A.  Yes.

21  Q.  Where was it?

22  A.  Sapang in Dau.

23  Q.  In Dau.  Is that close to where you live or far away from

24  where you live?

25  A.  Farther.

1    Q.  Do you remember how long it took you to get from your house

2    to Lyan's house?

3    A.  No.

4    Q.  Do you remember whether you ever had your picture taken

5    outside of Lyan's house?

6            MR. OLMOS:  Objection.  Vague as to time.

7            THE COURT:  Rephrase.  Sustained.

8    Q.  BY MS. KENNEDY:  During the time when you had your pictures

9    taken at Lyan's house, did they ever take you outside to take

10   pictures out there as well?

11   A.  Yes.

12   Q.  And did Shellina also instruct you how to pose when you went

13   outside Lyan's house?

14   A.  Yes.

15   Q.  When Shellina was instructing you, can you tell us some of

16   the poses that she asked you to make with your body?

17   A.  Yes.

18   Q.  Okay.  Could you describe any of those poses for us?

19   A.  Yes.

20   Q.  Can you tell me about one that you remember and the way that

21   Shellina asked you to pose?

22   A.  Yes.

23   Q.  Did Shellina ask you to open your legs for the camera?

24   A.  Yes.

25   Q.  Did she ever ask you to get on your hands and knees for the

1    camera?

2    A.   Yes.

3    Q.   Did she ever ask you to touch yourself in between your legs?

4    A.   Yes.

5    Q.   Did she ever ask you to touch or pretend to touch any of the

6    other girls?

7    A.   No.

8    Q.   When you were doing these photo shoots, did Shellina or Lyan

9    ever say that you could go home if you wanted to?

10   A.   No.

11   Q.   Did they ever say that you could call your mom if you wanted

12   to?

13   A.   No.

14   Q.   Did you feel like if you wanted to leave you could have

15   left?

16   A.   Yes.

17   Q.   Did you feel like if you wanted to call your mom to come get

18   you, that they would have let you do that?

19   A.   No.

20   Q.   If you had left the hotel by yourself, would you have known

21   how to get home?

22   A.   No.

23   Q.   If you had left Lyan's house by yourself, would you have

24   known how to get home?

25   A.   No.

1   Q.  When you did leave Lyan's house, how did you get home that

2   time?

3   A.  I was with Sheila.

4   Q.  Did Sheila bring you home?

5   A.  Yes.

6   Q.  Each of the four times that we've been talking about, did

7   Sheila bring you home each time or was it someone else?

8   A.  Yes.

9   Q.  Sheila brought you home each time?

10  A.  Yes.

11  Q.  Did Sheila or Lyan ever give you any money for any of these

12  four photo shoots?

13  A.  Yes.

14  Q.  How much money did they give you each time?

15  A.  500.

16  Q.  500 pesos?

17  A.  Yes.

18  Q.  Do you know whether they gave anyone in your family any

19  money for these photo shoots?

20          MR. OLMOS:  Lacks foundation.

21          THE COURT:  Sustained.  Next question.

22  Q.  BY MS. KENNEDY:  Did Shellina or Lyan ever tell you anything

23  about whether you could talk to anyone else about these pictures

24  that you had taken?

25  A.  No.

1   Q.  Was there a time after the photo shoots were done when you

2   went with Lyan and Shellina to meet an American?

3   A.  Yes.

4   Q.  Did someone come to get you for that meeting?

5   A.  Yes.

6   Q.  Who was it who came and got you?

7   A.  Shellina.

8   Q.  Did she get you in a car, or did you ride the bus or

9   something else?

10  A.  We rode on the bus.

11  Q.  Was anyone with you and Shellina?

12  A.  Just Shellina and myself.

13  Q.  Did Shellina tell you anything about what was happening?

14  A.  No.

15  Q.  And where did you go with Shellina on the bus that time?

16  A.  We went to Angeles City.

17  Q.  Did you meet up with Lyan at some point?

18  A.  Yes.

19  Q.  When was that?

20  A.  I don't remember.

21  Q.  When you got to Angeles City, where did you go?

22  A.  We met with the American.

23  Q.  Was Lyan with you when you met with the American?

24  A.  Yes.

25  Q.  And what happened when you met with the American?

1    A.  He talked to me.

2    Q.  What happened after that, after you talked to the American?

3    A.  We went to the van.

4    Q.  Who was with you when you went to the van?

5    A.  Shellina, Lyan, myself and the American.

6    Q.  Did you get inside the van?

7    A.  Yes.

8    Q.  Did you know what was happening then?

9    A.  No.

10   Q.  What happened once you were in the van?

11   A.  The American was looking at my pictures.

12   Q.  Do you know why he was looking at your pictures?

13   A.  No.

14   Q.  What happened after that?

15   A.  Oh, I was arrested then, by the NBI.

16   Q.  The NBI came and got you out of the van, is that what

17   happened?

18   A.  Yes.

19   Q.  Did they also get Shellina and Lyan out of the van?

20   A.  Yes.

21   Q.  And without telling us what they said, did someone from the

22   NBI talk to you?

23   A.  Yes.

24   Q.  And then did they take you somewhere?

25   A.  They brought me to DSWD.

1    Q.  DSWD.  Is that like a social services place for young kids

2    to go?

3    A.  Yes.

4    Q.  I'm going to show you some pictures now.  Okay?

5    A.  Yes.

6    Q.  Can we bring up Exhibit 88, please.  Do you recognize that

7    person?

8    A.  Yes.

9    Q.  Who is that?

10   A.  Lyan.

11   Q.  Is that the person who took your picture?

12   A.  Yes.

13   Q.  Can we bring up Exhibit 89, please.  Do you recognize that

14   person?

15   A.  Yes.

16   Q.  Who is that?

17   A.  Shellina.

18   Q.  Is that the person who told you how to pose in your

19   pictures?

20   A.  Yes.

21   Q.  Can we bring up Exhibit 91, please.  Do you remember us

22   showing you this picture yesterday?

23   A.  Yes.

24   Q.  Do you recognize that scene?

25   A.  Yes.

1    Q.  And who are those people in that picture?

2    A.  Lyan and myself.

3    Q.  Do you remember where this scene took place?

4    A.  No.

5    Q.  Do you remember, when you were at DSWD, that you just talked

6    about, when some people came and talked to you about your photo

7    shoots?

8    A.  Yes.

9    Q.  Did they show you some pictures of yourself when they talked

10   to you?

11   A.  I don't remember.

12   Q.  Did we show you some pictures of yourself yesterday when we

13   were talking?

14   A.  Yes.

15   Q.  Bring up Exhibit 31, please.  Do you remember this picture?

16   A.  Yes.

17   Q.  Who is that in the picture?

18   A.  Ella and myself.

19   Q.  Do you remember when this picture was taken?

20   A.  No.

21   Q.  I'm going to hand you a picture.  It's marked as

22   Government's Exhibit 34.  Do you recognize that picture?

23   A.  Yes.

24   Q.  Who is that in the picture?

25   A.  Myself.

1    Q.  Do you remember where this was taken?

2    A.  Yes.

3    Q.  Is this one of the pictures that was taken outside of Lyan's

4    house that you told us about?

5    A.  Yes.

6    Q.  Is that an accurate picture of something that happened

7    during your photo shoot at Lyan's house?

8    A.  Yes.

9          MS. KENNEDY:  Move to admit Government's Exhibit 34,

10   Your Honor.

11         THE COURT:  Objection?

12         MR. OLMOS:  No, Your Honor.

13         THE COURT:  Admitted.

14      (Government Exhibit 34 admitted into evidence.)

15   Q.  BY MS. KENNEDY:  Who took this picture of you?

16   A.  Lyan.

17   Q.  Who told you how to pose like that?

18   A.  Shellina.

19         MS. KENNEDY:  Nothing further.  Thank you.

20         THE COURT:  Mr. Olmos, any questions?

21         MR. OLMOS:  Briefly, Your Honor.

22                    CROSS-EXAMINATION

23   BY MR. OLMOS:

24   Q.  You're almost finished, okay?

25   A.  Yes.

1    Q.  All four times that you had photos taken of yourself, did

2    Shellina pick you up from your house?

3    A.  Yes.

4    Q.  And all four times Shellina took you back home afterward,

5    right?

6    A.  Yes.

7    Q.  And always on the same day, right?

8    A.  Yes.

9    Q.  And you knew during all those photo shoots, all four of

10   them, that you were going to go home afterward, right?

11   A.  Yes.

12        MR. OLMOS:  Thank you very much.  Nothing further,

13   Your Honor.

14        THE COURT:  Anything further?

15        MS. KENNEDY:  Nothing further.

16        THE COURT:  Thank you so much for being here.  You are

17   finished.  You can step down.  Thank you.  Give the jury a

18   break.  Let's take a recess at this time.  Again, all

19   admonitions apply.  Please report any violation of those

20   admonitions.  No talking with each other, no talking with

21   anyone, no independent investigations.  Come back in 15 minutes.

22      (Jury out.  2:10 p.m.)

23        THE COURT:  Next witness?

24        MR. ESPINOSA:  Your Honor, we're going to call Special

25   Agent Scott Medlin.  And, Your Honor, we may finish with Special

```
 1   Agent Medlin, which would only leave us with one witness.  We
 2   plan on that witness taking most of the day.  We talked to
 3   Mr. Olmos about the possibility of suggesting to the Court that
 4   we leave after Medlin and start up tomorrow and finish up.
 5          THE COURT:  That's okay.  If you only have one more
 6   witness tomorrow.  Excellent job with the kids, too.  Thank you.
 7          MS. KENNEDY:  Thank you, Your Honor.
 8      (Break taken.  2:11 p.m. - 2:33 p.m.)
 9      (Jury in.  2:33 p.m.)
10          THE COURT:  All right.  All jurors, all parties
11   present.  The Government may call your next witness.
12          MR. ESPINOSA:  The Government calls Special Agent
13   Scott Medlin.
14      (The witness was sworn by the Clerk.)
15          THE CLERK:  Please state your full name and spell your
16   last name for the record.
17          THE WITNESS:  My name is Scott Medlin, S-c-o-t-t,
18   M-e-d-l-i-n.
19      (Government witness, **SCOTT MEDLIN**, sworn in.)
20                       DIRECT EXAMINATION
21   BY MR. ESPINOSA:
22   Q.  Good afternoon.
23   A.  Good afternoon, sir.
24   Q.  Will you tell the jurors where you work, please?
25   A.  I'm employed with the Federal Bureau of Investigation in
```

331

1    Roseville, California.

2    Q.  How long have you worked for the Federal Bureau of

3    Investigation?

4    A.  Ten years.

5    Q.  Are you assigned a particular group at the FBI?

6    A.  I am assigned to the computer analysis response team or CART

7    for short.

8    Q.  What are your duties as a member of the CART team?

9    A.  The CART team are the computer forensic examiners.

10          THE COURT:  Get close to that mic.

11          THE WITNESS:  The CART team are the computer forensic

12   examiners.

13   Q.  BY MR. ESPINOSA:  I may ask you some more questions about

14   those duties as we go forward, but let me ask you this.

15       In 2015, did you participate in the investigation of Michael

16   Clemans?

17   A.  I did.

18   Q.  And, in general, what was your role in that investigation?

19   A.  As a computer forensic examiner.

20   Q.  Did you also participate in any other way?

21   A.  I participated in the search warrant that was conducted, and

22   then I helped process some of the evidence.

23   Q.  All right.  Let me ask you about that search warrant.  Was

24   this a search executed on a place or item?

25   A.  On a home.

1    Q.   What was the location of the home?

2    A.   700 Blackmer Circle in Sacramento.

3    Q.   And did other investigators participate in that search?

4    A.   Yes.

5    Q.   Other FBI agents?

6    A.   Yes.

7    Q.   And were there agents who were not FBI agents?

8    A.   There were.

9    Q.   All right.  During the search of 700 Blackmer Circle, did

10   you walk through the entire premises?

11   A.   I did.

12   Q.   Were you able to view the various rooms at the location?

13   A.   I was.

14   Q.   During that search, did you observe anyone taking

15   photographs?

16   A.   Yes.

17   Q.   I would like to ask you a few questions about some exhibits

18   in this binder.  Your Honor, may I approach?

19           THE COURT:  You may.

20   Q.   BY MR. ESPINOSA:  Will you open that binder and take a look

21   at or flip through Exhibits 1 through 9, and just look up at me

22   when you've finished doing that.

23   A.   (Witness reviewing document.)

24   Q.   All right.  Special Agent Medlin, those exhibits, Exhibits 1

25   through 9, do you recognize them?

1    A.   I do.

2    Q.   What are they?

3    A.   Those are photos that were taken at the search scene while

4    we were there.

5    Q.   Do those photos fairly and accurately represent the various

6    rooms at 700 Blackmer Circle as they appeared when you saw them

7    in 2015?

8    A.   They do.

9              MR. ESPINOSA:  Your Honor, Government moves to admit

10   Exhibits 1 through 9.

11             THE COURT:  Objection?

12             MR. OLMOS:  No objection.

13             THE COURT:  Admitted.

14      (Government Exhibits 1, 2, 3, 4, 5, 6, 7, 8 and 9 admitted

15   into evidence.)

16   Q.  BY MR. ESPINOSA:  Can we publish 1 and just go through 1

17   through 9 quickly and stop at 1 in particular.

18      Just to give the jurors a sense of the images you've

19   identified, let's look at Government's Exhibit 1.

20             THE COURT:  Mr. Vine, do we have to do something?

21   It's not up.

22   Q.  BY MR. ESPINOSA:  Okay.  Is this the residence that you

23   searched?

24   A.   This is.

25   Q.   All right.  And let's go to the next one, Exhibit 2.  And

1    this appears to be an image -- why don't you describe it.  What

2    is this image?

3    A.  This is opening the front door, a view into the home.

4    Q.  And let's go on to Exhibit 3.  Now, what's depicted in

5    Exhibit 3?

6    A.  Here we're looking at the other side of the front door, the

7    opposite direction of the last photo.  This is, I would call it,

8    the dining room and that dining room table.

9    Q.  On that table there appeared to be electronic items on --

10   A.  There is an Apple desktop computer in the foreground, on the

11   left; sitting on the table there is also a laptop computer that

12   is turned to the right, I guess we could say just to the right

13   of that Apple computer; a printer behind that; and then a banker

14   box also on the table with some flowers.

15   Q.  Do you recall when you viewed -- when you were in the

16   premises during the execution of that search, do you recall

17   these electronic items assembled in the manner that they are

18   depicted in that photo?

19   A.  Yes.  Although the laptop was not there when we arrived.  I

20   believe that was a law enforcement laptop.

21   Q.  Now if I haven't asked you this already, I want to clarify

22   the date that you executed this search.  What date did you do

23   that?

24   A.  That was July 24th, 2015.

25   Q.  Okay.  Let's move on to Exhibit 4.  What's depicted in this

1    photo?

2    A.  This is -- I call it a family room on the -- nearby the room

3    that we last saw in the last photo.

4    Q.  Let's go on to Exhibit 5.  And what's depicted in this

5    photo?

6    A.  This is another view of that dining room table, deeper into

7    the house.

8    Q.  Visible on the right-hand -- lower right corner of this

9    image is the screen of a laptop computer.  Is that the laptop

10   computer that you identified in the earlier exhibit, Exhibit 3,

11   as a law enforcement computer?

12   A.  Yes.

13   Q.  Now did you set that computer up?

14   A.  I did not.

15   Q.  Okay.  Let's look at Exhibit 6.  Move on to Exhibit 7.

16       Now, Exhibit 7, will you describe what's depicted in this

17   photo?

18   A.  This is another view of the same dining room table; the

19   printer that we saw in the earlier photos is on the left; there

20   is also a computer hard drive in the center, a USB plug-in hard

21   drive; and then that Bankers Box is to the right.

22   Q.  Now that item in the sort of upper center, the black square,

23   is that the item you described as a hard drive?

24   A.  Yes.

25   Q.  And this item, was that item on the table at the premises on

1    the day that you searched it?

2    A.  Yes.

3    Q.  Is this how you encountered it when you saw it that day?

4    A.  Yes.

5    Q.  Let's go ahead and look at Exhibit Number 8.  And this

6    appears to be another angle of that same dining room table with

7    the electronic devices, is that right?

8    A.  That's correct.

9    Q.  Now in the foreground in the middle of this photo the

10   computer identified as the law enforcement computer is not on

11   the table and not yet open, is that right?

12   A.  That's correct.  It's been closed and placed on the chair.

13   Q.  All right.  And, finally, let's take a quick look at Exhibit

14   Number 9.  And do you recall these personal items from your

15   search at 700 Blackmer Circle?

16   A.  I do.

17   Q.  All right.  Special Agent Medlin, I want to now show you

18   what's been marked for identification as Government's

19   Exhibit 86.  May I approach, Your Honor?

20           THE COURT:  You may.

21   Q.  BY MR. ESPINOSA:  Do you recognize that bag, Special Agent

22   Medlin?

23   A.  Yes, I do.

24   Q.  What is that bag?

25   A.  This is the same computer hard disc drive that was on the

 1   table in the photos that we noticed earlier.

 2   Q.  How do you know that?

 3   A.  I was the agent that seized this item from the table, and my

 4   initials are right here on the bag.

 5   Q.  The presence of your initials on that bag indicate that you

 6   packed that bag?

 7   A.  It doesn't indicate that I packed the bag.  It indicates

 8   that I took the item from the location in its home and delivered

 9   it to the evidence control technician who would have been the

10   one likely to package it.

11   Q.  If you would like to open it up or can you see through the

12   bag?

13   A.  I can see through the bag.

14   Q.  Is that object, does it appear to be in substantially the

15   same condition it was when you collected it on July 23, 2015?

16   A.  It does.

17          MR. ESPINOSA:  Your Honor.  Government moves to admit

18   86?

19          THE COURT:  Objection.

20          MR. OLMOS:  No, Your Honor.

21          THE COURT:  86 is admitted.

22       (Government Exhibit 86 admitted into evidence.)

23   Q.  BY MR. ESPINOSA:  Special Agent Medlin, I want to ask you

24   about the serial number on that device.

25       If you can see it through the bag -- you can leave it in the

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

1    bag or if you need to take it out that may be easier -- do you

2    see a serial number on the item?

3    A.  I do see the serial number on the item, yes.

4    Q.  What is that serial number?

5    A.  Apologize.  It's very small.  The serial number was copied

6    to the label on the outside of the bag.

7    Q.  Would it refresh your recollection to look at that label?

8    A.  I'm sorry.  I didn't bring my glasses.  WMC300163553.

9    Q.  Now, Special Agent Medlin, you testified about your

10   assignment to the CART team at the FBI.  I want to ask you a few

11   more questions about what CART team members do.

12       So let me start with that question.  What is the role of a

13   CART team member in a search like the search you conducted in

14   this case?

15   A.  So the CART team, or the computer forensic examiner assigned

16   to the search, in this case me, would help identify digital

17   media, whether a thumb drive, computer hard drive, cell phone,

18   GPS unit -- digital media can come in many forms -- and assist

19   in the safe collection of that digital media so it doesn't

20   accidently get erased or overwritten in any way.

21   Q.  Do you receive special training as a member of the CART

22   team?

23   A.  Yes.  A two-year certification procedure.

24   Q.  During the course, in your experience as a member of the

25   CART team, how many investigations have you participated in in

 1  which you brought to bear your training and skills?

 2  A.  A rough guess, 300.

 3  Q.  Now, does that 300 represent the number of investigations or

 4  the number of electronic devices that you have inspected and

 5  otherwise --

 6  A.  The number of investigations.  If we were to count the

 7  individual electronic devices, we would be well over 1,000.

 8  Q.  Okay.  Over 1,000.  So you describe the object in front of

 9  you, Government's Exhibit 86, as an external hard drive.  What

10  is an external hard drive?

11  A.  It's a computer storage device.  Rather than being installed

12  within the computer, it's connected to the computer, via a

13  cable, outside the device.

14  Q.  What is its function?  What's the purpose of connecting it

15  to a computer?  What does it permit the user to do?

16  A.  To store data on this external hard drive rather than on the

17  internal hard drive that's connected to the computer.

18  Q.  How much data can an external hard drive hold?

19  A.  This particular one holds two terabytes of data.

20  Q.  Is that a lot?

21  A.  That is a lot.  Yes, sir.

22  Q.  If you had to estimate, how many, say, for instance, photos

23  or documents could a two terabyte hard drive hold?

24  A.  Oh, hundreds of thousands.

25  Q.  After you collected that hard drive as evidence, what did

1 | you do with it?

2 | A.  I turned it over to an evidence control technician who would

3 | have sealed the bag and placed it in the evidence control room

4 | where it would have been safely stored until I was ready to

5 | retrieve it to examine it.

6 | MR. OLMOS:  Move to strike.  Lacks foundation.

7 | THE COURT:  Overruled.  Go ahead.

8 | Q.  BY MR. ESPINOSA:  At some point after retrieving, collecting

9 | and handing off that item for storage, did you come into contact

10 | with it again?

11 | A.  I did.

12 | Q.  What were the circumstances of your next contact with that

13 | hard drive?

14 | A.  I signed it out of the evidence control room in order to

15 | perform a computer forensic exam on the item.

16 | Q.  Did you perform that exam?

17 | A.  I did.

18 | Q.  What is a computer forensic exam?

19 | A.  In a computer forensic exam, I will take the digital media,

20 | whether a computer, or, in this case, a hard drive, I will

21 | connect it to a computer work station, FBI computer work

22 | station, and I will make a copy, but I will connect it to the

23 | computer work station via a write-protection device, write

24 | blocker is what we call them.  This way there is no way I can

25 | accidentally or intentionally make any changes to the original

1    evidence.

2    Q.  I want to ask you about that.  So this write blocker

3    process, could you -- I think you said it prevents you from

4    making any changes.  Can you describe a little more what that

5    means?

6    A.  So if I were to just plug it into a port on my computer, say

7    a USB, this is a change to -- the Windows on my computer would

8    write some data to the hard drive, or I could accidently copy

9    the wrong direction if I were to make a mistake, and then I

10   could alter the original evidence.  Using this write protection

11   device, it's a physical black box that goes in between the

12   evidence and my computer to make sure that there is no physical

13   way I can send electrons to the hard drive in order to make

14   changes.

15   Q.  I hope this doesn't sound like a dumb question, but why

16   would you want to avoid altering the content of the digital

17   content on the device?

18   A.  My number one job is to protect the original evidence from

19   any changes.

20   Q.  So the write protect process just ensures that whatever is

21   on the device is what is later subject to your search, is that

22   right?

23   A.  Precisely.

24   Q.  All right.  What do you do after you install the write

25   protect or you apply the write protect?

1   A.  So I connect it to my computer, and I collect a forensic

2   image, which is a copy of the hard drive.

3   Q.  And the copy of the hard drive, does it have -- is it --

4   does it have a specific name for that copy?

5   A.  We call it a forensic image.  I know the terminology is

6   confusing.  But the forensic image is a copy of the hard drive

7   bit or bit.  So every one, every zero that's on that digital

8   media is copied.  Not only files that are in use in the hard

9   drives but also the free space, or the parts of the hard drive

10  that are not being used but may have been used before may

11  contain deleted items that may be recovered.

12  Q.  So making that bit by bit digital copy, what does it permit

13  you to do?

14  A.  So now I can perform my forensic exam, apply other tools to

15  the copy, and there is no danger of damaging the evidence.

16  Q.  Is there a way to make certain that the copy is a bit for

17  bit copy?

18  A.  Yes.  As I'm collecting the copy, I'm collecting a forensic

19  hash.

20  Q.  What's a forensic hash?

21  A.  A hash is a mathematical formula that I will send the data

22  through, and then once all the data comes through, it comes up

23  with a digital fingerprint, a very long number, about 40

24  characters long.  So I compare the image I collected, the hash,

25  with the hash of the data on the hard drive, and if they are a

1   match, then the fingerprint matches.  If one of those ones or

2   zeros doesn't get copied correctly, then I will get a very

3   different fingerprint, and I'll know that the copy did not

4   successfully make, and I will have to start over again.

5   Q.  Did you do a hash in this case?

6   A.  I did do a hash comparison in this case, yes.

7   Q.  All right.  Once you finished with the write protect process

8   and the imaging and the hashing, what did you do next?

9   A.  Well, I unplugged the hard drive and returned it to evidence

10  control because now all the work I'm doing is on my computer.  I

11  applied a forensic tool called FTK, short for Forensic Tool Kit,

12  to that image, and that tool goes through from the start of the

13  drive to the end and pulls out all the Word documents, all the

14  e-mails, all the pictures, all the videos, any type of file that

15  it is capable of identifying it will find it and organize those

16  in such a way that it's easy for the investigator to then select

17  what's related to his case and what's not.

18  Q.  Did you do anything after you generated that report, did you

19  use it in any way?

20  A.  I turned the report over to the case agent.

21  Q.  So you, yourself, didn't conduct the analysis of the content

22  of the hard drive?

23  A.  Correct.

24          MR. ESPINOSA:  Just one minute.

25  Q.  BY MR. ESPINOSA:  Special Agent Medlin, at some point in

1    your participation in this investigation were you asked to

2    extract particular data from the collection that you first

3    extracted or that mirror that you made?

4    A.   Yes.

5    Q.   What particular data were you asked to extract from that

6    copy you made?

7    A.   At a later point in time, I was asked to extract photos and

8    videos, all the pictures and all the movies from the data

9    collected from this hard drive.

10   Q.   Did you do that?

11   A.   I did.

12   Q.   What did you do with the data --

13        Well, let me ask you first.  How do you do that extraction?

14   A.   Using that FTK program, which already sorted out the

15   pictures and videos, I used the export function to remove those

16   pictures and videos to another hard drive.

17   Q.   What did you do with the extracted video and image files?

18   A.   And those I turned over to the agent that requested them.

19             MR. ESPINOSA:  Okay.  All right.  No further

20   questions, Your Honor.

21             THE COURT:  Cross-examination.

22             MR. OLMOS:  Nothing from the defense, Your Honor.

23   Thank you.

24             THE COURT:  Okay.  Thank you very much.  You may step

25   down.

1          All right.  Ladies and gentlemen, we are moving at warp

2    speed.  The Government has informed me there is only one more

3    witness that they will call.  It may take up most of tomorrow,

4    but it does appear as if you may get the case when you come back

5    from Labor Day.  So it doesn't appear to me at all that you will

6    be here after next week, and it may be that, as I said, you'll

7    get the case as early as Tuesday.  So estimates were high.  I

8    usually do that.  And so we're moving much faster all leading to

9    I'm going to let you go home early today.  Get you out of here

10   and have you come back tomorrow about 9:15 again, and we'll have

11   a full day tomorrow.  Get a good night's sleep.  All admonitions

12   apply.  Don't talk to anybody, no investigation of anything

13   involved with the issues in this case.  And report any violation

14   of those admonitions to me.  And I will see you tomorrow morning

15   at 9:15.  Thank you all.

16        (Jury out.  2:56 p.m.)

17          THE COURT:  Mr. Olmos, are you going to have your

18   witness here tomorrow, or were you just planning to call him

19   next Tuesday?

20          MR. OLMOS:  I have him scheduled for next Tuesday on

21   his schedule.  So if --

22          THE COURT:  Sorry to interrupt.  But you said you may

23   go most of the day anyway.  There is a lot of exhibits.  Again,

24   if you finish early, 2:30 to 3:00 tomorrow, we'll go ahead and

25   break.  I anticipate I'll have to hear motions anyway at the

 1   close of the Government's case.  So we can take those up, and

 2   you can have your guy testify first thing Tuesday, and then

 3   we'll go into closing arguments.  Sound about right?

 4              MR. ESPINOSA:  Yes, Your Honor.

 5              MR. OLMOS:  It does, Your Honor.  So in that event,

 6   does the Court -- would the Court anticipate or want written

 7   Rule 29 motions to be heard tomorrow afternoon?

 8              THE COURT:  Well, I don't know if you'll finish.  You

 9   may finish by tomorrow afternoon.  I usually hear them right

10   after the Government closes its case.

11       I basically have the written Rule 29 in your trial briefs,

12   but if there is something more that you want to submit, I would

13   submit it to me sooner rather than later because, yeah, I

14   usually take them up right after the Government says they rest.

15       Okay.  See everybody tomorrow about 9:15.  If there is

16   something that we need to talk about before the jury gets here,

17   just notify Mr. Vine, and I will come in at 9:00.  But otherwise

18   I will come in at 9:15.

19       (Court adjourned.  2:58 p.m.)

20                          CERTIFICATION

21   I, Diane J. Shepard, certify that the foregoing is a correct

22   transcript from the record of proceedings in the above-entitled

23   matter.                    /s/ DIANE J. SHEPARD
                                DIANE J. SHEPARD, CSR #6331, RPR
24                              Official Court Reporter
                                United States District Court

25