IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                Plaintiff,
                                        Case No. 2:15-cr-00227

          vs.
                                        Sacramento, California
MICHAEL CAREY CLEMANS,                  September 5, 2017
                                        9:00 a.m.
                Defendant.
_____ /


                    JURY TRIAL - DAY 4
            BEFORE THE HONORABLE JOHN A. MENDEZ
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          OFFICE OF UNITED STATES ATTORNEY
                             501 I Street, Suite 10-100
                             Sacramento, California 95814
                             BY:  ANDRE M. ESPINOSA
                                  COLLEEN M. KENNEDY
                                  Assistant U.S. Attorneys




For the Defendant:           NOLAN BARTON & OLMOS
                             BY:  DANIEL B. OLMOS
                             600 University Avenue
                             Palo Alto, California 94301




For Court Reporter:          DIANE J. SHEPARD, CSR 6331, RPR
                             Official Court Reporter
                             501 I Street, Rm 4-200
                             Sacramento, California 95814
                             (916) 554-7460


Proceedings reported by mechanical stenography, transcript
produced by computer-aided transcription.

1          THE COURT:  Outside the presence of the jury.

2    Government has rested.  Mr. Olmos, you have a motion you want to

3    make at this time?

4          MR. OLMOS:  Yes, Your Honor.  Thank you.

5          THE COURT:  Okay.  And you didn't file anything

6    additional in writing?

7          MR. OLMOS:  I did not.

8          THE COURT:  Okay.

9          MR. OLMOS:  May I?

10         THE COURT:  You may.

11         MR. OLMOS:  I'm going to step to the podium if you

12   don't mind, Your Honor.

13         THE COURT:  No problem.

14         MR. OLMOS:  I hope that I think better on my feet.

15     I want the record to be clear that I am now making a motion

16   under Rule 29 for a judgment of acquittal with respect to all

17   three charges that are now still pending before the Court now

18   that we've closed the Government's case.

19     And without conceding in any absolute sense what I think the

20   strengths or weaknesses of my argument or position are with

21   respect to Counts 2 and 4, I want to start with Count 1 because

22   I think that that's where the theme, the thread that we have

23   been arguing in this case is kind of distilled to its barest to

24   where -- and where the Government's, in my view, overreach in

25   this case is most clear.

1      I hope the Court will indulge me just a few moments, Your

2  Honor.  We often lament in the defense bar -- I know you were a

3  trial lawyer -- that bad facts make bad law.  And the facts in

4  this case, I concede, are horrific.  Trial lawyers get, as you

5  will recall, sort of a trial psychosis when they get into trial.

6  I didn't get that here for obvious reasons.

7      But I think that it is precisely when we are confronted as

8  officers of the court and as the court with facts that are this

9  bad, circumstances that are this unspeakable, it is when we have

10  to pay the closest attention to the constitutional protections

11  involved.

12      It's a lot easier to do in a dope case than it is a case

13  like this, and I'm not trying to lecture or get on a soap box

14  with the Court.  I'm letting the Court know that I'm aware of

15  what we're facing here.  I have been for some time.

16      And you said at the outset of this case that there were

17  going to be important legal issues that were going to be

18  addressed in this Court and in this trial that, whether we like

19  it or not, I think are going to set precedent in this district

20  and in this circuit for some time.

21      So it's for that reason, as well, that I want to make sure

22  that I'm as careful and precise as I can possibly be with

23  respect to the constitutional legal protections that I think are

24  at issue here.  Because it's not just about my client.  I think

25  it's about everybody that comes after him.

1          As the Court is aware, Mr. Clemans has already pled guilty

2     to three charges that, in this Court's discretion, could send

3     him away for -- send him away for the rest of his life.  And I

4     don't mean to denigrate the prosecution at all.  I have a lot of

5     respect for Mr. Espinosa and Miss Kennedy and the way they've

6     handled themselves in this case.

7          But I think it is also difficult when prosecution agencies

8     are faced with facts like this and this bad that I can imagine

9     the natural inclination to overstep and to overreach, and I

10    think that's what they've done here.  Particularly with respect

11    to Count 1.

12         As pled up until the Friday afternoon before trial, that

13    count alleged facts only from November of 2013.  I think the

14    Government realized, belatedly, that it had a real issue there,

15    and it tried to fix that by this Second Superseding Indictment,

16    a new pleading, at the 12th hour.

17         And I think that it so stretched and tortured the facts and

18    the law in this area that it deserves to be addressed.  And I

19    think that the most perfect -- I wish I had the talent to

20    explain and to analyze to this Court better than the federal

21    judges did in the Weingarten opinion out of the Second Circuit,

22    but I can't.

23         What I think was so interesting about that case, and the

24    reason I think it is so applicable here, is that in that case

25    the Government saw three different phases of travel.  That was a

1    United States citizen who lived in Israel and was serially

2    raping his daughter.  And the Government saw three different

3    phases of travel.  They saw travel from Israel to the United

4    States; they saw travel from the United States to Europe; and

5    then they saw travel between Israel and I think it was Belgium.

6              THE COURT:  Belgium.

7              MR. OLMOS:  And they charged those three different

8    travel instances with distinct charges.

9         What the Second Circuit held, as I think this Court is

10   aware, that the travel between the United States and a foreign

11   country met the foreign commerce definition under the law, but

12   that travel between Europe and Antwerp didn't -- or between

13   Israel and Antwerp didn't.  Even though that was a United States

14   citizen; even though that was a United States citizen who flew

15   back and forth a number of times between Europe and United

16   States with his daughter, who he was abusing sexually throughout

17   this ten-year time period; and the Government chose in that case

18   to do it, in my view, the correct way.

19        And to a certain extent it faced its medicine for doing that

20   in the Second Circuit, but I think it was the right way to

21   proceed, and I think the Second Circuit saw that, and its

22   analysis I think is spot on.

23        Even though that's a United States citizen who is flying

24   back and forth, with some regularity, with his daughter, that

25   the travel that they were looking at, the international travel

1    they were looking at, much like we're looking at here, was a

2    distinct instance of travel.  It was a distinct flight.

3        And I think that that's exactly what we have here.  The

4    Government has tried to say, well, we're going to go back a

5    couple months to that September date, September 2013, and just

6    because Mr. Clemans was talking to this woman in the

7    Philippines, or whoever he or she was, that somehow when he flew

8    from -- through Seoul from the United States to Bangkok, that in

9    his mind that's travel, that's travel with the intent.

10       But he was flying to Bangkok.  He was flying to Thailand.

11   There has been no evidence that he communicated with anybody in

12   Thailand during that entire period of time.  The only evidence

13   we have in this case is that he is communicating with people in

14   the Philippines.

15       So it cannot possibly be that unless he's stopping off at

16   Bangkok on his way to the Philippines on a layover -- and

17   Weingarten tells us that, that meets the test -- that that

18   travel in September 2013 between the United States and Bangkok

19   can satisfy the statute.  It does not meet the legal burden.  It

20   can't.  And we have then two months that go by.

21            THE COURT:  Let's start with you obviously know that

22   the Court has to take the facts in the light most favorable to

23   the Government.

24       You know the Government's argument, which is it started in

25   the United States, in Sacramento, and it was continuous

1    throughout this period of two months.

2        And so in the light most favorable to the Government, the

3    theory of the case is it never ended until he actually got to

4    the Philippines.  So, yes, there were stops along the way, but

5    it is a two-month process.  And so it's really the temporal

6    argument is because it took two months -- and I've looked at

7    Weingarten, and I -- just so you know I've looked at Clark, I

8    looked at a case called Boyajian, B-o-y-a-j-i-a-n.  It's a

9    Central District case that was decided last year.  Clark, which

10   is a Ninth Circuit case, was a 2423(c) case, so was this

11   Boyajian case, but had language that's instructive and helpful.

12       So in the light most favorable to the Government, it wasn't

13   like in Weingarten.  This wasn't three separate trips.  This was

14   three separate legs of basically one overall trip.  And although

15   it took him from September to November to finally get to the

16   Philippines, in the light most favorable to the Government, it's

17   one trip with three legs.  So you sort of have to start there

18   with that premise and could the jury return a verdict based on

19   that theory and those facts.

20       Legally, the issue is -- this temporal -- is two months too

21   long a time to say and allow the Government to argue is it just

22   one trip, or is two months not long.  Weingarten said travel

23   between two foreign countries absent any territorial nexus to

24   the United States does not constitute travel in foreign commerce

25   for purposes of 2423(b) -- but there was a caveat.  The

1    Weingarten court said, we do not suggest, of course, that the

2    mere presence of an intermediate stop outside the United States

3    on a multi-legged journey undertaken for unlawful purposes will

4    immunize the defendant from prosecution under 2423(b).  An

5    offender violates the law when he embarks on travel with the

6    requisite illicit purpose, and mere stops along the way do not

7    deprive travel of its territorial nexus to the United States.

8        And so Clark, which was a Ninth Circuit case -- again, it's

9    a 2423(c) case -- but it involved a U.S. citizen who, like

10   Mr. Clemans, primarily resided overseas.  This person in Clark

11   resided in Cambodia.  He visited his family in Seattle in May of

12   2003, left the United States, flew to Cambodia via Japan,

13   Thailand, and Malaysia.  And then a month later -- so a month

14   went by -- he got arrested after discovering that he was having

15   sex with two boys in Cambodia.

16       He entered a guilty plea to a 2423(c) violation but reserved

17   his right to appeal, and he asked the Ninth Circuit to address

18   whether under 2423(c) whether that statute violated the foreign

19   commerce clause.

20       The court held that Congress acted within the bounds of its

21   constitutional authority, that the lapse in time between Clark's

22   most recent transit between the United States and Cambodia and

23   his arrest was less than two months.  We see no plausible

24   reading of the statute that would exclude its application to

25   Clark's conduct because of this limited time gap.

1    Stated differently, Clark held that a lapse in time between

2    a defendant's travel and a sex act will not ordinarily preclude

3    prosecution under the statute.

4    But the Ninth Circuit did leave open the question, critical

5    question of whether a longer gap between travel and the

6    commercial sex act could trigger constitutional or other

7    concerns.

8    And that's when I looked at the Central District case

9    decided in 2016 -- again, it's only district court case, it's

10   not our district, and, again, it was a 2423(c) case -- but in

11   that case there was a gap of five months between the travel in

12   foreign commerce and when the defendant was alleged to have

13   engaged in illicit sexual conduct.

14   In relying on Clark, the district court held that five

15   months wasn't too long, that the five-month lapse in time fell

16   -- that it didn't fall outside the 2423(c) temporal scope, and

17   so the court denied the motion for acquittal on that count.

18   That's all I've got.  It's not a lot of case law.  And

19   you're right, it's a new issue.  They did charge it differently

20   in Weingarten including the Government could have charged at

21   least the U.S. -- well, there was no act that occurred until he

22   got to the Philippines.  So they really couldn't charge it the

23   way Weingarten did because there were three separate acts in

24   that case.

25   But that's the issue.  So taking all the facts in the light

1    most favorable to the Government you still think as a matter of

2    law they can't go forward.

3            MR. OLMOS:  I do, Your Honor.  Here's why.

4        The subsection (c) cases that the court cites, Boyajian, a

5    case I'm unfortunately pretty familiar with --

6            THE COURT:  Were you the lawyer?

7            MR. OLMOS:  I was not, but I was -- well --

8            THE COURT:  Go ahead.

9            MR. OLMOS:  -- those deal with subsection (c).

10   Congress enacted subsection (c) after it enacted subsections (a)

11   and (b); in other words, the original statute was passed and it

12   did not include (c).  Congress went back and added subsection

13   (c) later.

14       And you can see -- and there is language in cases addressing

15   this subsection opining that the reason Congress did that is to

16   fix, quote, unquote, this jurisdictional issue that was

17   presented to the courts in subsection (b).  Because you see

18   subsection (c) has the travel in foreign commerce, and then it

19   says "or resides."  And the rational basis for Congress doing

20   that is because (c) contemplates a completed act, the completed

21   sexual act, which Congress can and may punish -- address

22   differently.

23       And I think there is a common cannon of statutory

24   interpretation that we have to look at subsections of the same

25   statute, and we have to look at the code within chapters -- and

1   we'll get to this more when I address Count 4 -- we have to look

2   at them together.  And we have to assume, rightly or wrongly,

3   but we have to assume that Congress knew what it was doing.

4   That Congress -- because there is no reason to have (c) if in

5   fact you already have (b).  They are punished the same here.

6           THE COURT:  Right.

7           MR. OLMOS:  But they are different definitions.  And

8   they are different definitions because Congress says, okay,

9   traveling in foreign commerce with the intent to do something is

10  one thing, but if you actually have a United States citizen who

11  is living overseas and does this, actually does this, that's a

12  crime.  It's a crime that we're going to address differently in

13  a different subsection.

14      And the foreign commerce discussions in Clark and Boyajian

15  what they do is they say, does this meet the sort of broadest

16  congressional definitions or the broadest congressional

17  boundaries of foreign commerce.  It's why I can't argue to this

18  court, when we get to Count 4, about foreign commerce because

19  that says "affects foreign commerce."  That gets under the

20  commerce clause because it says "affects."  It's much broader,

21  right?  Everything affects foreign commerce.

22      But what we have here is "travel in."  Right?  And that's

23  what (c) says, it says travel in foreign commerce, in other

24  words, the same as (b), "or resides."  Right?  And what those

25  cases are doing is they're saying, does that "or resides" prong

1    fall anywhere within the foreign commerce clause, the boundaries

2    that we've set forth.  And the district court said in those

3    cases they do.  Right?

4        But what we have here is -- so not in subsection (c) land,

5    which is where there are -- there is some case law interpreting

6    this -- we're in subsection (b) land.  (B) land is travel in

7    foreign commerce.  And that's why Weingarten, again, addressed

8    those three travel legs separately.

9            THE COURT:  That's the way they were charged, though,

10   right?

11           MR. OLMOS:  That is the way they were charged.  But a

12   reviewing court still has to look, as this court does with

13   respect to this motion, at the facts most favorable to the

14   Government.  Right?

15       So what the second circuit could have said in that case, for

16   example, is because that travel between Belgium and Israel back

17   in '97, when we know the sexual abuse had already started -- I'm

18   sorry -- when the travel occurred between the United States and

19   overseas, right, that that's sufficient to cover that

20   international travel, too.  Because this guy was already doing

21   this horrific stuff.  He was already doing it to his daughter.

22   So, clearly, when he flew from the United States, either to

23   Tel Aviv or to Antwerp, that sometime down the line he was also

24   going to fly international.

25       This is basically what the Government is saying here.  If I

1   fly from the United States to Thailand, and on my way there I've

2   already done some bad stuff in my life in Southeast Asia, and I

3   plan on doing some bad stuff in the future.  I don't know when,

4   I don't know how, but I'm going to.  That, under the

5   Government's position here, that that's satisfactory, that

6   satisfies travel in foreign commerce even though my destination,

7   where I'm going overseas, when I get there I have no intent

8   actually to do this.  I'm going to do it on some unidentified

9   foreign travel that's going to happen sometime in the future,

10  and I know I'm going to do it because I've already done it.  I

11  plan on doing it sometime in the future.  And I know the best

12  place to do it is in the Philippines.  Even though I have no

13  plans to do it when I'm in Thailand or there is no evidence of

14  any plans I have to do it in Thailand.  I have no expected or

15  anticipated or specific second leg of that travel.  That's what

16  Weingarten is talking about.

17          THE COURT:  When you say there is no evidence that I

18  expected to do it when I got to Thailand, there is a series of

19  exhibits, instant messages, e-mails, in which the same line of

20  conversation continues.  There is no gap.

21      The problem with the argument is that there is no gap here.

22  From September to November it's constant, constant I'm coming

23  over, keep sending me pictures, I want to have sex, I want to

24  stay with these girls, keep sending me pictures.  It's not three

25  or, his case, two separate instances.  It's continuous.

1    Non-stop between September and November.  The same conversations

2    over and over with the inference that when he finally got to the

3    Philippines he did have sex with at least two girls, two minors.

4        So there is no break.  The only break is that it took him

5    two months to get to the Philippines.  And so, again, the

6    question is, does the Government's theory of the case fit

7    2423(b).  It's one trip as far as they're concerned.  It just

8    took him two months to get there, and the first part of that

9    trip started in the United States.

10       I don't know if there is anything in between, but it was --

11   I know he flew somewhere -- but basically United States,

12   Thailand, Philippines, right?

13           MR. OLMOS:  But that's not what happened.  He didn't

14   even have his ticket.  He didn't buy his ticket until November.

15   This wasn't one continuous travel.

16       What Weingarten is saying here, the language in Weingarten I

17   believe is saying is that if I book a trip from the United

18   States to the Philippines --

19           THE COURT:  Well, that one is easy.

20           MR. OLMOS:  But let's say I have some layovers.  I

21   have layovers in other places.  I have no intent in the

22   international boarding area in Thailand, on my layover, to do

23   anything awful to kids.  But I do when I get to the other side.

24   Right?  That's what Weingarten is talking about there.

25       This is not -- I understand that there may be a thread of

1   communications that run these two months, but there is not --

2   inarguably, I don't think, there is not uninterrupted travel.

3   There is travel to the Philippines -- I'm sorry -- to Bangkok,

4   period.

5           THE COURT:  Where he stays for a while.

6           MR. OLMOS:  Where he stays for two months.  He travels

7   to Laos, back and forth, in the interim there, and then he books

8   a separate, distinct trip between Bangkok and Manila.

9       And if we extend it this far, if we extend Weingarten this

10  far, then I don't think that there is any limits to it.  Again,

11  because then I can say --

12          THE COURT:  Well, that's the issue.  Is there any

13  limits?  In his case, it's only two months.  Even though the

14  Ninth Circuit case is a (c) case, and the central district case

15  is a (c) case, and I understand your argument legally how that

16  statute should be looked at differently, but it still gives me

17  some guidance as to whether two months is too long.  And I don't

18  get that sense from those two cases although they are not (b)

19  cases.  Is there any other (b) case that you came across?

20  Because I didn't.

21          MR. OLMOS:  Well, I would say, unfortunately not, but

22  I'm sort of glad there aren't.  Right?  Because I'm glad the

23  courts in this country don't have to deal with this awful stuff.

24          THE COURT:  Let me ask Mr. Espinosa.  Do you think

25  there is another (b) case?

1          MR. ESPINOSA:  Yes, Your Honor.

2          THE COURT:  Just quickly because I don't want to

3   interrupt Mr. Olmos' argument, but give me the name of the case.

4          MR. ESPINOSA:  The case is United States vs. Bredimus,

5   B-r-e-d-i-m-u-s.  The most relevant case is the district court

6   opinion in that case which is at 234 F.Supp.2d 639.

7          THE COURT:  What district court?

8          MR. ESPINOSA:  The Northern District of Texas.

9      The Fifth Circuit affirmed that case, Your Honor, on review

10  at 352 F.3d 200.  It's from 2003.  And it is a 2423(b) case.

11     And in the district court case it's clear not only that --

12  not only did the court uphold the statute's applicability in the

13  face of a constitutional and as-applied challenge, but in the

14  facts of the case the defendant was a businessman --

15         THE COURT:  Let me look at it.  I want Mr. Olmos to

16  continue.  Go ahead.  Still on Count 1.

17         MR. OLMOS:  Well, I think I've exhausted my wind on

18  Count 1.  I think the Court gets my position.  This was not

19  uninterrupted travel.  That was a single, discreet trip that the

20  Government, up until the Friday afternoon before trial, had

21  charged.  And I think that's because that's what the evidence is

22  in this case.

23         THE COURT:  Okay.

24         MR. OLMOS:  I don't think there is any way any

25  reasonable jury could find otherwise.

1          THE COURT:  Well, it depends on how they are

2    instructed.  It's a legal issue.  It really is.  That one

3    clearly is, I think.  There is no disagreement as to the facts,

4    but it's a legal issue.  Go ahead.

5          MR. OLMOS:  Count 2.  I won't belabor this.  I think

6    that Count 2, the gravamen of it is -- and I highlighted this in

7    my trial brief -- is whether there was an overt act in

8    furtherance of travel.

9          THE COURT:  Travel.

10          MR. OLMOS:  Not of child pornography.  Not of

11    production.  Not of any of this other stuff.  Clearly, we've got

12    more overt acts than I can count and I want to think about with

13    respect to production of child pornography.

14      But with respect to travel, because that's, again, what the

15    central element that the jury is charged to consider here.  It

16    is the travel.

17          THE COURT:  So on Count 2 in the second superseding

18    indictment in the paragraphs under overt acts, paragraph 9

19    charges that on June 25, 2014, Mr. Clemans had the intent to

20    travel; on July 1st, 2014, he had the intent to travel; and that

21    on May 8th, 2015, he had the intent to travel.  So there is

22    three overt acts out of 23 that at least focus on travel.

23      Now, I understand that undisputed facts are he actually

24    never did travel, but that's not the charge.  It's a conspiracy

25    to travel with intent to engage in illicit conduct.

1      Your argument is, what, that every time he mentions I'll be

2  there, I'm going to come, I intend to get there, even though he

3  never got there, that that's -- that I should interpret that in

4  the light most favorable to the Government as he's just puffing,

5  he's just -- because I'm not clear what your argument is because

6  there is clearly evidence over and over again that I'm coming,

7  I'm going to get there, I don't know when I can get there.  And

8  at least three overt acts.

9      The word "travel" is throughout his IMs.  So I'm not clear

10  what you're arguing.  If I take those in the light most

11  favorable to the Government, he had the intent to travel.  He

12  intended to travel but things got in the way.

13           MR. OLMOS:  Well, let's say --

14           THE COURT:  And he doesn't actually have to travel to

15  prove this charge.

16           MR. OLMOS:  I understand that.  And I need to get in

17  the habit of doing this more often with federal judges.  Let's

18  say I agree with everything you just said.  I agree that

19  throughout this period of time he had an intent at some point in

20  the future to go to the Philippines.  It doesn't say in the

21  statute, in the case law interpreting it, the overt intent.  It

22  says the overt act.  There has to be an act, an action.  Act and

23  intent are two very different things in the criminal justice

24  system.

25      The intent goes to the agreement.  The intent goes to

1    forming the common criminal purpose.  That's the intent.  Right?

2    But the reason conspiracy case law has evolved the way it has is

3    because if you and I sit around and say we're going to go rob a

4    bank, but we never actually do anything about it, then we're not

5    guilty of a criminal conspiracy.  It is the act, the overt act

6    requirement which separates a couple of idiots sitting around

7    talking about committing a crime and an actual crime.

8        What is the overt act?  Not intent.  What is the overt act

9    here that goes to travel?  There isn't one.  The intent, itself,

10   is not sufficient.  Sitting around and talking about something

11   you may want to do is not sufficient.  It is the act.  What did

12   I do?  Or what did anybody in the conspiracy do?  Right?

13       Because if -- we'd be having a very different argument here

14   had Tandeg, in the Philippines, booked a hotel room for a

15   certain date.  Even if my client never bought a ticket, never

16   had an itinerary, never did anything.  Right?  If she did

17   something specifically related to travel, or if my client did

18   something, an act specifically related to travel, we'd be having

19   a different conversation here.  But there is no evidence of

20   that.

21       There is plenty of evidence running through these horrible

22   IMs about intent.  But it is the overt act requirement which

23   separates what is and what isn't a criminal conspiracy.

24            THE COURT:  And best case for you is, in support of

25   that argument?

1          MR. OLMOS:  You know, I found a wonderful case, which

2    I think I cited in my trial brief, which quotes Plato, I think.

3    Talking about this precise --

4          THE COURT:  P-l-a-t-o not P-l-a-y-d-o-u-g-h.

5          MR. OLMOS:  But that's the thread that runs through

6    these conspiracy cases.

7          THE COURT:  You're avoiding my question.  So you don't

8    have a case.  It's your belief, your interpretation.

9          MR. OLMOS:  Of the definition of an act versus intent.

10   That's my argument.

11         THE COURT:  But nothing anywhere that supports that

12   view of this statute?

13         MR. OLMOS:  Well, I did not cite, and I don't have on

14   hand with me cases that deal specifically, in different context,

15   with there is no overt act here.

16         THE COURT:  Mr. Espinosa is helping you.  What did you

17   cite?

18         MR. OLMOS:  I cited a footnote in a 1945 Supreme Court

19   case, which, based on my legal research, has not been

20   overturned.  And I appreciate Mr. Espinosa's help.

21         THE COURT:  What's the case?

22         MR. OLMOS:  Cramer, C-r-a-m-e-r, vs. United States,

23   1945, 325 US1, in footnote 21, and I think footnote 20 addresses

24   the same -- or 26, memory serves, addresses the same concept.

25         THE COURT:  Okay.

1          MR. OLMOS:  Words -- quote -- words do not constitute

2     an overt act.  They remain only an idea.

3        And I do cite, thankfully, a Ninth Circuit case in my trial

4     brief, Melchor-Lopez, M-e-l-c-h-o-r, 627 F.2d 886.

5          THE COURT:  Six what?

6          MR. OLMOS:  627 F.2d 886.

7        But that goes to a separate issue.  That goes to, let's say,

8     there were no overt act requirement, whether still talking about

9     this common concept still constitutes an agreement.  So I don't

10    think that that Ninth Circuit case is going to deal with the

11    definition of an overt act.

12       And now I will move to Count 4.

13         THE COURT:  Okay.

14         MR. OLMOS:  I see from the draft jury instructions the

15    way the wind is blowing here on the legal definition of custody

16    and control.  So the appropriate time, among the jury

17    instructions, that is the specific instruction that I wish to

18    object to, which is found on page 29.

19       It is a separate -- it's a definitional jury instruction

20    under Jury Instruction 28.

21         THE COURT:  Hang on.

22         MR. OLMOS:  And I have it for the Court if you want to

23    see it.

24         THE COURT:  2256, 7.  18 U.S.C. 2256, 7.  Custody or

25    control includes temporary supervision over or responsibility

1    for a minor whether legally or illegally obtained.

2        So how do I get around that?

3            MR. OLMOS:  You get around it, Your Honor --

4            THE COURT:  For purposes of this chapter, definitions

5    for the chapter in which the charge 2251(A)(b)(1), so if the

6    statute tells me this is the definition of that term, what gives

7    me the right to make up another definition?  That's what I

8    struggled with.

9            MR. OLMOS:  Again, I will concede that I wish I could

10   do this argument as much justice as, unfortunately, a dissenting

11   judge in the -- I don't even know how to say this case, but it

12   is spelled B-u-c-u-l-e-i.  Buculei.  Buculei.

13       That's where the majority decision finds that custody or

14   control in 2251(A) means -- what this jury instruction and

15   2256(7) --

16           THE COURT:  Is that the Texas case?

17           MR. OLMOS:  Yes -- No. No.

18           THE COURT:  The mother goes to Texas?

19           MR. OLMOS:  That's the Eastern District case.

20           THE COURT:  That's right.  Okay.

21           MR. OLMOS:  Buculei is a Fourth Circuit case, and I

22   don't know the district court where it originated.  The case the

23   court is thinking about is LaBrecque, L-a-B-r-e-c-q-u-e.

24       But what Buculei, what the Fourth Circuit case says, the

25   dissenting court says that the overriding concern when you look

1    at a statute is to, again, interpret it in a way that makes it

2    not redundant with another.

3        And my argument -- and I -- the Court was nice enough to

4    grant me a long time to argue this when I filed my motion to

5    dismiss -- the very common -- I hesitate to use the word

6    ordinary in this context, but I can't think of a better word --

7    if I produce child pornography, if I take a picture of a little

8    kid, almost definitionally I have some sort of temporary control

9    over that child.  I have to.

10             THE COURT:  Yes.

11             MR. OLMOS:  When I take the picture of the kid, I've

12   got temporary control over that kid.

13             THE COURT:  Unless the parent is there, which is that

14   case out of the Eastern District.

15             MR. OLMOS:  I don't think under -- I don't think that

16   it's an exclusive term.  In other words, I don't think even

17   under Buculei, even under that Fourth Circuit case that that

18   would preclude application of the statute as defined by that

19   court and as defined in this jury instruction.

20       I still have -- it may be co-custody, but I still have some

21   custody over that little kid if I'm taking a nasty picture of

22   him or her.  All right.  So if --

23             THE COURT:  In your view, for purposes of a small (a)

24   prosecution, but for purposes of a capitol (A) prosecution, your

25   argument is there's got to be more; otherwise you're reading the

1    statute the same way.

2            MR. OLMOS:  Exactly.  Otherwise it's a lesser-included

3    offense, essentially, of production of child pornography.

4            THE COURT:  So what more do you think is needed that's

5    not here?

6            MR. OLMOS:  That the definition of custody or control

7    has a more robust definition than temporary custody or control.

8    Right?

9        This jury instruction makes 2251(A) a lesser-included

10   offense, essentially, of production of child pornography.  And

11   that cannot be what Congress intended because the penalties for

12   (A) are so much more dire.  It's a 30-year mandatory minimum.

13   We have to assume, again -- I hate saying that out loud -- but

14   the law tells us that we have to assume that Congress knew what

15   it was doing.

16           THE COURT:  So your proposed jury instruction is that

17   that term, custody or control, requires that the defendant

18   obtain permanent supervision over or responsibility for the

19   minor from the minor's previous parent or guardian.  Temporary

20   control, employment, use, persuasion, inducement, enticement or

21   coercion is insufficient.  And then you rely on LaBrecque, which

22   I don't think helps you at all.  But is that where you got that

23   language from?

24           MR. OLMOS:  I got that language from the dissenting

25   opinion in the Fourth Circuit case.

1          THE COURT:  Okay.

2          MR. OLMOS:  And that language -- it's not a direct

3    lift from the Fourth Circuit case, but that is what the

4    dissenting judge in that case argues that the definition of

5    custody or control must be.  And it must be that because we have

6    to assume that Congress intended, when it passed that law, to

7    punish something different from what it punished in 2251 -- in

8    the different statute.

9        So again, if temporary custody or this inducement -- or if

10   this temporary custody is sufficient, the United States

11   Government, particularly under this attorney general, should be

12   charging that count -- in every single child pornography

13   production case it might as well charge 2251(A) because it must

14   necessarily include that conduct.

15       And we're not allowed -- under Supreme Court case law, we're

16   not allowed to interpret statutes that way.  We're not allowed

17   to assume that Congress didn't know what it was doing.  We're

18   supposed to assume that they did.

19          THE COURT:  Right.

20          MR. OLMOS:  So if what I believe to be the proper

21   definition of custody or control in this instance is applied,

22   then I don't think there is any way that a reasonable jury could

23   find that the facts here meet that definition.

24          THE COURT:  Mr. Espinosa.

25          MR. ESPINOSA:  Your Honor, I'll respond in order of

1   the arguments by count.

2        So, first, with respect to Count 1, the travel count --

3             THE COURT:  Right.

4             MR. ESPINOSA:  -- it's useful to start with just some

5   small -- some amount of factual detail from Weingarten.

6        In Weingarten, it's true that the Second Circuit held that

7   travel between two foreign countries, exclusively between two

8   foreign countries couldn't support a conviction under 2423(b).

9        But each time that Weingarten wrote that sentence or made

10  that point, the court made clear to add that such travel without

11  any territorial nexus to the United States was the travel it was

12  talking about.

13       And it took those great pains to use that phrase every

14  single time that it makes that point because in Weingarten the

15  defendant had moved from the United States 13 years before the

16  travel at issue.  He was charged 24 years after leaving the

17  United States, but the travel happened 13 years.

18       And so that's why the Government was unable to offer proof

19  of the formation of intent in the United States linking the

20  travel between Israel and Belgium, and the circuit was required

21  to reach the conclusion that it did.

22       But it took pains to point out that a territorial nexus

23  could be established, or at least the court took pains to imply

24  that a territorial nexus could be established under

25  circumstances such as those in this case.

1          THE COURT:  I'm going to stop you for a second.

2      Mr. Vine, if all the jurors are here, tell them it will

3  probably be about 15 more minutes.  So tell them to just relax.

4          MR. ESPINOSA:  I'm referring to the last two

5  paragraphs in Weingarten, at pages 71, Your Honor.

6          THE COURT:  Right.  You quoted those in your brief.

7          MR. ESPINOSA:  In that section, the court in

8  Weingarten cites specifically Clark, a case that the court

9  mentioned earlier, a 2423(c) case, in which there was a

10  two-month delay between travel and the ultimate sex act in that

11  case.

12      But the Weingarten court also cites Bredimus, the district

13  court case that I mentioned to the court, from 2002, from the

14  Northern District of Texas, which was later affirmed by the

15  Fifth Circuit.

16      Although in Weingarten they don't include a parenthetical

17  about Bredimus, but, surely, the reason and the only reasonable

18  explanation for the citation there, for the proposition that we

19  do not suggest, of course, that the mere presence of an

20  intermediate stop outside the United States on a multi-leg

21  journey undertaken for unlawful purposes will immunize the

22  defendant from prosecution under 2423(b), the reason Bredimus is

23  cited at that point is because in Bredimus a businessman

24  traveled to Thailand for the purpose of engaging in illicit

25  sexual conduct with a minor.

1        After he left the United States, but before he reached

2   Thailand, he stopped in two separate countries for two separate

3   business trips.  He stopped in Tokyo, Japan, and he stopped in

4   Hong Kong, which is part of China now -- at the time of Bredimus

5   it was as well.  And in Bredimus, in the district court opinion,

6   the district court responds directly to an argument similar to

7   the argument being presented in this case.

8        That travel -- that the defendant's travel in that case to

9   Thailand was cut off or liability under the statute was cut off

10  by the intervening stops in Japan and China, and said that

11  that's -- and held that that's just not the case.  That the

12  defendant left the United States with the intent necessary to be

13  guilty under the statute, and that the intervening stops didn't

14  break that chain.

15       Now, in that case, in Bredimus, the defendant pled guilty

16  and reserved his right to argue -- make his constitutional

17  challenges to the district court and the appeals court.  And in

18  his guilty plea, he admitted that he possessed the intent to

19  travel on to Thailand for the purpose -- for the illicit sexual

20  conduct at issue in that case.

21       And the court said in the absence of that admission, the

22  Government would have been required to adduce evidence, proof of

23  the intent to link the travel from the United States to the

24  ultimate destination.

25       Well, that's precisely what the Government has offered in

1    this case.  The Court sat through a long day of testimony with

2    Special Agent Schofield in which he testified at length about

3    chat messages between the defendant and Nelia Cruz in September

4    of 2013, preceding his departure from the United States.

5              THE COURT:  What was the time period between when he

6    left the United States and when he got to Thailand in Bredimus?

7              MR. ESPINOSA:  I read Bredimus very, very carefully,

8    Your Honor, and the district court opinion doesn't set forth

9    that timeline.

10        But if we read Bredimus and Clark together, as Weingarten

11   does, and they cited the two cases together, we can at least

12   posit that a two-month delay in travel and the ultimate act, as

13   in Clark, isn't too long a delay for purposes of liability under

14   2423.

15        And we have, essentially, that time period here.  The

16   defendant left the United States, in this case, on or about

17   September 10, 2013, and then ultimately reached Thailand on or

18   about November 13th, 2013.

19        So the Government's position is that there's more than

20   sufficient evidence, especially viewed in the light most

21   favorable to the Government, for a rational jury to find the

22   defendant guilty on Count 1.

23        As to Count 2, the defendant's charged with a conspiracy to

24   commit the same crime, 2423(b) in Count 2, arising out of a

25   separate time period involving Lyan Tandeg.  And the second

1    superseding indictment does allege overt acts that occurred

2    throughout time from June 24, 2014 through July 24, 2015.

3        Now, the conspiracy, as set forth in the evidence, involved

4    a detailed list of steps.  In fact, there was a chat that the

5    jurors saw where the defendant lays out a five-point plan,

6    specific steps that they must take in order to achieve the goal

7    of his travel to the Philippines for sex with a minor.

8            THE COURT:  Just talk.  That's all he's doing.  Just

9    talking.  Big talk.  No action.  That's the argument.  Where is

10   the overt act?

11           MR. ESPINOSA:  It starts as talk and the overt acts

12   come fast.  First, the defendant says in order for me to travel,

13   you got to find me a victim to travel for, and the only way we

14   can do that is if you take pictures of these girls and send them

15   to me.

16       So to facilitate that first step in our conspiracy, I'm

17   going to send you money for a camera, and he sends her $750

18   right up front.  He then says the next step in our conspiracy is

19   that you take photographs of these girls and send them to me.

20   She does that on multiple occasions throughout the period of

21   conspiracy.

22       He says once we've found girls that I'm interested in

23   traveling for, we then have to figure out how and where I'm

24   going to complete the act.  And he sets Miss Tandeg on a path

25   toward looking into rentals, hotels, and other options, which

1   consumes lots of chats throughout the conspiracy period.

2          THE COURT:  All that's conceded.  She finds three

3   girls for him.  She takes pictures.  Again, his theory is I

4   never traveled.  You got to have travel as part of this

5   conspiracy.

6          MR. ESPINOSA:  That's certainly the defendant's

7   argument.  But the conspiracy here -- to prove a conspiracy, the

8   Government doesn't have to prove that he actually traveled

9   because an unconsummated conspiracy -- a defendant can be found

10  guilty of an unconsummated conspiracy.

11         THE COURT:  There was an agreement between two or more

12  persons to commit the crime of travel with the intent to engage

13  in illicit sexual conduct.

14         MR. ESPINOSA:  An analogy that may be helpful is if we

15  charge the defendant with possession of drugs with intent to

16  distribute -- conspiracy to possess with the intent to

17  distribute, which is a common charge, the evidence could show

18  that the defendant and his collaborators intended to distribute

19  those drugs by possessing evidence of the intent to distribute,

20  bags, scales, money wrappers, cash counters, other evidence that

21  would demonstrate that they intended to take the drugs that they

22  possessed and distribute it.

23         THE COURT:  Different crime.  The gist of this crime

24  is the interstate travel -- or foreign commerce travel.

25      The hook is, it's basically you charge in Count 1 for a

 1   different time period, but you're charging it as an agreement.

 2   That I agreed to do the same thing that you're telling me that I

 3   did in Count 1.  And that's the argument.  Where is that act?

 4          MR. ESPINOSA:  He does not have to buy a ticket, Your

 5   Honor.  There is a Supreme Court case that discusses liability

 6   for a conspiracies.  It's Salinas vs. United States 118 S.Ct.

 7   469.  And in that case --

 8          THE COURT:  What year is that?

 9          MR. ESPINOSA:  This is 1997.

10          THE COURT:  Okay.

11          MR. ESPINOSA:  It deals with conspiracy law generally

12   and does not relate to a 22 -- to the statute at issue in this

13   case.

14      But it does make clear these general concepts.  At page 477,

15   Justice Kennedy writes:  A conspirator must intend to further an

16   endeavor which if completed would satisfy all of the elements of

17   a substantive criminal offense, but it suffices that he adopt

18   the goal of furthering or facilitating the criminal endeavor.

19      He earlier, in the same opinion, writes:  A conspiracy may

20   exist even if a conspirator does not agree to commit or

21   facilitate each and every part of the substantive offense.  The

22   partners in the criminal plan must agree to pursue the same

23   criminal objective and may divide up the work.

24      So, here, they divided up the work.  The criminal objective

25   was, I'm going to come to the Philippines for the purpose of

1    this illicit sexual conduct.  But to do that, we must take these

2    several steps in furtherance of this criminal objective.

3        Those steps -- they took three -- you know of those five

4    steps, they took three of the steps.  The defendant ultimately

5    and during the conspiracy traveled back and forth to the United

6    States.

7            THE COURT:  Let's use Mr. Olmos' bank robbery example,

8    though.

9        So I get a car, I get masks, I get guns.  That's enough to

10   charge conspiracy to commit bank robbery?  I drive by banks.

11   All this is financed by the defendant, who is charged with

12   conspiracy to commit bank robbery.  But that's it.

13           MR. ESPINOSA:  Yes, Your Honor.  If those conspirators

14   purchased weapons, ammunition --

15           THE COURT:  You think that's enough to create

16   conspiracy to commit bank robbery?

17           MR. ESPINOSA:  -- purchase disguises.  The substantive

18   conspiracy law does not require that they go rob the bank.  They

19   need only take a substantial step toward that goal.  The

20   substantial step can be the collection of the necessary tools to

21   accomplish the criminal objective.  That's what happened in this

22   case.

23           THE COURT:  That's your argument.

24           MR. ESPINOSA:  That is our argument.  And as for the

25   substantive element of travel, the jurisdictional hook, the

1    defendant on two occasions during the period of the conspiracy

2    is in the United States, and in both occasions he says -- or

3    during both periods, when he is in United States, he says to

4    Tandeg in chats, "I may come directly there from here."

5        Now the first time, in September of 2014, he does not.  He

6    says I'm not going to have enough time.  I'll do it later.

7            THE COURT:  But in May of 2015, he definitely says, as

8    soon as I get my passport back.

9            MR. ESPINOSA:  As soon as I get it, I'm going to do

10   it.  Here's some money.  Here's continued payment for your

11   efforts in this conspiracy, and which is an advancement or a

12   step in furtherance of the conspiracy.

13           THE COURT:  Okay.

14           MR. ESPINOSA:  For those reasons --

15           THE COURT:  I understand your argument.  Count 4.

16           MR. ESPINOSA:  Your Honor, I won't belabor Count 4.

17   The argument from the defendant essentially turns on the

18   definition of custody and control.  As this Court pointed out,

19   that is a statutorily defined term in 2256(7).  It's defined in

20   the manner that the proposed jury instructions define it.

21       In all of the case law that definition is employed.  It is

22   true that in the case that we've been calling Buculei, the

23   dissenting judge in that case dissents from the conclusion of

24   the majority that a 13-year-old girl who is given intoxicating

25   liquid was not under the control or custody of the defendant in

1    that case.

2       The dissenting judge was wrong, Your Honor.  And we

3    shouldn't guide the Court's definition of the term custody and

4    control in this case based on that erroneous finding.

5            THE COURT:  Anything further you want to add for

6    purposes of the Rule 29 at this time?

7            MR. OLMOS:  Your Honor, the last thought that I just

8    formulated is that I think that when the Court is looking at the

9    temporal -- the temporal issue here, that it should be guided

10   not just by the amount of time, which I understand is sort of

11   the definition of temporal, but what is the final destination of

12   my travel from the United States?  Right?

13      Because -- and I think it's Clark -- no -- it's the Northern

14   District of Texas case that Mr. Espinosa is citing -- there was

15   a final destination in that case.

16           THE COURT:  Cambodia.

17           MR. OLMOS:  Right.  The final destination, even though

18   there were these layovers, was Cambodia.  And that's what

19   Weingarten contemplates specifically.  If there are layovers or

20   stops on the way to an ultimate destination, you don't get to

21   get out from under the statute.

22      But that's not what happened here.  That's not what happened

23   in this case.  What happened in this case is the domestic nexus

24   was the travel in September.  And the final destination,

25   inarguably, in that -- for that flight was Bangkok.  There was

1   no second leg.

2          THE COURT:  Hang on.  In Bredimus, Mr. Espinosa --

3   actually Thailand -- when he flew from the United States, did

4   his ticket -- he said he stopped -- made two stops for business

5   and then ended up in Thailand.  Did he have a ticket for

6   Thailand already when he left?  The facts are not clear enough.

7          MR. ESPINOSA:  They are not clear.  The discussion is

8   at page 645 and 646 in the case, and the court just summarizes

9   his argument that his two prior separate business trips to two

10  other sovereign nations broke the chain of intent, and the court

11  disagreed with that finding.  I did look for the underlying

12  documents but wasn't able to find whether he had separate

13  tickets or additional facts.

14         THE COURT:  Bredimus challenges the validity of

15  2423(b) because it criminalizes conduct occurring entirely

16  within another sovereign nation.  He explains that his arrival

17  in Thailand was proceeded by business trips to two other

18  sovereign nations, namely, Tokyo, Japan and Hong Kong, China,

19  and that the only travel in foreign commerce that occurred was

20  his travel from the United States to Tokyo.

21      He argues the statute is being unconstitutionally applied to

22  his subsequent travel from Hong Kong to Thailand and to acts

23  that allegedly occurred while he was in Thailand.

24      The Government contends that Bredimus committed the alleged

25  acts mostly or completely within the United States.

1          Here's what I'm going to do.  Under 29(b), the Court may

2     reserve decision on the motion to proceed with trial where the

3     motion is made before the close of all the evidence, submit the

4     case to the jury and decide the motion either before the jury

5     returns a verdict or after it returns a verdict of guilty or is

6     discharged without having returned a verdict.

7          If the Court reserves decision, it must decide the motion on

8     the basis of the evidence at the time the ruling was reserved.

9          I am exercising my Rule 29 discretion.  I'll take this --

10    reserve my decision.  I'm going to submit it to the jury, look

11    further into this.  It's fascinating legal arguments.

12    Appreciate the lawyer's raising these, and we'll revisit this

13    after the verdict.

14              MR. ESPINOSA:  Thank you, Your Honor.

15              MR. OLMOS:  Understood.

16              THE COURT:  Okay.  The other thing we need to go over

17    quickly are the draft jury instructions that we sent to you.

18         I want to do it this way.  Let me focus on Count 4.  You

19    each submitted different jury instructions for Count 4.  There

20    was no Ninth Circuit model instruction.  There is one for

21    2251(a) but not (A)(b)(1).

22         You both requested that I instruct the jury that Mr. Clemans

23    needed to have, quote, the intent to promote the engaging of

24    sexually explicit conduct by a minor.  But that language

25    pertained to (b)(2) not (b)(1), and so I didn't include that

1    since the indictment only charged him with a (A)(b)(1)

2    violation, and then I took the, obviously, the 2256(7) statutory

3    definition of custody or control, which Mr. Olmos has objected

4    to.  The Court notes the objection.  The objection is preserved

5    for purposes of appeal, but I would overrule that objection.

6        But I really want to come back to why the (b)(2) language

7    was included.  You both put it in there, but I wasn't sure why.

8            MR. ESPINOSA:  Your Honor, the Government included it

9    because section (b)(1) ends with a semicolon and the word "or."

10   And although we didn't specifically include in the charge (b)(1)

11   and (b)(2), because that "or" in (b)(1) implies application of

12   (2), we -- and because this statute is not written in a manner

13   that makes it especially easy to interpret, we wanted to include

14   that additional element as potentially necessary in order to

15   avoid error on review.

16           THE COURT:  So you prefer that I include it?

17   Mr. Olmos, you would.  Or does it matter to you?

18           MR. OLMOS:  If the Government is proceeding only with

19   respect to (b)(1), and I understand that's the way it's charged,

20   then I don't see any reason to include it if that is the only

21   theory --

22           THE COURT:  Okay.

23           MR. OLMOS:  -- that they are proceeding under.

24           THE COURT:  You just did it --

25           MR. OLMOS:  I just did it out of an abundance of

1    caution, too, because I didn't know how the evidence in the

2    trial was going to unfold, and I also submitted that before the

3    second superseding indictment on Friday afternoon.

4         THE COURT:  That's true.

5    Second superseding indictment, Court 4.  Defendant Clemans

6    purchased and otherwise obtained custody and control of at least

7    one minor and offered to purchase and otherwise obtain custody

8    and control of at least one minor with knowledge that as a

9    consequence of the purchase and the obtaining of custody, the

10   minor would be portrayed in a visual depiction engaging in

11   sexually explicit conduct and with the intent to promote the

12   engaging in of sexually explicit conduct by such minor for the

13   purpose of producing any visual depiction of such conduct, and

14   the offer was communicated and transported using any means and

15   facility of interstate commerce.

16   So looking for that language "with intent to promote."  You

17   have "with knowledge that."  There it is.  Line 18.  So you did

18   charge him both as a (b)(1) and a (b)(2), right?

19        MR. ESPINOSA:  We do, Your Honor.  We do have that

20   language in the substantive charging language.

21        THE COURT:  It's not the caption that controls.  It's

22   the language of the indictment.  So it's charged as both (b)(1)

23   and (b)(2).  I'm not sure what you're going to argue in closing.

24   I'm going to put it back in out of abundance of caution since

25   it's charged that way.  Unless the Government is going for it on

1  a theory that it's only a (b)(1) not a (b)(2).

2          MR. ESPINOSA:  Your Honor, since it's in the charging

3  language and because it's charged that way, then the only way

4  the jury could find him guilty under that theory is if they find

5  that element, and so I think we should include it.

6      But our proofs are going to satisfy the definition that the

7  Court has provided, that is, the (b)(1)(1) definition.

8          THE COURT:  The other thing you did in your

9  instruction is you didn't include -- looking at your proposed

10 instruction -- you didn't include the language "purchases or

11 otherwise obtain custody."  You just went with "offers to

12 purchase."

13     In your proposed instruction "the defendant offered to

14 purchase or otherwise obtain custody and control."  So you

15 didn't include that other language.  Mr. Olmos, again, included

16 the entire language from the statute.  So I think in the

17 proposed instruction I only went with what your theory was.

18         MR. ESPINOSA:  Your Honor, I think in the proposed

19 instruction you did include "purchased or otherwise obtained,"

20 and we don't object to that inclusion.  Mr. Olmos included it in

21 his proposed definition.  It's alleged that way in the

22 indictment, and our proposed instruction was incomplete.

23         THE COURT:  The other thing, Mr. Olmos, is they

24 actually use the initials of the minors.  So they got more

25 specific in their proposed instruction.  Any objection to that?

 1   You just use the word "minor."  They actually said custody or

 2   control over M.Q., J.U. and/or E.S.

 3           MR. OLMOS:  I don't think it would be prudent to

 4   object to a narrowing of the jury instructions.

 5           THE COURT:  Okay.

 6           MR. ESPINOSA:  Your Honor, on that instruction, I

 7   think both parties included the interstate and foreign commerce

 8   element, which is found in subsection (c) of the statute, but I

 9   don't think that element is in the Court's proposed instruction.

10           THE COURT:  The offer was communicated or transported

11   using any means or facility.  That one?

12           MR. ESPINOSA:  Yes, Your Honor.

13           THE COURT:  So we should add that.

14           MR. ESPINOSA:  We would also like to add (1) of

15   section C, the course of conduct.

16           THE COURT:  Hang on.  So I've got to add that element.

17   And then what else did you want to add?

18           MR. ESPINOSA:  From the same subsection, subsection

19   (c)(1) sets forth another interstate and foreign commerce

20   possibility.

21       It reads:  In the course of the conduct described in such

22   subsections, the minor or the actor traveled in or was

23   transported in or affecting interstate or foreign commerce.

24       We intend to proceed on two theories that, first, the

25   defendant did purchase or otherwise obtain custody of the minors

1    at issue; and, second, that he offered to so purchase or

2    otherwise obtain custody.  And those two separate theories are

3    rooted in two different foreign commerce links in subsection

4    (c).

5              THE COURT:  It says:  The actor, in this case would be

6    Mr. Clemans, traveled in or was transported in or affecting

7    interstate or foreign commerce.  I'm not following your

8    argument.

9         You want that language in.  After the offer was communicated

10   or transported using any means or facility of interstate or

11   foreign commerce.  "By any means" including by computer.  And

12   then what language do you want?

13             MR. ESPINOSA:  So, Your Honor, for the --

14             THE COURT:  The offer -- I don't understand what

15   language you're proposing.

16             MR. ESPINOSA:  We would add the foreign commerce

17   elements as follows:  We would say, first -- so we would ask to

18   include (1) first, but we note that (1)(c)(1) relates only to

19   the purchase or otherwise obtain custody of.  So that is like

20   the affirmative act of purchasing or obtaining custody must be

21   done, and in the course of that conduct the minor or the actor

22   must move in or affecting interstate commerce; secondly, for the

23   offer, the other way the statute can be violated, the offer may

24   be transported in foreign commerce.

25        So both of the foreign commerce elements are necessary, and

1    we would just set them out separately one after the other.

2            THE COURT:  That's going to be so confusing.  So when

3    you're trying to explain this to the jury, I'm not sure -- so,

4    first, the defendant purchased or otherwise obtained custody or

5    control or offered to purchase; second, the defendant knew that

6    as a consequence of the purchase or obtaining of custody of the

7    minors that the minors would be portrayed in visual depictions

8    engaging in sexually explicit conduct or with the intent to

9    promote the engaging in of sexually explicit conduct; that they

10   were under the age of 18; and then, fourth -- do you have actual

11   language that you wrote out that I can look at?

12           MR. ESPINOSA:  We don't, Your Honor.  Because we

13   didn't want to alter the language of the subsections, that is,

14   we didn't want to say that subsection (c)(1) applies only to the

15   purchase -- sorry -- purchase or otherwise obtain custody, and

16   that (c)(2) applies only to the offer, but that is what the

17   statute appears to require because (c)(2) refers only to any

18   offer described in such subsection.

19           THE COURT:  Why would you want to confuse it when it's

20   basically undisputed that the offer was communicated by means of

21   a computer?  Why do you want to add confusion to a jury

22   instruction?

23           MR. ESPINOSA:  We don't want to add confusion, Your

24   Honor.  We want to give the jury the two ways -- we want to

25   explain to the jury the two ways the defendant violated the

1    statute, but one way requires one interstate commerce or foreign

2    commerce nexus, and the other way only requires the other.  The

3    nexus isn't the same for both ways you can violate the statute.

4        So we've attempted to make that clear in the closing, but I

5    agree that in the jury instruction without adding some language

6    it isn't perfectly clear.

7            THE COURT:  Well, it's clear now that there was an

8    offer to purchase or otherwise obtain custody or control --

9    that's your theory -- with the knowledge -- or with the intent,

10   and that if the jury found that the defendant did offer that,

11   all they got to find is that it was by means of a computer.  Why

12   do you want to add something else?

13           MR. ESPINOSA:  We're not adding anything.

14           THE COURT:  I'm not sure what you're adding.  What's

15   your theory on the (c)(1)?

16           MR. ESPINOSA:  So on (c)(1) we're saying the defendant

17   did take custody and control, through Tandeg, of those minors.

18           THE COURT:  Okay.

19           MR. ESPINOSA:  That is, she did -- in every way she --

20   she enacted his will on those minors.

21           THE COURT:  Okay.

22           MR. ESPINOSA:  And in order for the jury to find the

23   defendant guilty under that theory, then they must also find

24   that he or the minors moved in or affecting interstate or

25   foreign commerce.  And our evidence shows that he moved in and

1   affecting interstate commerce while exercising that control

2   through Tandeg.

3           THE COURT:  When did he move?  You mean when he took a

4   trip during this year in -- or this 13-month period?

5           MR. ESPINOSA:  Yes.

6           THE COURT:  See, the problem is you only pled in the

7   superseding indictment the (c)(2).  You didn't plead (c)(1).

8   Lines 20, 21, 22 on page 8 only discuss (c)(2), right?

9           MR. ESPINOSA:  That's right, Your Honor.

10          THE COURT:  I'm not going to include the (c)(1)

11  language.  It's going to be hard enough for the jury to

12  understand these instructions, and that's just going to add

13  confusion.  It really wasn't your theory anyway.

14      So I'm going to make that correction to include the element

15  that I left out, but I'm going to overrule your objection, deny

16  your request to add the (c)(1) part because it's not pled.

17          MR. ESPINOSA:  Well, the act is pled, Your Honor.  The

18  purchase or otherwise obtain custody language is pled in the

19  indictment.

20          THE COURT:  Right.  In the course of the conduct, the

21  minor/actor traveled in or was transported in or affecting

22  interstate or foreign commerce isn't pled, right?

23          MR. ESPINOSA:  That's right, Your Honor.

24          THE COURT:  Other objections to the proposed jury

25  instructions?

1    Mr. Olmos, let me start with you.  Many of the instructions

2  you've both submitted I've already given.  I went through those;

3  so I just want to focus on any other objections you have.

4         MR. OLMOS:  I don't have any other objections other

5  than the one I've noted to Count 4.

6         THE COURT:  Mr. Espinosa.

7         MR. ESPINOSA:  Yes, Your Honor.  First, on page 22,

8  jury instruction number 22, the definition of illicit sexual

9  conduct.

10    The Court included prong three, the production of child

11  pornography, but it appears that's subsection was a recent

12  amendment to the statute defining illicit sexual conduct, which

13  did not become effective until May 29, 2015, which is at the

14  very end of our facts and likely does not apply -- more than

15  likely.  We've looked at our last overt act, and it wouldn't

16  apply.

17         THE COURT:  Take it out?

18         MR. ESPINOSA:  Yes, Your Honor.

19         THE COURT:  Any objection, Mr. Olmos?

20         MR. OLMOS:  No objection.

21         THE COURT:  Okay.  That will be out.

22         MR. ESPINOSA:  The Government also would ask the Court

23  to include an amendment to jury instruction number 21, Your

24  Honor, which is the definition of travels in foreign commerce.

25         THE COURT:  Okay.

1            MR. ESPINOSA:  And the Government proposes adding a

2     comma where the period at the end of that sentence now appears

3     and including the phrase "including travel from the United

4     States on a multi-leg journey," which is the language in

5     Weingarten.

6            THE COURT:  Mr. Olmos?

7            MR. OLMOS:  I object.

8            THE COURT:  Unless I included the word "continuous,"

9     right?

10           MR. OLMOS:  And send the jury the Weingarten opinion

11     to explain what that caveat means.  Otherwise, I object.

12           THE COURT:  I agree.  I'm not going to include the

13     amendment.  Mr. Olmos' objection to the request to add language

14     is sustained.  What else?

15           MR. ESPINOSA:  And then, finally, Your Honor, in the

16     conspiracy definition in jury instruction number 24, this, I

17     think, all the parties struggled with getting this right.  The

18     model instruction, which I brought a copy of, is not a model of

19     clarity.  It contemplates multiple conspiracies in an

20     indictment, and it uses language about all jurors agreeing on

21     the conspiracy at issue.

22        So I think both Mr. Olmos and the Government tried to modify

23     the language to make clear that we're talking about the only

24     conspiracy charged in the second superseding indictment that

25     remains.

1        So at lines 28, on page 24, through 2, on page 25, that

2   section is -- I think if the Court reads it, it will read

3   confusingly, and we would propose some modifications.

4        THE COURT:  Let me see what you submitted originally.

5   Is this yours that you submitted originally and now you want to

6   change it?

7        MR. ESPINOSA:  No, Your Honor.  We included the

8   modification that we propose now in our original instruction.

9        THE COURT:  A conspiracy is a kind of criminal

10  partnership.  That's from yours.  For a conspiracy to have

11  existed, it is not necessary that the conspirators made a formal

12  agreement, or that they agreed on every detail of the

13  conspiracy.  It is not enough, however, that they simply met,

14  discussed matters of common interest, acted in similar ways, or

15  perhaps helped one another.  You must find that there was a plan

16  to commit the crime of travel with intent to engage in illicit

17  sexual conduct as an object or purpose of the conspiracy.  You

18  just wrote "as an object of the conspiracy."

19       MR. ESPINOSA:  Right.  So as alleged in the second

20  superseding indictment, it may not be necessary.  They won't

21  have the second superseding indictment with them.

22       THE COURT:  Right.  I'm not going to include that.

23       MS. ESPINOSA:  We end it as "object" -- I think adding

24  "or purpose" is fine -- "of the conspiracy."  We put a period

25  there.  Because the next phrase, "with all of you agreeing as to

1   the particular crime which the conspirators agreed to commit," I

2   think that issue, the particular crime, is set forth in the

3   preceding sentence where it says "you must find there was a plan

4   to commit the crime of travel with the intent to engage in

5   illicit sexual conduct."

6           THE COURT:  I agree.  It's redundant.

7           MR. ESPINOSA:  That's just a remnant from the broad

8   conspiracy model instruction.

9           THE COURT:  I would put a period at the end of the

10  word "conspiracy" on line 1.

11     Mr. Olmos, object, not object?

12          MR. OLMOS:  No.  This is -- I think the way the Court

13  is going and the way Mr. Espinosa is suggesting is what I have

14  in my proposed jury instruction.

15          THE COURT:  Mr. Olmos, any other changes to that?

16          MR. OLMOS:  Well, I think that what Mr. -- well --

17          THE COURT:  I didn't know if he was done, and I'll

18  come back to you.  Were there any other changes?

19          MR. ESPINOSA:  The only other change is a proposed

20  addition, Your Honor.  The jury is going to hear the terms

21  Count 1, Count 2, and Count 4.  They may wonder what happened to

22  Count 3.

23     The Government proposes modifying model Rule 2.13 concerning

24  dismissal of charges just to make clear Count 3 is not before

25  you and don't speculate why, et cetera.  I brought a copy of the

1    model.

2              THE COURT:  Do you want that, Mr. Olmos?

3              MR. OLMOS:  I don't.  I will be candid with the Court

4    and counsel.  I'm not going to talk about the plea, but I'm

5    going to tell the jury in closing, argue that Mr. Clemans has

6    accepted responsibility for child pornography.  I think I'm

7    permitted to do that.  So I don't know how that language that

8    Mr. Espinosa --

9              THE COURT:  How can you argue that?  What fact would

10   support -- what evidence would support that unless I took

11   judicial notice and told the jury I'm taking judicial notice of

12   the fact that he entered guilty pleas.

13             MR. OLMOS:  Well, I think that, one, the testimony by

14   Special Agent Schofield that my client provided log-in

15   credentials to his online identity.

16             THE COURT:  That's true.

17             MR. OLMOS:  So I'm not going to say that he pled.  I'm

18   not going to say that he pled open.  I'm going to say that he

19   accepted responsibility.

20             THE COURT:  And then you're referencing the

21   cooperation?

22             MR. OLMOS:  Correct.

23             THE COURT:  Well, you can argue that because of that

24   fact.  But you don't want the instruction that Count 3 is not

25   before you?

1          See, there is an instruction, also, that you've heard that

2     he committed other crimes, but those are not before you.  So it

3     is covered by an instruction.  I don't necessarily think it's

4     required, and if the defense objects, I'm not inclined to

5     include it.

6          MR. ESPINOSA:  That's fine, Your Honor.  We proposed

7     it because we think, inevitably, the jury will wonder what

8     happened to the count, and they may even ask us in a question.

9     This forecloses that possibility.

10         THE COURT:  Then I'd send them a note back saying

11    remember that instruction I gave you that there is certain

12    conduct that you heard about but it's not before you, so just

13    ignore it and do what I'm telling you to do.  They usually do.

14    They will ask me after.  Understood.

15         MR. ESPINOSA:  We had no other proposed modifications,

16    Your Honor.

17         THE COURT:  Okay.  Let's take ten minutes.  We'll

18    start closing at 10:45 a.m., probably go through lunch.

19    Depends.  I don't know how long you anticipate your closings

20    will be, but I don't think you guys are going to take three

21    hours.  And then I'll instruct.  I may instruct so that way they

22    will stay together during the lunch hour and start deliberations

23    in the afternoon.

24         MR. ESPINOSA:  Your Honor --

25         THE COURT:  You get a reply, by the way.  I forgot to

1    tell you.  But it has to be a rebuttal argument.  If I think

2    you're shading over into a second closing argument, I'll cut you

3    off.  Has to be a pure rebuttal argument.

4              MR. ESPINOSA:  Of course, Your Honor.  We prepared the

5    closing with the two theories for Count 4 that we discussed with

6    the Court.  If the Court would indulge us a few extra minutes to

7    modify those slides in the form of maybe 20 minutes.

8              THE COURT:  No.  Not 20 minutes.  So we're going to

9    start in -- it's 10:40 now.  We'll start at 10:55.

10             MR. ESPINOSA:  Thank you, Your Honor.

11             THE COURT:  So work quickly.

12        (Break taken.  10:39 a.m. - 10:57 a.m.)

13        (Jury in.  10:57 a.m.)

14             THE COURT:  Have a seat.  Welcome back.  Hope you had

15   a nice weekend.  Thank you for your patience this morning.  We

16   were working hard to make sure that we can move forward this

17   morning, and you can get the case and begin your deliberations.

18   So sorry it took a little longer than I expected.  Again, really

19   appreciate the fact that you were here on time and that you were

20   patient with us.

21        The Government has rested.  Mr. Olmos, any witnesses or any

22   further evidence from the defense?

23             MR. OLMOS:  No, Your Honor.

24             THE COURT:  The defense has rested which means we go

25   right into closing arguments.  This will be the opportunity for

1   the attorneys to explain, to argue to you their view of the case

2   with respect to the charges in this case.

3       Again, as I instructed you, closing arguments are not

4   evidence, but, again, they are meant to assist the jury in

5   deciding the case.

6       The Government, because it has the burden of proof, burden

7   of proof always stays with the Government, will get a closing

8   argument and then get a brief rebuttal argument, and so you will

9   hear from the Government twice.  Mr. Olmos, you'll only hear

10  from him one time.

11      With that, the Government may make your closing argument.

12  Miss Kennedy.

13          MS. KENNEDY:  Thank you, Your Honor.  Good morning,

14  ladies and gentlemen.

15      At the beginning of this trial, my colleague, Andre

16  Espinosa, told you that we would come back to you at the end of

17  the case and ask you to return a guilty verdict.  And that's why

18  I'm here today, to talk to you about why the only verdict that

19  is supported by all the evidence that is in this case is a

20  verdict of guilty.

21      You've now heard and seen the evidence, and the evidence in

22  this case paints a picture that is unspeakably horrible, but

23  it's a picture that's also very clear.  The defendant, Michael

24  Clemans, wanted sexually explicit photos of children; he wanted

25  those photos to meet his every desire down to the last detail,

1   and he wanted to use those photos to select children for sex.

2   And that's exactly what the defendant did.

3       Beginning in September of 2013, he chatted online with Nelia

4   Cruz, a woman in the Philippines.  He asked her for sexually

5   explicit images of children and paid her money to get those

6   images so he could select young virgins for sex.  Between

7   September and November he travelled from the U.S. to the

8   Philippines to meet Cruz and the girls he had selected.  When

9   Cruz stood him up, he turned to another woman, Juvy Malicdem,

10  asked her for photos, paid her, and then had sex with the girls

11  she provided.

12      About seven months later, in June 2014, he made a business

13  proposal to a third woman in the Philippines, Lyan Tandeg, in

14  which he would pay her to be his photographer, to send him

15  sexually explicit photos of young girls, from whom he could

16  select virgins for sex.  The defendant and Tandeg carried out

17  this plan according to his specifications and direction.

18      She found a recruiter who located several young girls for

19  photographs, and you heard those girls testify in this trial.

20  The defendant and Tandeg referred to the girls as Ishin, Nicole

21  and Angel.  The defendant liked these girls so much that he sent

22  Tandeg thousands of dollars over less than a year to conduct

23  sexually explicit photo shoots with them and eventually to

24  purchase the virginity of, first, Nicole and then Angel.  So

25  that they would be reserved for him for his later travel to the

1    Philippines.

2        This plan continued even after defendant was arrested on

3    state charges at San Francisco International Airport on

4    April 27, 2015, when he was found with child pornography on his

5    iPad, and it continued right up until his arrest on federal

6    charges on July 24th, 2015.

7        Right up until the end, during those three months that he

8    was left at his mother's house in Sacramento, without a

9    passport, his desire for sexually explicit photos and for sex

10   with young children never wavered.

11       Your job at the end of these arguments will be to find the

12   facts and apply the law.  The facts before you are the exhibits,

13   which you will have back with you as you deliberate; the witness

14   testimony you have heard; and the stipulations that the parties

15   have agreed on, which you also have with you.

16       The judge will instruct you on the law.  Since my goal is to

17   make things as clear as possible for you, I will also discuss

18   the law and how it applies to the facts, but please remember

19   that the judge's instruction on the law controls over anything

20   that I say here.  Likewise, as I walk through the evidence, it

21   is your memory of the testimony that controls and not what I

22   say.

23       Every criminal charge is broken up into elements.  These are

24   the individual pieces of these charges that you must consider in

25   determining whether the defendant is guilty.  I'll walk through

1    the evidence and show you how what you've seen proves each and

2    every element of each of these three charges.

3        These are the charges in this case:  travel or attempted

4    travel with intent to engage in illicit sexual conduct;

5    conspiracy to travel with intent to engage illicit sexual

6    conduct; and buying children.

7        The first charge relates to the late 2013 time period, and

8    the second and third charges relate to the 2014 to 2015 time

9    period.  Let's take them one by one.

10       First, travel or attempted travel with intent to engage in

11   illicit sexual conduct.  The elements of this charge are the

12   following:  First, the defendant must be a United States

13   citizen; second, he must have traveled in foreign commerce

14   between September 10th and November 15th, 2013; and, third, he

15   must have traveled for the purpose of illicit sexual conduct.

16       Beginning with the first element.  How do you know the

17   defendant is a U.S. citizen?  Well, you saw his birth

18   certificate.  He was born in Texas, and people who are born in

19   the U.S. are U.S. citizens.  You also know he is a U.S. citizen

20   because you saw his passport that lists his nationality as

21   United States of America.  So that element is satisfied.

22       Now let's look at the evidence that the defendant traveled

23   in foreign commerce between these dates.  Travel in foreign

24   commerce has a particular meaning, and the judge will instruct

25   you on that meaning.  The meaning of that term is travel between

1    the United States and a foreign country.  Here, you know the

2    defendant traveled between the United States and a foreign

3    country between September 10th and November 15th, 2013; you know

4    he was in the United States on September 10th because you saw

5    the text records and you heard Special Agent Schofield testify

6    about these records.

7        He has an entry into the U.S. months earlier, in March of

8    2013, and his departure leg from Seattle to Seoul, Korea, on

9    September 11th, 2013.  And you heard Special Agent Schofield's

10   testimony that these records only show you the leg of travel

11   that crosses a U.S. border, even if there were other legs on

12   that same trip.

13       And if the text records weren't enough, you also saw the

14   defendant's bank statement for September 2013 showing that he

15   made purchases in Sacramento, and then after September 11, 2013

16   in Bangkok.

17       You also saw in the Yahoo chats that you looked at that the

18   defendant told Nelia Cruz on September 10th, 2013, that he was

19   preparing to leave on his departure for Thailand that day.

20       So you know he traveled to Thailand on or about

21   September 11, 2013, and you also know that from there he

22   traveled to the Philippines on or about November 13th, 2013.

23   How do you know this?  You know it because the defendant said it

24   in his own words.  First, on November 13th, the defendant told

25   Cruz that he was on his way to Manila and would meet her at

1    8:00 a.m. at Market Market, and, then, about ten hours later, he

2    tells her that he is at Market Market and waiting for her.  And

3    you heard Special Agent Schofield tell you that Market Market is

4    a mall in Manila.

5         The defendant had no reason to lie to Cruz about his travel.

6    This was a private conversation with someone that he was

7    arranging to meet so why would he lie about that.  The evidence

8    is clear he went to Manila in November of 2013, and you also saw

9    his passport stamps showing his entry into the Philippines on

10   November 14th, 2013, and you also saw his November 2013 bank

11   statement where you saw his purchase of a plane ticket and a

12   hotel in Manila during those dates.

13        And you'll also see a stipulation between the parties, which

14   is an agreement by the defendant, that his Yahoo account was

15   accessed during these dates first in Thailand, then in the

16   Philippines for several days, and then in Thailand again.  So

17   you know the second element of this charge is satisfied.

18        So let's move on to the third element.  That defendant's

19   travel was for the purpose of illicit sexual conduct.  What does

20   illicit sexual conduct mean?  The judge will instruct you on the

21   definition of this term as well, and the definition he will give

22   you is controlling, but we can summarize it here.  It includes a

23   sexual act with anyone under age 12 or anyone between the ages

24   of 12 and 16 whose is at least four years younger than the

25   defendant, and it also includes a commercial sex act with a

1   person under 18 years old.

2       How do you know the defendant wanted sex with girls in this

3   age range?  You see it over and over again with the Yahoo chats

4   that he exchanged with Nelia Cruz.  You saw the picture of the

5   girl referred to as BB in Exhibit 36, who was standing in the

6   middle of a group of five girls, and you probably remember that

7   somewhat blurry exhibit.

8       You can use your common sense to decide whether this girl

9   was under 16, but you can also and should also look to the

10  defendant's own words to see what he believed about her and what

11  he was interested in.

12      This chat is between the defendant and Nelia Cruz on

13  October 8, 2013.

14      Cruz says, "Her name is BB; she is virgin; she is twelve

15  years old."

16      And the defendant says, "Ok, good age."

17      Here's a portion of the image of the girl referred to as

18  Jessa.  You can also use your common sense regarding her age,

19  but the defendant was told her age, and it was clear this was

20  the type of girl he wanted and who he was traveling to see when

21  he went to Manila.

22      Cruz says, "You like her?  She is Jessa, hon, her name."

23      He says, "Yes, she is the type of girl I'm looking for.  How

24  old?"

25      Cruz says, "She is 11 years old.  Not yet period."

1    He did not say she's too young or find me someone older.

2    And, in fact, in later chats you can see that he continues to

3    refer to Jessa as someone that he was interested in having sex

4    with in Manila.

5    So you know he was looking for young girls.  But how do you

6    know that when he traveled from the U.S. to the Philippines, his

7    purpose was for sex with these girls?  Again, you can look to

8    the defendant's own words and what he said over and over again.

9    While he was still in the U.S. in early September of 2013,

10   he was already making specific plans with Nelia Cruz to travel

11   to Manila.

12   On September 9th, the defendant told Cruz that he would pay

13   for photos of virgins now, but they must be available to rent

14   next month.  This is while he's in the United States, ladies and

15   gentlemen.  And then he discussed a location for sex.  He said

16   he didn't want problems with the police.  He asked her about

17   meeting at her apartment, and he suggested a meeting place at,

18   again, Market Market.

19   Now, you've already seen that the exhibits in this case

20   contain many, many pages of Yahoo chats between the defendant

21   and these three women, and you will have those exhibits back

22   with you.  I'm giving you some of the most important examples of

23   each point here, but all it takes is a flip through those chats

24   to see that there are additional examples.

25   The defendant and Cruz continued to chat on September 9th,

1    and they discussed price, and they discussed location.

2         He says, "I know that I've been paying $50 for girls in

3    Manila overnight.  I can pay more, but I need quality."

4         He said, "if I pay $200, I would need her for more than one

5    day, and I would try to find a nice shower and a condo nearby.

6    For less than twelve hours, I would have to pay less."

7         And then at the end of this section he says, "I would like

8    to do a lot of business with you when I come."

9         This is, again, September 9, 2013.  Still in the U.S.

10        On the same date, he also tells Cruz he will give her his

11   flight number in a couple of weeks and they will continue to

12   plan.

13        So the evidence shows beyond doubt that before the defendant

14   left the U.S. he had already made up his mind that he was going

15   to travel to Manila for sex with young girls.

16        After he arrived in Thailand and before he went on to

17   Manila, he continued to firm up the details.  This is a chat

18   between the defendant and Cruz on October 3rd, 2013.

19        She asks him what ages he wants, and he says "12 to 16,

20   virgin if possible."  He says he wants two or three girls but

21   needs to see their photos first to decide.

22        You also heard testimony and saw bank records showing that

23   the defendant paid Cruz about $40 on this same date,

24   October 3rd, 2013.  And you confirm this in defendant's bank

25   statement for October 2013, which is Exhibit 74.5.

1    A few weeks later, the defendant told Cruz he was ready to

2    come when he saw a girl he liked.  On November 11, 2013, he

3    says, "When I see a girl I really like, I will come within two

4    days," and then later that same day, "I will try to travel this

5    week depending on the girls in the photos."

6    After Cruz sent him the photos, the defendant did in fact

7    select the girls he wanted and sent her more money.  This is an

8    exchange from November 12th, 2013.  He sends Cruz the Western

9    Union instructions in that little blurb that you've seen

10   multiple times, with the tracking number, and he says, "I want

11   Jessa as my first girl."

12   Ladies and gentlemen, there is no doubt that this is the

13   defendant's Yahoo account.  You've heard testimony that at some

14   point after his arrest that he signed over consent to the FBI

15   for this account, and you will have a stipulation to that

16   effect.

17   But if that weren't enough, in this chat Cruz asks him,

18   "What is your real name, hon?"

19   He says, "You know it."

20   She says, "Michael Clemans."

21   He says, "Yes, but keep it to yourself."

22   Once the defendant did travel on to Manila, he was furious

23   when Cruz failed to show up.  He repeatedly told her that having

24   sex with young girls was the reason he had come to Manila.

25   He said, "Nelia, at this point I'm not asking for photos.  I

1  want to be clear that I'm here for a reason.  Not for photos.

2  Is there a misunderstanding?"

3       And then again on the same day, "I only have a few days

4  here.  I'm not going to waste a day."

5       He made clear over and over again that this was the reason

6  he was in Manila, and he didn't want to waste it.

7       On November 14th, 2013, he told Cruz, "You and I agreed on a

8  price while we chatted on the internet.  You told me that I

9  would fuck the girls on your dirty floor because it was safe

10  there.  You promised me three girls to begin with.  I fell in

11  love with BB, Holly and Jessa.  They are the reason that I am

12  here."

13       And then again he says, "I am here to fuck a virgin."

14       There is another reason you can be sure the defendant's

15  intent in traveling to Manila was to have sex with young girls,

16  and that's because he, in fact, did accomplish that.

17       You'll recall the testimony in the chats -- or the

18  discussion in the chats and the testimony from Special Agent

19  Schofield that when Cruz stood the defendant up, he turned to

20  another woman, Juvy Malicdem, and asked her what she had

21  available.  She told him she had girls age 14 to 15, and they

22  arranged to meet.

23       The next day, November 16, 2013, Cruz asked him, "Did you

24  meet young girls?"  And he said, "Yes, with much success."

25       A few days later, on November 20th, 2013, the defendant

1   chatted Juvy and discussed the girls she provided for him.  He

2   commented that Khate, one of the two girls, was perfect, but

3   that neither girl was a virgin.

4       He then said, "Erica, did not want to fuck."  And when Juvy

5   asked "You not fuck her," the defendant said, "Yes, but not

6   virgin."

7       Ladies and gentlemen, you heard Special Agent Schofield

8   testify that the defendant's Yahoo account was not under

9   surveillance at this time.  He had no reason to believe that

10  these chats would ever be read by anyone else other than him and

11  these two women, and he's talking about events in the past.  He

12  has no reason to lie.  You can use your own common sense and

13  experience and decide for yourself whether you believe him.

14      Now, the crime charged here is travel for the purpose of

15  illicit sexual conduct.  And so the Government can establish

16  that crime if the defendant did travel with that intent.  The

17  Government does not need to prove that the defendant did in fact

18  have sex with young girls once he reached Manila.

19      But the evidence here tells you that he did in fact commit

20  that terrible act.  And what that tells you is that it's even

21  further evidence of his intent and the reason he was there.

22      So because you know the defendant is a United States

23  citizen, you know that he traveled in foreign commerce during

24  these dates, and you know that he did so for the purpose of

25  illicit sexual conduct, every element of this charge is

1   satisfied.

2        On this particular charge, the Judge will also instruct you

3   that the defendant is alternatively charged with attempted

4   travel for the purpose of illicit sexual conduct, which means

5   that even if he didn't accomplish the act, he can be convicted

6   if he took a substantial step toward completing the crime.

7        Well, you know he took a substantial step because the

8   evidence shows he actually did travel from the U.S. and on to

9   the Philippines.  You know that he got on a plane and went to

10  Manila for the purpose of having sex with young girls, and that

11  satisfies the statute, both the crime itself and the attempt.

12       Let's move on to the second charge.  Conspiracy to travel

13  with intent to engage in illicit sexual conduct.  The elements

14  of this charge are as follows:  From June 24, 2014 through

15  July 24, 2015, there was an agreement between the defendant and

16  another person to commit the crime; second, the defendant knew

17  the object of the conspiracy and intended to help accomplish it;

18  and, third, one of the members of the conspiracy performed at

19  least one overt act.

20       The judge will instruct you on the meaning of a conspiracy.

21  It's a criminal partnership, which is an agreement of two or

22  more people to commit a crime.  The crime of the conspiracy is

23  the agreement itself.  It does not matter whether the crime

24  agreed upon was actually committed.

25       So let's look at the evidence of an agreement between the

1    defendant and another person to commit the crime of travel for

2    the purpose of illicit sexual conduct.

3        The evidence proves without a doubt that there was an

4    agreement between the defendant and Tandeg that began in

5    June 2014 and lasted through July of 2015 for this purpose.

6    Again, you can look to the defendant's own words in his Yahoo

7    messages, which describe the agreement in specific detail.

8        Starting on June 24, 2015, the defendant began to describe a

9    business proposal to Tandeg.  He told her he needs some help.

10        And he says, "I'm getting older now, Lyan, but with my age I

11    have not gotten over thinking young."

12        As she seems receptive to his plan, he goes on to describe

13    it in further detail on the same day.

14        He says, "I'm talking about young girls here, Lyan.  Girls

15    from Manila or Provence."

16        She says, "Ok.  So you want me to get a young girl, keep

17    them in apartment for you?"

18        And further down he says, "Yes, Lyan."

19        And she says, "Then the young girls will make you happy?"

20        He says, "I'm willing to pay for their company during my

21    trips there, yes."

22        The following day, June 25th, 2014, he lays it out for her

23    explicitly:  "If you could be a manager or mamasan and get girls

24    to recruit younger girls for photo shoots and for my visits to

25    Manila, we would need a house away from neighbors to do photos

1    in private."

2        She asks him, "What ages of girls do you want?"

3        And he says, "Younger, Lyan."

4        He became more specific about the girls in the photos he

5    wanted and how much he would pay.  He sent her the photo of BB

6    that we saw just now, and that you saw during the testimony.

7        He said, "This is the age I'm looking for and the poses I

8    like.  I prefer that they are virgin as well, Lyan."

9        He asked her, "Now that you have seen these photos, do you

10   really want to do this type of business for me?  I understand if

11   you say no.  The girls would have to be underage."

12       And she says, "It's easy to find young girls here."

13       The purpose of their agreement could not have been clearer.

14       Here's another example from June 25th, 2014, at the

15   beginning of their agreement.

16       He says, "It is true that I want photos, Lyan, but if I see

17   one of the girls I want sex with, I will want you to keep her

18   there with you until I arrive."

19       He says, "I will need both photo and sex with these girls

20   eventually."

21       And she says, "Even if it's young?"

22       And he says, "Yes."

23       The judge will instruct you that for two co-conspirators to

24   have agreed there doesn't need to be a formal agreement or

25   anything in writing.  But, here, there was something in writing.

1   The defendant put down the details and listed them in numbered

2   bullet points.

3       On June 25th, 2015, he wrote:  "What I see is this.  Number

4   one, I need to buy a nice camera for you to use; number two, I

5   need to rent a place for you and Kim" -- Tandeg's sister -- "and

6   out of sight of your cousin, she has her own family now; number

7   three, I will pay each girl $50 for 200 photos.  I will pay more

8   if I choose to have sex with them."

9       She says to him, "Yes, it's a good idea."

10      He says, "Number four, I need to pay you for each photo

11  session you do; and, number five, I need the rental to be away

12  from neighbors but clean enough for you, Kim and me when I stay

13  in Manila."

14      The judge will also instruct you that for a conspiracy to

15  have existed, the co-conspirators don't need to agree on every

16  detail of the conspiracy, and you heard some testimony from

17  Special Agent Schofield that there was a recruiter involved

18  named Shellina Atad, and that the defendant didn't know who she

19  was.  And it's true, the defendant didn't know Atad, didn't know

20  her name.

21      But there's no doubt that the defendant knew that Tandeg was

22  using a recruiter.  In fact, he told her to do so from the very

23  beginning.

24      On June 25th, he said, "I prefer that people do not

25  recognize you, Lyan.  I think it might be better if you let the

1   recruiter handle it.  The more you are away from the recruiting

2   of the girls is safer.  Then the recruiter goes to her parents."

3        And that's exactly what happened.  You heard the testimony

4   from the three girls, the three minors, who came into this

5   courtroom who said that Atad, the recruiter, went to their

6   parents and lured them away for photos with Tandeg for the

7   defendant.

8        You also heard testimony from Special Agent Schofield that

9   Tandeg told the defendant that the girls were from orphanages,

10   and that that wasn't true.  But there is no doubt that these

11   girls were real, and there is no doubt that the defendant wanted

12   sex with them regardless of whether they were from orphanages or

13   they were lured away from their parents.

14        To prove the conspiracy charge in this case, the agreement

15   must be for the purpose of travel for illicit sexual conduct.  I

16   discussed earlier the definition of illicit sexual conduct and

17   the fact that it includes sex with minors under twelve or under

18   sixteen if the defendant is four years older than the minor.

19        In 2014, the defendant was still interested in the same age

20   range that he was interested back in 2013, when he was chatting

21   with Cruz and Malicdem.

22        On June 24, 2015, he told Tandeg:  "The younger the better

23   because they might be virgins."

24        Perhaps the best evidence of what age girls the defendant

25   wanted are the girls he ultimately selected for sex, the girls

1    he and Tandeg called Angel, Nicole and Ishin.  You saw those

2    girls testify in court; you heard their ages and birth dates;

3    and their birth certificates are in evidence.  They are still

4    well under 16 today, more than two years after these crimes were

5    complete.

6        At the time their photos were taken and the defendant

7    purchased their virginity, the girl called Nicole was 10 years

8    old, and the girl called Angel was 7 years old.  So there is no

9    doubt the defendant wanted sex with girls under the age of 16

10   and in fact under the age of 12.

11       Because the evidence demonstrates the defendant agreed with

12   Tandeg to commit the crime of travel for the purpose of sex with

13   minors, this element is satisfied.

14       Now let's look at the evidence on the second element.  That

15   the defendant knew of the object of the conspiracy and intended

16   to help accomplish it.

17       How do you know he intended to travel for sex with minors?

18   Again, he says it over and over in his own words.

19       In June 2014, he said all of the following:  "I will need

20   both photo and sex with these girls eventually.  I want to be

21   able to get my photos and arrange sex with these underage girls.

22   I will eventually want to fuck some of these girls.  Maybe you

23   misunderstood me, Lyan.  I'm sorry if I gave you the wrong

24   impression here.  I do want photos of the girls, but I also want

25   sex with them."

1        How do you know that he was serious about it?  How do you

2    know that this wasn't just some elaborate fantasy?  One of the

3    ways you know is because the defendant put his money where his

4    mouth was.

5        Money talks, ladies and gentlemen.  And in this case, money

6    spoke loudly to the tune of more than $5,700 that the defendant

7    paid to Tandeg during less than a year.

8        Here, you can see the payments made by the defendant to

9    Tandeg that were directly related to their criminal conspiracy.

10   You heard evidence the defendant paid her additional money for

11   schooling and living expenses, but at least $5,775 of that money

12   was specifically directed to their criminal agreement, including

13   $750 for Tandeg to buy a fancy camera on June 25, 2014, the

14   first entry there; $550 for a computer on July 21, 2014 for

15   multiple photo shoots, including on July 20, 2014, November 2,

16   2014, and February 9, 2015; and to pay to reserve the virginity

17   of Nicole and Angel on September 17, 2014 and October 20th,

18   2014.

19       You heard Special Agent Schofield testify that he made

20   summaries of the Western Union data showing each of these

21   transfers, and you saw some of those summaries during his

22   testimony.  Those are all in evidence and they will be available

23   to you.  They are grouped together at Exhibits 59.5 through 73.

24       The defendant's First U.S. Community Credit Union statements

25   showing these payments coming out of his California bank account

1   are also in evidence and grouped together in Exhibits 74

2   through 85.

3       These records prove the defendant paid this money to Tandeg,

4   and the chats show you what each of those payments was for.

5       You heard testimony and saw some of the chat messages and

6   bank records showing that on September 17, 2014, that payment

7   included payment for Nicole's virginity.

8       Before the defendant paid that money he asked Tandeg:  "So

9   what do I get from Nicole and her parents for 225 US dollars?"

10      She says, "Sex with Nicole."

11      Later the same day the defendant again states the specific

12  terms of his payment.  He says, "In return, we get Nicole for a

13  photo shoot and sex with me for three days."

14      This chat alone proves that his payment was so that he could

15  return to Manila for sex.  There are many more chats in

16  Exhibit 44 that confirm this as well.

17      You also heard Special Agent Schofield's testimony and saw

18  some of the Yahoo chats demonstrating that the October 20th,

19  2014, payment was to reserve the virginity of Angel.  That's one

20  month after the payment for Nicole.

21      Throughout much of October 2014 the defendant discusses the

22  details of that transaction with Tandeg.  This is one example.

23      He says, "I need Angel and Nicole ready for me.  I will need

24  both the girls available to me for as long as I want during my

25  visit.  I will try sending the money for Angel now.  Once I pay

1    the money in full, Angel is ours to do as we please."

2        And that same day he does in fact pay $600 to Tandeg for

3    Angel's virginity.  You don't pay that amount of money for

4    something that's just a fantasy.  And, in fact, you can take it

5    from the defendant because he told Nelia Cruz on October 3rd,

6    2013, "I don't send money just because."  So you know the

7    defendant really intended to do these acts.

8        In addition to the thousands of dollars he paid to Tandeg,

9    he also demonstrated his intent to commit these acts by

10   discussing with Tandeg the specific details of how they would

11   accomplish it.

12       On June 30th, 2014, at the beginning of the conspiracy,

13   there is an extensive discussion of different possible places

14   where the defendant could have sex with these young girls.

15       In this example, the defendant asks a series of detailed

16   questions about a possible rental.

17       He asked, "does it have a refrigerator, a microwave, air

18   conditioning?  How many fans do we need?  Is there WiFi set up?

19   Is there a backyard inside the fence?  Does the fence surround

20   the house?  Can anyone see down from a house next door?"

21       Ladies and gentlemen, someone who really had no intention to

22   travel would not ask these questions.

23       You heard Special Agent Schofield's testimony about how the

24   defendant discussed getting birth control for some of the girls

25   that he planned to have sex with.  On October 26th, 2015, the

1   day before he travels back to the United States, he asked this

2   of Tandeg:  "So if I wanted to get pills for the girls I fuck,

3   do I have to buy from Amazon.com or can I buy through a pharmacy

4   there?"

5       She says, "We can buy at pharmacy here.  I can buy it."

6       Then on the same day he asks her, "Can I find a pharmacy who

7   will sell without a prescription?  What strength do I buy for a

8   girl who is 12 or 13?"

9       These are not the words of someone who had no plans to have

10  sex with young girls.

11      Defendant confirmed again and again his intention to travel

12  to the Philippines for sex and made clear that because he

13  planned to take the girls' virginity, he wasn't going to do it

14  quickly, and he would need a sufficient amount of time to make

15  it worthwhile.

16      In this chat from September 9th, 2014, while the defendant

17  is in the U.S., he mentions being delayed, and Tandeg says:

18  "Delayed?  Are you in a rush?"

19      He says, "My intention is to break their hymens, of course.

20  Lyan, if I only have three or four days during this return trip,

21  yes, I will be in a rush.  When I have sex with Angel, I do not

22  plan on breaking her hymen in five minutes."

23      Again, on September 14th, 2014, just before he leaves the

24  U.S. for Thailand, during that trip that he took in that time

25  period, he tells Tandeg he doesn't have time to visit just yet.

1    He says, "My next flight is on the 19th so it doesn't give

2    me enough time to drop by and visit you on this trip."

3    So it's clear the defendant's not going to be satisfied with

4    just any quick weekend trip.  He wanted to wait until the

5    perfect moment to get the biggest return on his investment.

6    Although he couldn't travel right away, he continued to make

7    plans and confirm the agreement.  On February 19, 2015, he told

8    Tandeg he planned to come that year and again told her the

9    importance of protecting his investment.

10   He said, "I do not want to be disappointed when I come to

11   visit them this year.  I am making an investment with each of

12   these girls, and I do not want to pay for photo shoots of a girl

13   that is not going to remain a virgin when I finally meet each of

14   them."

15   Even after he was arrested at San Francisco International

16   Airport on April 27, 2015, and was back in Sacramento without

17   his passport, he continued to confirm his intention to travel to

18   Manila in the future for sex with young girls.

19   On May 8, 2015, he told Tandeg, "When I come visit, we need

20   to find a house or town rental for a week.  I do not mean a love

21   hotel.  I'm talking about a vacation rental for a week."

22   These conversations continued right up until just before his

23   arrest on federal charges on July 24, 2015.

24   On July 17th, he again confirmed that Angel's virginity was

25   reserved for him.  He said, "How is Angel doing?  Is the

1   director keeping her safe for me?"

2       He then discussed the possibility of going to the

3   Philippines directly from the U.S.

4       He said, "I will probably return around the 1st of

5   September.  I will probably go direct to Thailand, and if not, I

6   will come visit you in Angeles before I return to Bangkok.  I

7   won't have a lot of time, but maybe we can arrange for a week

8   with a few of the girls."

9       In fact, you have heard no evidence in this courtroom that

10  the defendant did not intend to travel for sex with these girls.

11  The one time he gets cold feet, he tells Tandeg about it, and it

12  lasts for all of one day.

13      On October 20, 2014, at about 7:30 p.m. Pacific, he tells

14  Tandeg he has changed his mind, and he would rather not have sex

15  with Angel.  The next morning he explains further.

16      She says, "Why you suddenly change your mind, Mike?"

17      He said, "I do not want to cause Angel damage to her vagina

18  during sex."

19      But he quickly becomes unsure and asks Tandeg for her

20  opinion.

21      Later that same day he says, "What do you think?  Should I

22  buy Angel?  I really want sex with her."

23      He says, "If I tear her vagina, and it bleeds, will the

24  orphanage understand?"

25      But then a few lines later, "but if you think I should pay

1   for Angel, too, I will say ok."

2        A few minutes later he continues.

3        He says, "I might have to force it.  That's what I'm asking.

4   I've not had sex with an 11-year-old before.  Maybe just a

5   13-year-old.  I'm not trying to rape her.  I would use a lot of

6   lubricant."

7        But he says, "If you think I should buy Angel, I will buy

8   Angel."

9        This discussion continues over the next several hours, and

10  you will have all of these chats with you in Exhibit 45 to

11  review.

12       But ultimately, on October 21st, 2014, the next day, at

13  10:55 p.m. Pacific, about 27 hours after he first said he

14  changed his mind, the defendant decides he will go ahead after

15  all.

16       He says, "Well, if Angel is available, and you think she's

17  able to have sex with me, I will buy her.  If we leave Angel

18  with the recruiter, she must guarantee us that she will not be

19  touched.  She is for me only."

20       This is a real girl he's talking about, ladies and

21  gentlemen.  This is a real girl who testified in this courtroom.

22  And at the time of these words she was seven years old.  The

23  defendant considered the physical consequences to her from

24  having sex, and he decided he would go ahead.

25       The evidence is overwhelming that the defendant knew he was

1   making an agreement with Tandeg to travel to the Philippines for

2   sex with pre-pubescent girls, and that he intended to accomplish

3   that goal.  He found someone he could trust in Tandeg.  And all

4   the evidence before you demonstrates that he intended to do what

5   he said he would do.

6       So you know without a doubt the defendant knew the object of

7   the conspiracy and intended to help accomplish it.  So this

8   second element is satisfied as well.

9       Let's move to the third and final element of this charge,

10  that one of the members of conspiracy must have performed at

11  least one overt act.  The judge will instruct you that an overt

12  act does not, itself, have to be unlawful as long as it was

13  carrying out the purpose of the conspiracy.  And the overt act

14  does not need to be done by the defendant himself.

15      Here, the evidence proves a number of overt acts.  The

16  critical part of the conspiracy, according to the defendant's

17  own words, was that Tandeg would complete these photo shoots of

18  these girls so he could ensure that they were virgins and decide

19  who he wanted for sex.

20      On July 21st, 2014, he told Tandeg, "Our models will have to

21  spread their pussies open wider so I can see their hymen if they

22  are truly virgin."

23      You saw some of these photos, and I'm sure you remember

24  them.  They are hard to forget.  These photos were exactly what

25  the defendant directed, including extreme close-ups of girls'

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

1    genitals.  You heard the testimony from the girls who the

2    defendant and Tandeg called Ishin, Nicole and Angel.  Ishin was

3    photographed once; Nicole was photographed twice; and Angel was

4    photographed four times.

5        And Tandeg did send the photos that she made to the

6    defendant so that he could select the girls he wanted.  You know

7    he received those photos because he commented on them

8    specifically and said what he liked.

9        On July 26th, 2014, he said, "I also like the photos you did

10   with her on the bed, facing down.  The oil was placed very well,

11   just on the bikini line was perfect.  Thank you."

12       And then later, "I like that the girls pee in the photos,

13   Lyan.  Good shots."  Smiley face.

14       You also know the defendant accessed these photos because of

15   those voluminous exhibits that you saw and heard Special Agent

16   Schofield testify about that were the log-in records for the

17   Dropshots accounts.

18       Now Special Agent Schofield told you that Dropshots is a

19   cloud-based storage service for people to store photos, videos,

20   and other things.  And this is the primary way that Tandeg sent

21   photos to the defendant.

22       And what those large logs tell you is that the defendant in

23   fact accessed those Dropshots accounts, and you can tell from

24   the chats that he actually saw the photos and viewed their

25   content.  And he accessed those accounts from his mother's house

1   in Sacramento when he was back in the U.S. at the end of the

2   period.  These are all overt acts sufficient to prove a

3   conspiracy.

4       Each of the payments the defendant made to Tandeg to further

5   their criminal agreement is also an overt act.  Two of the

6   payments, the $300 payment on September 6th, 2014, and the $300

7   payment on May 5th, 2015, were also made while the defendant was

8   in the U.S.

9       Because the defendant and his co-conspirator each committed

10  a number of overt acts for the purpose of carrying out the

11  conspiracy, you know this final element is satisfied as well,

12  and every element of this charge is proven.

13      Let's move on to the third and final charge.  Buying

14  children.  Buying children is the name of the statute, but it

15  applies to conduct other than just of the purchase of children

16  for money.

17      The defendant will be proved guilty of this crime if each of

18  these elements are met:  first, if he offered to purchase or

19  otherwise obtain custody or control of a minor; second, if he

20  did so with knowledge that as a consequence the minor would be

21  portrayed in child pornography; and, third, that the offer was

22  communicated in or affecting foreign commerce.

23      So the first element includes the phrase "custody or

24  control."  So what does that mean?  Custody in this context does

25  not refer to custody of a child as in a divorce proceeding.  The

1    Court will instruct you on what custody or control means for the

2    purpose of this crime, but it includes temporary supervision

3    over or responsibility for a minor, whether legally or illegally

4    obtained.  Because it can be temporary, it can last for part of

5    a day or a few hours.  It does not have to be permanent.

6        That definition is met here.  At the defendant's direction

7    and command, each of these young girls were lured by Tandeg and

8    her recruiter, Atad, from their homes and taken to unfamiliar

9    places that they had never been before, with a woman they had

10   never been alone with before; she took them far from their homes

11   on public transportation.  And Tandeg and Atad kept them there

12   while the pictures were taken, with no access to their family,

13   before finally bringing them home some time later.

14       These facts were confirmed by the testimony of each of the

15   three girls.  This is a picture of the James Bond room in the

16   Hotel Sogo in Manila where the minors M.Q. and E.S. were taken

17   for photo shoots as they told you.  The hotel was far from their

18   homes, and they had never been there before.

19       You also heard testimony from Nate Sanger, which was

20   confirmed by the girl, M.Q., called Angel, that Tandeg and Atad

21   brought Angel to a Starbucks at a mall in Manila to meet with

22   Sanger when they thought he was a friend of the defendant's.

23   They didn't tell Angel where they were taking her.  They left

24   her nearby when they went to meet with Sanger.  And they were

25   able to go and fetch her quickly as soon as Sanger asked about

1    her.

2        So you know there is no doubt that the defendant, through

3    Tandeg, was able to obtain temporary custody or control of these

4    girls.

5        Although the defendant was generally in Thailand or in the

6    U.S. when these acts took place, the evidence is clear that he

7    was the one responsible.  He was the one who directed and

8    commanded Tandeg and told her exactly what to do, and she

9    carried out his instructions.  He made an offer to her, and his

10   offer was accepted.

11       You've already seen that this plan was the defendant's idea.

12   It was the same thing he was seeking from Nelia Cruz, but this

13   time he wanted to be sure he got exactly what he wanted.  He

14   paid Tandeg a salary like an employee and referred to it as a

15   job.

16       On September 17th, 2014, he referred to her October salary,

17   and she told him "you're a great boss."

18       On July 26th, 2014, he told her, "I need you as my

19   photographer as a main job, Lyan.  I need you to find me a safe

20   love motel and arrange these models for me through your

21   recruiter."

22       Like you would do with an employee, he gave her the

23   equipment necessary for the job.  He sent her the money to buy a

24   fancy camera and to buy a computer, and he instructed her on

25   exactly what he wanted her to do.

 1          You heard the testimony and saw the images that he sent

 2    Tandeg photos as examples of exactly what he wanted, and he told

 3    her what camera settings to use.

 4          In this e-mail on July 20th, 2014, he told Tandeg this.

 5          He said, "Ok, Lyan, I have forwarded you some sample poses.

 6    You need to get closer to our models during their photo shoots.

 7    Be sure the girls shave themselves smooth.  I do not want to see

 8    any hair on their pussies.  The models can also use baby oil on

 9    their bodies to make them look wet, but I do not want to see any

10    watches, chains or earrings in their ears.  I want these girls

11    totally nude.  Our models will have to spread their pussies open

12    wider so I can see their hymen if they are truly virgin.  I want

13    to see their vagina hole clear and in focus.  Use a fine setting

14    on the camera and use manual to focus on your focus points,

15    Lyan.  It is not so important that their faces are in clear

16    focus, but they must smile for the camera.  A smaller aperture

17    setting will give you a larger field of focus; therefore, you

18    will need to set a larger f-stop setting on your lens.  If you

19    cannot figure it out, use automatic but be sure to check each

20    photo you take.  If it is not clear, try again.  You have all

21    day with the girl."

22          On July 31, 2014, he sent Tandeg some of the images of Angel

23    from the prior photo shoots that he liked the most and told her

24    why he liked them and what she should do next.

25          This is Exhibit 42 at page 59, and will be available for

1    your review.  We don't need to read all of it, but suffice it to

2    say that in the first paragraph and then going on from there he

3    describes the photos of Angel that he likes and tells her

4    exactly how to replicate them and exactly which type of photos

5    to take going forward.

6        The evidence clearly shows the defendant made offers to

7    Tandeg to obtain custody and control of minor girls, and that

8    those offers were accepted.

9        In this chat on July 27th, 2014, he specifies to Tandeg how

10   he wants her to take custody and control of the girls.

11       He said, "It's an up to you, Lyan.  Never mention my name."

12       She says, "Of course, Mike."

13       He said, "Never mention where we are taking her."

14       She said, "I know that."

15       He said, "Only offer money per day, like renting a car."

16       The defendant also made offers to Tandeg, which she also

17   accepted, that at a future time he would come to the

18   Philippines, himself, and take custody or control of these girls

19   because he intended to come and have sex with the girls that he

20   specified.

21       As you've seen, he spent hundreds of dollars buying Nicole

22   and Angel for that purpose.  You've already seen many of these

23   chats and there are many more.

24       In this example from October 20th, 2014, he says, "Her

25   parents understand that I have her for as long as I want.  It

1    might be a couple of weeks, and she will not be able to go home

2    at night.  She stays with me."

3        And then regarding Angel, "Once I pay the money in full,

4    Angel is ours to do as we please."

5        There is no doubt the defendant offered to come to the

6    Philippines to, himself, take custody and control of these

7    girls, and that offer was also accepted.

8        The evidence shows that Tandeg did exactly what the

9    defendant wanted in every detail.  She used the recruiter; she

10   took the girls to a private location; she used baby oil; she did

11   the photo; the poses he wanted; and she made them imitate the

12   photos and the poses that the defendant had sent her at the

13   beginning of the conspiracy.

14       You heard the girls' testimony and you saw some of those

15   photos that Tandeg sent him.  In fact, she took photos that were

16   almost exact copies of the poses the defendant sent her.  The

17   poses the defendant sent her are at Exhibits 18, 19 and 20, and

18   you've seen those.  You'll have all the exhibits available to

19   you, and you will see that she copied those poses exactly.

20       For example, if you compare Exhibits 26, 27 and 28, that

21   Tandeg took of Angel and Ishin, they are nearly identical to

22   Exhibit 18, which is the photo the defendant sent her.

23       You compare Exhibit 10 that Tandeg took of an unidentified

24   girl, which is at one of those extreme close-up shots, it looks

25   just like Exhibit 19 that the defendant sent to her.

1    And if you compare Exhibits 15 and 23.5 that Tandeg took of

2    Angel and Nicole, they match Exhibit 20 that the defendant sent

3    to her.

4    Because the defendant made offers to Tandeg to purchase or

5    otherwise obtain custody or control of minors, the first element

6    is proved.

7    Let's look at the second element.  Whether the defendant did

8    so with knowledge that, as a consequence, the girls would be

9    portrayed in child pornography.

10   Well, you know that he did this because he said it over and

11   over again.  You've seen many examples and there are many more

12   of chats showing that the defendant knew full well that these

13   girls would be used to make child pornography.  In fact, that's

14   exactly what he demanded from Tandeg.

15   Further, when the defendant said he would come to the

16   Philippines for sex with the girls, he also made clear that he

17   wanted more sexually explicit photos while he was there having

18   sex with them.

19   This chat is from July 27, 2014.  He said, "I need to be

20   able to keep the girl overnight and time for photos."

21   And he's talking about when he comes to Manila for three or

22   four days.

23   He says, "The photos would be taken by you, Lyan."

24   In another example, on May 8, 2015, after his first arrest,

25   when he was in the U.S., he told Tandeg that when he came for

1    sex with Angel, he also wanted her to take photographs.

2         So you know the second element is satisfied.

3         Finally, to prove this charge, the Government must prove

4    that the defendant's offers were communicated in or affecting

5    foreign commerce.  So let's look at that.

6         You know the defendant's offers were communicated in foreign

7    commerce because it's undisputed.  There is a stipulation

8    between the parties, which means the defendant has agreed, that

9    all of his Yahoo messages, including e-mails and instant

10   messages, traveled through the U.S.

11        The stipulation, which you can read here, says that each of

12   those messages during the time period we're talking about would

13   necessarily have transited a Yahoo mail server located in the

14   United States regardless of the physical location of the user of

15   the account.

16        Because all of the offers the defendant made to Tandeg

17   traveled from or through the U.S. to a different country, they

18   were transported in foreign commerce.  And if that weren't

19   enough, you also know from the bank statements that all of the

20   payments the defendant made to Tandeg came out of his First U.S.

21   Community Credit Union account located in California.  So the

22   offers caused funds to leave the U.S. and travel to another

23   country, and in that way they affected foreign commerce as well.

24        Each of these three elements is satisfied, and the crime of

25   buying children is proved.

1        We've now been through each of the three charges and the

2    elements of each and why each element is proved beyond a

3    reasonable doubt.

4        So let's talk about reasonable doubt for just a moment.  The

5    judge will instruct you on the meaning of this term.  It means

6    proof that leaves you firmly convinced that the defendant is

7    guilty.  It is not proof beyond all possible doubt.  And a

8    reasonable doubt is based on reason and common sense.  Not on

9    speculation.

10       You don't throw common sense out during this process.  You

11   use it the way you use it in your everyday life.  The Government

12   bears the burden of proof at all times.  The burden never shifts

13   to the defendant.

14       The Government must prove each element of each count beyond

15   a reasonable doubt.  That standard applies in every criminal

16   case.  It is a standard that the Government welcomes and the

17   Government has satisfied in this case.

18       I'll talk to you a moment about the verdict form you will

19   receive.  You will get a written form that lists each of the

20   charges and allows you to mark whether you would find the

21   defendant not guilty or guilty.

22       When you see the buying children charge, you will notice

23   that it mentions the initials of the three children who

24   testified here and who are the subject of much of the evidence.

25       These are those three children.  Minor J.U. is the girl

1   referred to as Ishin in the chats; minor M.Q. is the girl

2   referred to as Angel in the chats; and minor E.S. is the girl

3   referred to as Nicole in the chats.

4       You will recall those girls' testimony and the evidence that

5   identified each of them in the defendant's discussions with

6   Tandeg.

7       Ladies and gentlemen, I want to thank you.  I want to thank

8   you for your attention today, and I want to thank you for your

9   careful attention over the course of this trial.  The evidence

10  in this case is shocking.  It's hard to hear, and it's even

11  harder to see.  But this is the evidence that you must consider

12  when you decide whether the defendant is guilty of each of these

13  charges.

14      The arguments I've made to you here today and the arguments

15  that the defense will make in a few moments are not evidence.

16  So if you have any question about whether any of the elements of

17  these charges is satisfied, look to the evidence; look to the

18  defendant's own statements, there are many of them; consider the

19  testimony you've heard; and the undisputed facts; and apply your

20  common sense.

21      The evidence that you have seen and heard leads to only one

22  conclusion.  The defendant is guilty of each and every charge

23  beyond a reasonable doubt.  Thank you.

24          THE COURT:  All right.  Thank you.  Mr. Olmos, closing

25  argument on behalf of Mr. Clemans.

1            MR. OLMOS:  May I have just a moment, Your Honor?

2            THE COURT:  You may.

3            MR. OLMOS:  I'm going to start off here with what I

4    said to you in my opening statement, and that is to thank you.

5    There is no possible way that when any of you got that piece of

6    paper from the Government telling you to show up for jury

7    service that you could possibly have known what you were going

8    to see in this trial.

9        You couldn't possibly have known the kind of human behavior

10   that you were going to have to bear witness to over these two

11   weeks, and that is not lost on anybody in this courtroom, and

12   it's not lost on me.

13       So I want to thank you for being here and doing your job as

14   a juror.  This is an incredibly important duty, as Judge Mendez

15   said to you at the outset, but that doesn't diminish how truly

16   awful this must have been.

17       During my opening statement last week, I told you about the

18   horrors of the evidence that you were going to see and hear in

19   this case.  The unspeakable images and the disgusting language.

20   And I told you that you would not be able to understand how a

21   human mind could be responsible for that language and that

22   conduct.

23       And I don't think I was exaggerating when I said that, but I

24   wanted you to hear it from me then because I knew that I was

25   going to be standing here now, after you had heard it and seen

1    it, and ask you to do a job that right now must seem impossible.

2         To bear witness to the kind of evidence and the kind of

3    horror that you saw here and to still do your job as impartial

4    jurors.  To sit through days of evidence of unspeakable language

5    and conduct by my client, by Michael Clemans, and to still

6    somehow carefully and methodically apply the law that Judge

7    Mendez is going to give you to those facts.

8         I heard some of you describe your prior jury service, and it

9    was hard for some of you to disguise your feelings about the

10   litigants in those cases.  About what you saw and felt about

11   their positions.

12        But that's not what we had here.  Right?  When we think

13   about jury service, we think about random, sort of the

14   run-of-the mill, ordinary situations, and we imagine that we see

15   the evidence as a juror and that things become clear, but that's

16   not what we have here.

17        That's not this trial.  You have heard, in this trial, clear

18   and overwhelming evidence of horrible, awful, despicable conduct

19   by my client.  There is no doubt about that.

20        What you have heard evidence of is that he financed and

21   directed people in the Philippines to victimize real kids.  And

22   those little kids got on an airplane for the first time in their

23   life and flew here and told you about it.

24        And you've also heard evidence, clear and overwhelming, of

25   some of the disgusting language that my client used when talking

1    with those kids.  There is no doubt about that either.

2        Put simply, you have heard the most overwhelming evidence

3    imaginable that my client produced, conspired to produce,

4    financed the production of child pornography.  That is a

5    horrific crime.  And I couldn't possibly stand up here and say

6    to you that he didn't do that, that the evidence isn't clear

7    that that's what he did.  Because I've seen the same evidence

8    that you all have over the last couple weeks.  I've seen that

9    evidence for years.

10       But that doesn't make your job here easier.  I think it

11   makes it harder.  Because you're not here to decide whether

12   Michael Clemans is guilty of production of child pornography, of

13   receiving child pornography, of asking for it, of financing it,

14   of directing it.  It's not why you're here.  It's not what

15   you're being asked to do.  You're not being asked to determine

16   whether my client is a good person or whether he did this

17   horrific thing of producing child pornography.  That's not why

18   you're here.

19       And that's why I think that your job is so much more

20   difficult as a juror in this case than it might ordinarily be.

21   You're not here to judge whether Mr. Clemans directed human

22   traffickers in the Philippines to produce child pornography.

23   The Government, instead, has chosen to bring Michael Clemans

24   into this courtroom on three charges for which it doesn't have

25   evidence.  It does not have the evidence to prove him guilty of

1   these three charges.

2       It's relying on those ghastly, appalling photographs, that

3   horrible language, disgusting language that you heard.  It's

4   relying on that evidence because I don't think it believes that

5   twelve people who heard it or who saw it, it's imagining that

6   people in your position would do absolutely everything in their

7   power to punish the defendant to the greatest extent they could.

8       It's relying on your emotion, the heartbreak, the empathy

9   that you must have felt for those little girls to dissuade you

10  from looking carefully at the charges that you're actually here

11  to deliberate about, that you're actually here to consider.

12      And I want to walk through those charges now because as hard

13  as it must be in your mind right now to imagine that you would

14  be able to vote not guilty in a case involving this type of

15  conduct, I think it's going to become clear, as we go through

16  what the judge will actually instruct you on the law, that if

17  you can find it somewhere in you to look past the horrors that

18  you've seen over the last week, I think it's going to become

19  clear to you what the right answer here is.

20      It's so important.  Right?  Your job here as a juror.  After

21  having seen what you've seen and heard what you've heard and

22  still be asked to be the last kind of safeguard against

23  Government overreach, to protect the legal and constitutional

24  rights of somebody you must despise.  I can't image how hard it

25  is to wrap your brains around that, but that's what I'm going to

1    ask you to do, and I think that's what the Court is going to ask

2    you to do.

3         Count 1.  Some of this is going to look familiar to you.

4    It's probably identical to what Ms. Kennedy just described to

5    you.

6         Count 1 is travel with intent to engage in illicit sexual

7    conduct in 2013.  And I'm not going to read the elements to you,

8    but I want you to focus on one thing, and that is the second

9    element that requires, that the law requires that the travel

10   that Mr. Clemans is alleged to have undertaken took place in

11   foreign commerce.

12        This is one thing that the Government and I can agree on.

13   That traveling in foreign commerce means travel between the

14   United States and a foreign country.  Period.

15        The only travel -- the evidence is plain and clear in this

16   case -- the only travel between the United States and a foreign

17   country in 2013 occurred in September when my client flew from

18   the United States through Seoul, South Korea, to Thailand.

19        That's his travel in foreign commerce.  That's his travel

20   between the United States and a foreign nation.  He had no

21   specific plan at that point to go to the Philippines.  He didn't

22   know when he was going to go.  He didn't know if he was going to

23   go.  He talked about it.  He talked about wanting to go.  But

24   his travel between the United States and a foreign country

25   happened in September between the United States and Thailand.

1    Period.

2        And if it wasn't any more clear that Thailand wasn't just a

3    stopover on his way somewhere else, Clemans flew the next month,

4    in October, to Laos and back.  He didn't buy his plane ticket to

5    the Philippines until November 13th.  We know that from

6    Exhibit 75, page 4.  You saw, you heard Agent Schofield testify

7    about that.  That's the purchase from Cebu Airlines of the plane

8    ticket between Thailand and Manila.

9        That was when the evidence, I'm sure, has convinced you

10   Mr. Clemans in fact flew with this criminal purpose, that he

11   flew to the Philippines in November to do horrible things to

12   little girls, but that trip had absolutely nothing to do with

13   his trip two months prior.

14       Mr. Clemans did travel in foreign commerce in 2013; he did

15   it in September.  And the end of the line, the destination of

16   that trip was Bangkok, Thailand.  There is no dispute about

17   that.  No number of horrible images and horrific language can

18   change that.

19       And what makes it even more clear is that Exhibits 59.5, 60,

20   and 61 show Agent Schofield's summary of payments to Cruz in the

21   Philippines, or the person whose name is Cruz on internet

22   chatter.  That happened in November.  You heard some testimony

23   that maybe there was another payment from back in October.  That

24   didn't happen until Mr. Clemans was in Asia.

25       He traveled from the United States to Thailand, and there

1    has been absolutely no evidence in this case that he intended to

2    do anything when he got to Thailand that was criminal.  Period.

3        And no matter how much you hate my client right now, the

4    Government doesn't have proof that that September trip, which

5    was in foreign commerce, had anything to do with the

6    Philippines.

7        Count 2.  This is the conspiracy to travel with intent to

8    engage in illicit sexual conduct that happened in 2014 and 2015.

9    The same elements that Ms. Kennedy just talked to you about.  I

10   want to focus you on the third one.  One of the members of

11   conspiracy performed at least one overt act for the purpose of

12   carrying out the conspiracy.

13       The conspiracy is not the production of child pornography.

14   The conspiracy is not directing or paying for child pornography.

15   The conspiracy is to travel.  And the Government has to prove to

16   you beyond any reasonable doubt in your mind that somebody in

17   this conspiracy, my client, or Miss Tandeg, or Miss Atad, or

18   somebody else, undertook an overt act, an action related to that

19   travel.

20       Because the United States criminal laws don't seek to put

21   people in prison or to convict them for talking.  You have to do

22   something.  You have to act.  And where is the proof that

23   Mr. Clemans acted or anybody else acted, committed any single

24   act that has anything to do with traveling to the Philippines in

25   2014 and 2015?

1      Their theory is that for more than a year he conspired to

2   travel there.  But he never did.  There is no evidence that he

3   went to the Philippines, ever, after November of 2013.  Period.

4   We knew he could.  He did it in 2013.  Just like the Government

5   told you.  He said, in November of 2013, "when I see a girl I

6   like, I can be there within two days."  And guess what, two days

7   after he sent that message, he was there in the Philippines.

8      We know he had the opportunity to do it.  He had the ability

9   to do it.  But the Government's theory on this count is that for

10  more than a year he conspired to go, but he never did a single

11  thing to effectuate it.

12     As hard, as horrible as it may be for you to go through

13  those chats again when you're in that jury room, I want you to.

14  I want you to look at Exhibits 41 to 52.2.  Those are all the

15  chats between Clemans and Tandeg that are in evidence in this

16  case.  Over 13 months.  308 pages.

17     You're going to get an enormous binder of exhibits in this

18  case, a third of them, quarter of them, are those chats from

19  that period, that time period, and you will not see a single

20  line, a single word, a single letter that talks about a day he's

21  going to go to the Philippines, a week, even a year.  He never

22  bought a plane ticket; he never sent an itinerary; he never made

23  a specific plan actually to go.

24     Where is the act?  Where is the evidence of the act?  Not

25  the act to produce child pornography.  We've got plenty of that.

1  Where is the overt act in furtherance of the travel to actually

2  go?

3       Look at Exhibit 92, it's Mr. Clemans's passport, when you

4  get into the jury room.  Pages and pages and pages of entry.  In

5  2014 and 2015, he went to China, Cambodia, Malaysia, Laos,

6  Indonesia, the United States; he flew all over the place, and he

7  never once went to the Philippines.  I tried to count the

8  entries in that document.  I think he took 50 trips during those

9  two years, international trips.  He never once went to the

10 Philippines.

11      Look at the very last exhibit, 52.2, pages 307 and 308 of

12 all those chats that I just described to you.  A week before he

13 was arrested by federal agents in July of 2014.  Take a look at

14 that exhibit.  He still doesn't have any plan to go; he still

15 has no plans to travel; he still hadn't done anything; he hadn't

16 acted and neither did anybody else.

17      You have heard no evidence, and you can take as much time as

18 you possibly can to go through the exhibits in this case, you

19 will not see any evidence, not a single shred that Mr. Clemans

20 ever acted, that he ever did anything to effectuate that travel.

21      Count 4.  Buying children.  Here, and I think the Government

22 through its closing argument sort of -- we're on the same page

23 here.  That the real issue here is whether Mr. Clemans offered

24 to take custody and control of those kids.  And, again, I know I

25 can say it until I'm blue in the face, and it won't matter

1    because of what you've just seen and heard over the last two

2    weeks, but this is not a case about child pornography.  You are

3    not being asked to determine whether my client trafficked or

4    directed or bought child pornography.

5        Here, the Government has to prove beyond any reasonable

6    doubt in your mind that he offered to purchase or otherwise

7    obtain custody and control over those kids.  He bought child

8    pornography of those kids.  There is no doubt about that.  But

9    beyond that, beyond the child production, beyond the taking

10   pictures of those kids, did he ever offer to obtain custody or

11   control over those kids; was anybody's -- those kids, as

12   horrible as it was for them to testify here and to hear those

13   poor little kids testify, their parents, their guardians never

14   lost custody over them, they never lost control over them.  They

15   were always going back home.  And thank goodness because that's

16   the way they were managed to be saved here.

17       Taking a picture of a kid, as horrible as that is, is not

18   obtaining custody or control over that child.  The Government

19   has to prove to you not that Mr. Clemans directed their picture

20   taking, but that he offered, that he wanted, that he intended,

21   that he offered to take custody or control over those kids, and,

22   folks, there is no evidence of that in this case.  This is a

23   case about child pornography.  It's not a case about buying

24   kids.

25       And I'm going to sit down now.  And when I do, nobody else

1   is going to speak on behalf of Michael Clemans.  The Government

2   gets to talk again.  They get to talk to you again.  It's the

3   system we have.  I don't like it, but I don't have to like it.

4   They get to talk to you again.

5        And the reason they get to talk to you again is because they

6   have a burden, that Ms. Kennedy said she was eager to embrace,

7   to prove to you beyond any reasonable doubt that Mr. Clemans is

8   guilty of the three charges that are here before you, not

9   charges that aren't, but the charges that the Government has

10   chosen to bring here in this courtroom.

11        And I know I'm asking a lot of you.  That is not lost on me.

12   I'm asking you to stand up for the rule of law in a case with

13   unimaginable, unspeakable, horrible facts.  I know I'm asking a

14   lot of you, but I believe that you're up to the task.

15        And I want to thank you in advance for your careful

16   consideration in this case.  Thank you.

17             THE COURT:  All right.  Thank you, Mr. Olmos.

18   Mr. Espinosa, brief rebuttal.

19             MR. ESPINOSA:  Yes, Your Honor.

20        I won't take up much of your time, ladies and gentlemen.

21   This case is almost over, and you'll have it to deliberate upon

22   soon.  I just want to quickly respond to a few of the arguments

23   raised by defense counsel in his closing.

24        First, with respect to Count 1 defense counsel argued to you

25   that the only travel from the United States in this case was

1  travel from -- on September 10th to Thailand.  He directs you to

2  that travel rather than to the reason for that travel, the

3  intent and purpose for that travel.  And if you focus on those

4  questions, those terms, you'll see how the evidence proves the

5  defendant's guilt on Count 1.

6       You saw chats and you heard evidence from September of 2013

7  while Mr. Clemans was still in the United States, but he was

8  chatting with Nelia Cruz for a specific purpose.  He said, you

9  saw those chats, he was looking for underage girls to rent.

10      He talked about -- he asked her about her apartment, whether

11 he could have sex in the apartment, whether it had a mattress,

12 whether it had a shower.  He asked and negotiated about price;

13 he talked about paying $200 for no less than 12 hours with a

14 minor.

15      They even settled on a specific meeting point in the

16 Philippines, in Manila, Market Market.  You heard about Market

17 Market over and over during the course of the testimony.  And in

18 November of 2013, just 60 days later, that's where they met.

19 You saw in the chats Mr. Clemans angrily asking Cruz, "Where are

20 you; I'm here, I'm here."

21      The travel that Mr. Clemans embarked upon in September of

22 2013 was for the purpose of illicit sexual conduct with a minor

23 in the Philippines, and he traveled through Thailand, that's for

24 sure, but he never wavered on that intent.  His intent, he

25 maintained his intent throughout that period until he reached

1    Manila.

2        You saw those chats.  Not only did he maintain his intent,

3    he sharpened it, clarified it.  There were dozens of chats over

4    the weeks between September 10th, 2013 and November 13th, 2013.

5    That travel is sufficient.  Because he left the United States

6    with the intent and purpose of engaging in illicit sexual

7    conduct, that travel is sufficient for you to find him guilty on

8    Count 1.

9        As to Count 2, the conspiracy, defense counsel asks you:

10   Where is the evidence of travel?  Where are the acts in

11   furtherance of travel?  Well, the evidence is filled with steps

12   in furtherance of travel.  In fact, you saw the five-point plan

13   that the defendant and Miss Tandeg agreed upon.

14       By 2014/15, in Count 2, the defendant has sharpened his

15   interests to virgins.  He had become obsessed with virgins.  He

16   asked for these extreme close-up photos, some of which you saw.

17       And in pursuit of the criminal agreement that he made with

18   Lyan Tandeg to travel to the Philippines for sex with a virgin,

19   he laid out steps that were necessary first.  He said, "You're

20   going to need to take those photos for me so I can find the

21   right girl; I can determine whether she's a virgin and whether

22   I'm attracted to her and want to travel for sex with her."  And

23   to do that first step, he said, "I'm going to have to get you a

24   camera," and he does.  He sends her $750, and she buys an

25   expensive camera.

1        He then says, "Once you've taken these pictures, you're

2    going to need to deliver them to me so I can review them and

3    assess them and evaluate them."  And to accomplish that step

4    toward the goal of travel, he sends her money to buy a computer

5    so she's able to upload those photos, upload them to Dropshots

6    for him to review.

7        All those steps along the chain, along the numbered

8    agreement, the plan that he put in place with Tandeg are steps

9    in furtherance of the travel.

10       Another important step is his payment to reserve the

11   virginity of Angel and Nicole.  Those payments don't make any

12   sense if they are not related to the goal of traveling.  That's

13   why he makes those payments so that when he arrives, those girls

14   are preserved for him.  Those girls, who he identified through

15   the meticulous steps that they had already taken and that were

16   the foundation of their criminal agreement.

17       All of those steps, each and every one of them is in

18   furtherance of the goal of travel.  Because as you saw in the

19   evidence, Mr. Clemans had a particular interest in a particular

20   goal; he didn't want to rush through sex with Angel; he didn't

21   want to rush through breaking the hymens of these minor virgins;

22   he wanted to take his time; he didn't want to hurry through a

23   quick weekend like he did in 2013.

24       He had something more in mind, and that's why each and every

25   step of the agreement that you heard evidence in support of is a

1    step in furtherance of the goal of travel, and that's why he is

2    guilty on Count 2, the conspiracy.

3         Finally, on Count 4, ladies and gentlemen, the question of

4    custody and control is clearly established by the evidence.  But

5    take a step back first and think back to what Ms. Kennedy told

6    you about what the crime alleged is.  Mr. Clemans is accused of

7    offering to take custody and control of these girls with

8    knowledge that, as a result, images of child pornography will be

9    produced.

10        The evidence of that offense is peppered throughout the

11   chats and exhibits that you saw during this trial and that

12   Ms. Kennedy summarized for you.

13        Now defense counsel suggests that it's insufficient custody

14   or control, the evidence here, but it's not.  Think about that

15   evidence.  The evidence that you heard shows that three minor

16   girls were taken from their homes by women that they did not

17   know.  Now, one of those girls testified that Shellina Atad was

18   a relation, that is, she was married to the girl's brother --

19   mother's brother.  So she was an aunt by marriage, but that she

20   had only ever seen that person, Shellina Atad, at that uncle's

21   wedding and on the birthdays of that aunt's child.  The other

22   two didn't know her at all.

23        All three girls testified that they had never seen Lyan

24   Tandeg before.  So two women, who these three girls had either

25   never seen before or barely knew, took them from their homes to

1   a location far from their homes, kept them in that location for

2   some period of time while these photo shoots happened.

3      The girls testified that they didn't call home; that they

4   weren't offered the opportunity to call home; that they didn't

5   know the way home; and some of the girls testified that if they

6   had been permitted to leave, they wouldn't have known how to get

7   home.

8      They were totally reliant on Tandeg and Atad to get back

9   home.  They were in the custody and control of Tandeg and Atad,

10  and they were in that custody and control at the defendant's

11  direction, at the defendant's offer, which they accepted, which

12  Tandeg accepted.

13     But the defendant made additional offers.  He offered to

14  take custody and control of those girls in the same way at a

15  future visit so that he could have sex with them and take

16  sexually explicit photos with them.

17     All those offers were communicated in foreign commerce

18  through Yahoo, and all that evidence is sufficient for you to

19  find him guilty of Count 4.

20     For all those reasons, ladies and gentlemen, the Government

21  asks you to return the only verdict supported by the evidence,

22  and that's a verdict of guilty on all three counts.  Thank you.

23          THE COURT:  All right.  Thank you.  Mr. Vine, if you

24  would hand out the jury instructions.

25          THE CLERK:  Yes, sir.

1          THE COURT:  Members of the jury, now that you've heard

2    all the evidence, it is my duty to instruct you on the law that

3    applies to this case.  You may take your copy of these

4    instructions with you to the jury room for you to consult.  It

5    is your duty to weigh and to evaluate all the evidence received

6    in the case, and in that process to decide the facts.  It's also

7    your duty to apply the law as I give it to you to the facts as

8    you find them, whether you agree with the law or not.

9          You must decide the case solely on the evidence and the law

10   and must not be influenced by personal likes or dislikes,

11   opinions, prejudices, or sympathy.

12         You will recall that you took an oath promising to do so at

13   the beginning of the case.  You must follow all these

14   instructions and not single out some and ignore others.  They

15   are all important.  Please do not read into these instructions

16   or into anything I may have said or done any suggestion as to

17   what verdict you should return.  That is a matter entirely up to

18   you.

19         The parties have agreed to certain facts that have been

20   admitted as evidence in this case.  You should therefore treat

21   these facts as having been proved.  The stipulated facts are

22   attached to this instruction.

23         There are four stipulated facts, separate pleadings.  I want

24   to make sure -- are they attached to your instructions?  Should

25   be right behind that page.  If not, I will make sure that those

1   go into the jury room with you.  There are four sets of

2   stipulated facts.  We will make sure that they are sent in with

3   you.  Most of them have to do with admission of exhibits.  There

4   are some other facts, as I instructed you just now, that you

5   have to and should accept.

6        The second superseding indictment is not evidence.  The

7   defendant has pleaded not guilty to the three charges.  You are

8   to consider and he is presumed to be innocent unless and until

9   the Government proves the defendant guilty beyond a reasonable

10  doubt.

11       In addition, the defendant does not have to testify or

12  present any evidence to prove innocence.  The Government has the

13  burden of proving every element of each of the charges beyond a

14  reasonable doubt.

15       The defendant in a criminal case has a constitutional right

16  not to testify.  You may not draw any inference of any kind from

17  the fact that the defendant did not testify.

18       Proof beyond a reasonable doubt is proof that leaves you

19  firmly convinced the defendant is guilty.  It is not required

20  that the Government prove guilt beyond all possible doubt.  A

21  reasonable doubt is a doubt based upon reason and common sense

22  and is not based purely on speculation.  It may arise from a

23  careful and impartial consideration of all the evidence or from

24  lack of evidence.

25       If after a careful and impartial consideration of all the

1   evidence, you are not convinced beyond a reasonable doubt that

2   the defendant is guilty, it is your duty to find the defendant

3   not guilty.

4       On the other hand, if after a careful and impartial

5   consideration of all the evidence, you are convinced beyond a

6   reasonable doubt that the defendant is guilty, it is your duty

7   to find the defendant guilty.

8       The evidence you are to consider in deciding what the facts

9   are consists of, one, the sworn testimony of any witness; two,

10  the exhibits received in evidence; and, three, any facts to

11  which the parties have agreed.

12      In reaching your verdict, you may consider only the

13  testimony and exhibits received in evidence.  The following

14  things are not evidence, and you may not consider them in

15  deciding what the facts are:

16      1.  Questions, statements, objections and arguments by the

17  lawyers are not evidence.  The lawyers are not witnesses.

18  Although you must consider a lawyer's questions to understand

19  the answers of a witness, the lawyer's questions are not

20  evidence.  Similarly, what the lawyers have said in their

21  opening statements, closing arguments, and at other times is

22  intended to help you interpret the evidence, but it is not

23  evidence.  If the facts as you remember them differ from the way

24  the lawyers state them, your memory of them controls.

25      2.  Any testimony that I've excluded, stricken or instructed

1    you to disregard is not evidence.

2         3.   Anything you may have seen or heard when the court was

3    not in session is not evidence.  You are to decide the case

4    solely on the evidence received at the trial.

5         Evidence may be direct or circumstantial.  Direct evidence

6    is direct proof of a fact such as testimony by a witness about

7    what that witness personally saw or heard, or did.

8         Circumstantial evidence is indirect evidence, that is, it is

9    proof of one or more facts from which you can find another fact.

10        You are to consider both direct and circumstantial evidence.

11   Either can be used to prove any fact.  The law makes no

12   distinction between the weight to be given to either direct or

13   circumstantial evidence.  It is for you to decide how much

14   weight to give to any evidence.

15        In deciding the facts in this case, you may have to decide

16   which testimony to believe and which testimony not to believe.

17   You may believe everything a witness says, or part of it, or

18   none of it.  In considering the testimony of any witness, you

19   may take into account, one, the witness's opportunity and

20   ability to see or hear or know the things testified to; two, the

21   witness's memory; three, the witness's manner while testifying;

22   four, the witness's interest in the outcome of the case, if any;

23   five, the witness's bias or prejudice, if any; six, whether

24   other evidence contradicted the witness's testimony; seven, the

25   reasonableness of the witness's testimony in light of all the

1    evidence; and, eight, any other factors that bear on

2    believability.

3        The weight of the evidence as to a fact does not necessarily

4    depend on the number of witnesses who testify about it.  What is

5    important is how believable the witnesses were and how much

6    weight you think their testimony deserves.

7        You are here only to determine whether the defendant is

8    guilty or not guilty of Counts 1, 2 and 4 in the second

9    superseding indictment.  The defendant is not on trial for any

10   other conduct or offense.

11       A separate crime is charged against the defendant in

12   Counts 1, 2 and 4.  You must decide each count separately.  Your

13   verdict on one count should not control your verdict on any

14   other count.

15       You've heard testimony by witnesses who testified in the

16   Kapampangan language.  These witnesses testified through

17   official court interpreters.  Although some of you may know the

18   Kapampangan language, it is important that all jurors consider

19   the same evidence.  Therefore, you must accept the official

20   English translation of witness's testimony even if you would

21   translate it differently.  In this way, all jurors are

22   considering the same evidence.

23       You heard evidence in the form of e-mail instant messages

24   from Nelia Cruz and Juvy Malicdem.  I instructed you that this

25   evidence is admitted only for the limited purpose of context.

1    It is not admitted for the truth of the matter asserted.  You

2    must consider it only for this limited purpose and not any other

3    purpose.

4        You saw images that the Government alleges contain visual

5    depictions of minors engaged in sexually explicit conduct.

6    These images are being shown only to assist you in determining

7    whether the Government has met its burden to prove the defendant

8    guilty of all of the elements of the charges against him.

9        Do not allow any feelings that you may have regarding these

10   images affect this determination in any way.  Recall that at the

11   beginning of this case, you swore an oath that you would be fair

12   and impartial to both sides.

13       The second superseding indictment charges that the offenses

14   alleged in Count 1, Count 2 and Count 4 were committed on or

15   about a certain date.  Although it is necessary for the

16   Government to prove beyond a reasonable doubt that the offense

17   was committed on a date reasonably near the date alleged in

18   Count 1, Count 2 and Count 4 of the second superseding

19   indictment, it is not necessary for the Government to prove that

20   the offense was committed precisely on the date charged.

21       You have heard testimony that the defendant made statements.

22   It is for you to decide, one, whether the defendant made the

23   statements; and, two, if so, how much weight to give to them.

24   In making those decisions, you should consider all the evidence

25   about the statements including the circumstances under which the

1    defendant may have made them.

2         You've heard evidence that the defendant committed other

3    acts not charged here.  You may consider this evidence only for

4    it's bearing, if any, on the question of the defendant's intent,

5    motive, opportunity, preparation, plan, knowledge, identity,

6    absence of mistake or absence of accident and for no other

7    purpose.  You may not consider this evidence as evidence of

8    guilt of the crimes for which the defendant is on trial.

9         You've heard testimony from FBI Special Agent Scott

10   Schofield and Nate Sanger, who were involved in the Government's

11   investigation in this case.  Law enforcement officials may

12   engage in stealth and deception, such as the use of informants

13   and undercover agents in order to investigate criminal

14   activities.  Undercover agents and informants may use false

15   names and appearances and assume roles of members in criminal

16   organizations.

17        Certain charts and summaries have been admitted in evidence.

18   Charts and summaries are only as good as the underlying

19   supporting material.  You should therefore give them only such

20   weight as you think the underlying material deserves.

21        The defendant is charged in Count 1 of the second

22   superseding indictment with travel with intent to engage in

23   illicit sexual conduct in violation of Section 2423(b) and (e)

24   of Title 18 of the United States Code.

25        In order for the defendant to be found guilty of this

1    charge, the Government must prove each of the following elements

2    beyond a reasonable doubt.

3        First, the defendant was a United States citizen; second,

4    beginning on or about September 10, 2013, and continuing through

5    on or about November 15, 2013, the defendant traveled in foreign

6    commerce; and, third, such travel was for the purpose of

7    engaging in any illicit sexual conduct with another person.

8        The term "travels in foreign commerce" means travel between

9    the United States and a foreign country.

10       The term "illicit sexual conduct" means a sexual act

11   including the penetration, however slight, of the anal or

12   genital opening of another by a hand or finger, or by any object

13   with an intent to abuse, humiliate, harass, degrade or arouse or

14   gratify the sexual desire of any person with a person under

15   18 years of age, including with a person who has not attained

16   the age of 12 years old, or with a person who has attained the

17   age of 12 years old but has not attained the age of 16 years old

18   and is at least four years younger than the defendant; or, two,

19   any commercial sex act defined as any sex act for which anything

20   of value is given to or received by any person with a person

21   under 18 years of age.

22       The defendant is also charged in Count 1 of the second

23   superseding indictment with attempted travel for the purpose of

24   engaging in illicit sexual conduct in violation of

25   Section 2423(b) and (e) of Title 18 of the United States Code.

1     In order for the defendant to be found guilty of this

2  charge, the Government must prove each of the following elements

3  beyond a reasonable doubt:  First, beginning on or about

4  September 10, 2013, and continuing through on or about

5  November 15, 2013, the defendant intended to travel with intent

6  to engage in illicit sexual conduct as defined in the previous

7  section; and, second, the defendant did something that was a

8  substantial step toward committing the crime.

9     Mere preparation is not a substantial step towards

10  committing a crime.  To constitute a substantial step, a

11  defendant's act or actions must demonstrate that the crime will

12  take place unless interrupted by independent circumstances.

13     The defendant is charged in Count 2 of the second

14  superseding indictment with conspiracy to travel with intent to

15  engage in illicit sexual conduct in violation of Section 2423(b)

16  and (e) of Title 18 of the United States Code.

17     In order for the defendant to be found guilty of that

18  charge, the Government must prove each of the following elements

19  beyond a reasonable doubt:  First, beginning on or about

20  June 24, 2014, and continuing through on or about July 24, 2015,

21  there was an agreement between two or more persons to commit the

22  crime of travel with intent to engage in illicit sexual conduct

23  as charged in the second superseding indictment; second, the

24  defendant became a member of the conspiracy knowing of at least

25  one of its objects and intending to help accomplish it; third,

1    one of the members of the conspiracy performed at least one

2    overt act for the purpose of carrying out the conspiracy.

3         A conspiracy is a kind of criminal partnership, an agreement

4    of two or more persons to commit one or more crimes.  The crime

5    of conspiracy is the agreement to do something unlawful.  It

6    does not matter whether the crime agreed upon was committed.

7         For a conspiracy to have existed, it is not necessary that

8    the conspirators made a formal agreement or that they agreed on

9    every detail of the conspiracy.  It is not enough, however, that

10   they simply met, discussed matters of common interest, acted in

11   similar ways, or perhaps helped one another.  You must find that

12   there was a plan to commit the crime of travel with intent to

13   engage in illicit sexual conduct as an object or purpose of the

14   conspiracy.

15        One becomes a member of a conspiracy by willfully

16   participating in the unlawful plan with the intent to advance or

17   further some object or purpose of the conspiracy even though the

18   person does not have full knowledge of all the details of the

19   conspiracy.  Furthermore, one who willfully joins an existing

20   conspiracy is as responsible for it as the originators.

21        On the other hand, one who has no knowledge of a conspiracy

22   but happens to act in a way which furthers some object or

23   purpose of the conspiracy does not thereby become a conspirator.

24   Similarly, a person does not become a conspirator merely by

25   associating with one or more persons who are conspirators nor

1    merely by knowing that a conspiracy exists.

2         An overt act does not itself have to be unlawful.  A lawful

3    act may be an element of a conspiracy if it was done for the

4    purpose of carrying out of the conspiracy.  The Government is

5    not required to prove that the defendant personally did one of

6    the overt acts.

7         I've already instructed you about the underlying elements of

8    the crime of travel with intent to engage in illicit sexual

9    conduct in violation of Section 2423(b) and (e) of Title 18 of

10   the United States Code.  You should apply those instructions

11   when considering whether the Government has met its burden of

12   proof beyond a reasonable doubt on Count 2.

13        The defendant is charged in Count 4 of the second

14   superseding indictment with buying children in violation of

15   Section 2251(A)(b)(1) of Title 18 of the United States Code.

16        In order for the defendant to be found guilty of this

17   charge, the Government must prove each of the following elements

18   beyond a reasonable doubt:  First, beginning on or about

19   June 24, 2015, and continuing through on or about July 24, 2015,

20   the defendant purchased or otherwise obtained custody or control

21   over minors M.Q., J.U. and/or E.S., or, offered to purchase or

22   otherwise obtain custody or control over M.Q., J.U. and/or E.S.;

23   second, the defendant knew that as a consequence of the purchase

24   or obtaining of custody M.Q., J.U. and/or E.S. would be

25   portrayed in a visual depiction engaging in or assisting another

1    person to engage in sexually explicit conduct, or with the

2    intent to promote the engaging in of sexually explicit conduct

3    by M.Q., J.U. and/or E.S. for the purpose of producing any

4    visual depiction of such conduct; third, the offer was

5    communicated or transported using any means or facility of

6    interstate or foreign commerce or in or affecting interstate or

7    foreign commerce by any means including by computer.

8         The term "minor" means any person under the age of 18 years.

9         The term "sexually explicit conduct" means actual or

10   stimulated, (a), sexual intercourse including genital to

11   genital, oral to genital, anal to genital, or oral anal whether

12   between persons of the same or opposite sex; (b), bestiality;

13   (c), masturbation; (d), sadistic or masochistic abuse; or, (e),

14   lascivious exhibition of the genitals or pubic area of any

15   person.

16        The term "custody or control" includes temporary supervision

17   over or responsibility for a minor whether legally or illegally

18   obtained.

19        When you begin your deliberations, elect one member of the

20   jury as your foreperson who will preside over the deliberations

21   and speak for you here in court.  You will then discuss the case

22   with your fellow jurors to reach agreement, if you can do so.

23        Your verdict, whether guilty or not guilty, must be

24   unanimous.  Each of you must decide the case for yourself, but

25   you should do so only after you've considered all the evidence,

1    discussed it fully with the other jurors, and listened to the

2    views of your fellow jurors.  Do not be afraid to change your

3    opinion if the discussion persuades you that you should.  But do

4    not come to a decision simply because other jurors think it is

5    right.

6        It is important that you attempt to reach a unanimous

7    verdict, but, of course, only if each of you can do so after

8    having made your own conscientious decision.  Do not change an

9    honest belief about the weight and effect of the evidence simply

10   to reach a verdict.

11       Because you must base your verdict only on the evidence

12   received in the case and on these instructions, I remind you

13   that you must not be exposed to any other information about the

14   case or to the issues it involves.

15       Except for discussing the case with your fellow jurors

16   during your deliberations, do not communicate with anyone in any

17   way, and do not let anyone else communicate with you in any way

18   about the merits of the case or anything to do with it.  This

19   includes discussing the case in person, in writing, by phone or

20   electronic means via e-mail, text messaging, or any internet

21   chat room, blog, website or other feature.  This applies to

22   communicating with family members, your employer, the media or

23   press and with people involved in the trial.

24       If you are asked or approached in any way about your jury

25   service or anything about this case, you must respond that you

1    have been ordered not to discuss the matter and to report the

2    conduct to the Court.

3        Do not read, watch or listen to any news or media accounts

4    or commentary about the case or anything to do with it, and do

5    not do any research such as consulting dictionaries, searching

6    the internet, or using other reference materials, and do not

7    make any investigation or in any other way try to learn about

8    the case on your own.

9        The law requires these restrictions to ensure the parties

10   have a fair trial based on the same evidence that each party has

11   had an opportunity to address.

12       A juror who violates these restrictions jeopardizes the

13   fairness of these proceedings, and a mistrial could result that

14   would require the entire trial process to start over.  If any

15   juror is exposed to any outside information, please notify the

16   Court immediately.

17       Some of you have taken notes during the trial.  Whether or

18   not you took notes, you should rely on your own memory of what

19   was said.  Notes are only to assist your memory.  You should not

20   be overly influenced by your notes or those of your fellow

21   jurors.

22       The punishment provided by law for this crime is for the

23   Court to decide.  You may not consider punishment in deciding

24   whether the Government has proved its case against the defendant

25   beyond a reasonable doubt.

1    A verdict form has been prepared for you.  After you have

2 reached unanimous agreement on a verdict, your foreperson should

3 complete the verdict form according to your deliberations, sign

4 and date it, and advise the clerk that you are ready to return

5 to the courtroom.

6    If it becomes necessary during your deliberations to

7 communicate with me, you may send a note through the clerk

8 signed by any one or more of you.  No member of the jury should

9 ever attempt to communicate with me except by a signed writing,

10 and I will respond to the jury concerning the case only in

11 writing or here in open court.

12    If you send out a question, I will consult with the lawyers

13 before answering it, which may take some time.  You may continue

14 your deliberations while waiting for the answer to any question.

15 Remember that you are not to tell anyone, including me, how the

16 jury stands numerically or otherwise on any question submitted

17 to you including the question of the guilt of the defendant

18 until after you have reached a unanimous verdict or have been

19 discharged.

20    Mr. Vine.  The record will reflect that my courtroom deputy

21 is handing the four stipulations that the parties have entered

22 into that go with jury instruction number 2.  Again, take those

23 stipulated facts with you into the jury room.

24    From this point forward, you control your breaks.  The only

25 thing that I ask is that you deliberate until 4:30 p.m.  What's

1   going to happen, though, is once we swear in the security

2   officer, we're going to make sure you get something to eat

3   before you begin your deliberations.  The reason I work through

4   lunch is so we can buy your lunch.  So that was my ulterior

5   motive.

6       Because from this point forward I keep you together during

7   the lunch hour.  Don't discuss the case when you're in the lunch

8   room, but we keep you together during lunch, and we will pick up

9   your lunch.  So don't begin your deliberations on an empty

10  stomach.  I want you to go to lunch.  Then you will come back

11  and begin your deliberations.  We will send the exhibits in.

12  They will be in the room already, waiting for you.  Take your

13  jury instructions with you.

14      Whoever the foreperson is, I'll ask the foreperson to make

15  sure that the rule that we have that all electronic devices be

16  off during deliberations remain in force and effect.  I've never

17  had a problem with juries, someone e-mailing, looking at their

18  phone.  Please keep all electronic devices off during your

19  deliberations.

20      Again, when you take a break and how long those breaks are

21  are up to you.  If you do separate during a break in your

22  deliberations, you go off into groups of two or three, don't

23  discuss the case.  Again, it's up to the foreperson to make sure

24  that the only time this case can be discussed is when all 12 of

25  you are in the jury room.

1     Again, I'd ask you to deliberate until at least 4:30 p.m.

2  If you want to go a little longer, that's fine.  You don't have

3  to send a note out to me saying "Can we leave?"  Just let us

4  know when you do leave, and then I would ask you to start again

5  tomorrow morning at 9:15.  And we'll take you to lunch again

6  tomorrow if you're still deliberating.  So, again, breaks and

7  all that is up to you as a jury.  Any questions?

8     Swear in the court security officer.

9     (CSO sworn by the Clerk.)

10     (CSO responds in the affirmative.)

11          THE COURT:  Just for the record, are both sides okay

12  with me not actually reading the four stipulations?

13          MR. OLMOS:  Yes, Your Honor.

14          MR. ESPINOSA:  Yes, Your Honor.

15          THE COURT:  Okay.  So the 12 jurors, without my

16  alternate juror, if you would now go into your jury deliberation

17  room, and then we'll hopefully get you out to lunch quickly.

18     (Jury out.  12:57 p.m.)

19          THE COURT:  I can't remember where you live.

20          ALTERNATE JUROR:  West Sacramento.

21          THE COURT:  You do not have to stay around the

22  courthouse.  Make sure Mr. Vine has your contact information.

23  If we do need you to substitute in, we'll contact you, and then

24  if you are substituted in, deliberations begin all over again.

25  So the jury will have to start from scratch.  So I ask that you

 1    remain generally available.  Don't go out of town, if you can,

 2    over the next few days.  And if we need you, we will call you.

 3    You can leave your instructions here.  And I can't tell you how

 4    much we appreciate you being here and serving as a juror, and if

 5    I need you, we will get you back here right away.  Thank you so

 6    much.

 7         (Alternate juror exits courtroom.)

 8         THE COURT:  As to the lawyers, I usually want you to

 9    stay within five minutes of the courtroom in case I get a note.

10    But all of you can go to lunch and anticipate just sort of

11    hanging around starting around 2:00.

12         If I get a note, I will prepare a proposed response, and we

13    will then discuss it on the record in open court before I send

14    anything into the jury.

15         Just one caveat, I may be out from 2:00 to 3:00.  So if I do

16    get a note, I may have to contact you by phone.  But, otherwise,

17    take some time for lunch and then just be in or around the

18    courtroom so we can get you back in here within five or

19    ten minutes.  Thank you.

20         (Jury deliberating.  12:59 p.m.)

21         THE COURT:  All right.  On the record outside the

22    presence of the jury.  At actually 2:04 p.m. the jury sent a

23    note saying the jury had reached a unanimous verdict.  We'll

24    bring the jury in and publish the verdict.

25         (Jury in.  3:17 p.m.)

1          THE COURT:  All jurors are present.  All parties are

2   present.  The Court has received the jury's note.

3      Who is the foreperson?  Has the jury unanimously agreed upon

4   it's verdict.

5          JURY FOREPERSON:  Yes, we have.

6          THE COURT:  If you would please hand the verdict to

7   Mr. Vine.

8      All right.  The Court has reviewed the verdict form, and it

9   is in proper form.

10      Ladies and gentlemen of the jury, your verdict will now be

11   published, that is, I'll read it aloud in open court.  Please

12   pay close attention to the verdicts as they are published

13   because in the event you are polled, you will be asked

14   individually whether each of the verdicts as published or as

15   read constitutes your individual verdicts in all respects.

16      United States of America vs. Michael Carey Clemans, case

17   number 2:15-cr-227.

18      We, the jury, find the defendant, Michael Carey Clemans, as

19   follows:

20      As to Count 1 of the superseding indictment, guilty, 18

21   U.S.C. Section 2423(b) and (e), travel and attempted travel with

22   intent to engage in illicit sexual conduct.

23      As to Count 2 of the superseding indictment, guilty, 18

24   U.S.C. Section 2423(b) and (e), conspiracy to travel with intent

25   to engage in illicit sexual conduct.

1    As to Count 4 of the superseding indictment, guilty, 18

2    U.S.C. Section 2251(A)(b)(1), buying of children.

3    If you found the defendant guilty of Count 4, do you find

4    the Government has proved each element beyond a reasonable doubt

5    concerning M.Q.?  Answer is:  Yes.

6    If you found the defendant guilty of Count 4, do you find

7    the Government has proved each element beyond a reasonable doubt

8    concerning J.U.?  The answer is:  Yes.

9    If you found the defendant guilty of Count 4, do you find

10   the Government has proved each element beyond a reasonable doubt

11   concerning E.S.?  Answer is:  Yes.

12   Dated and signed by the foreperson.

13   Either side either party wish to have the jury polled?

14        MR. OLMOS:  No, Your Honor.

15        MR. ESPINOSA:  No, Your Honor.

16        THE COURT:  All right.  The verdict is unanimous.  The

17   Court will ask the clerk and the record will reflect that the

18   Court has requested that the clerk file and record the verdicts.

19   All right, ladies and gentlemen.  This will conclude your

20   service as jurors in this case.  The admonitions that I have

21   given you up to this point regarding not discussing the case or

22   forming any opinions are withdrawn.  You are now free to discuss

23   the case with anyone that you wish, including each other, and

24   the attorneys.  But only if you so desire.  So if you do not

25   wish to speak to anyone after you've been discharged, that's

1   your decision.  If anyone doesn't respect that decision, let us

2   know right away.  We'll take care of it.

3       Before I actually discharge the jury, is there anything else

4   that needs to be addressed with the Court?

5           MR. ESPINOSA:  No, Your Honor.

6           MR. OLMOS:  No, Your Honor.

7           THE COURT:  Okay.  Ladies and gentlemen, on behalf of

8   the United States District Court for the Eastern District of

9   California, I do want to thank you for your time, your energy,

10  your efforts that you put into this trial and your

11  deliberations.

12      I am now discharging you with one final request, and that is

13  if you would just wait about five more minutes.  I actually

14  would like to come in and thank each of you individually.  This

15  is something I do at the end of every trial.

16      If you have to get on your way, I understand.  If you want

17  to take off, I understand.  But those of you that can remain

18  behind, I would like to come in and thank each of you

19  individually.  So with that, you are discharged.

20      (Jury out.  3:23 p.m.)

21          THE COURT:  Have a seat.  Sentencing will be set for

22  December 12, 2017, at 9:15 a.m. in this courtroom.  There is a

23  forfeiture provision.  Forfeiture is something we will take up

24  at sentencing if the parties haven't stipulated, which I assume

25  you will stipulate.  We will take up forfeiture at the time of

1   sentencing.

2        Mr. Clemans, the probation department will contact you.

3   They will ask for information in preparing a presentence report.

4   You can have your attorney present, if you wish, during that

5   interview, and then you and your attorney will get a chance to

6   review the presentence report before your sentencing hearing,

7   and I'll give you and your attorney an opportunity to address

8   the Court before your sentencing hearing.

9        As to the Rule 29 that the Court has taken under submission,

10  I'll issue, actually, a written ruling hopefully by the end of

11  this week on the Rule 29.  So you will have something in writing

12  with respect to the issues raised on the Rule 29.

13       Anything further that we need to take up right now?

14            MR. ESPINOSA:  No, Your Honor.

15            THE COURT:  Mr. Olmos?

16            MR. OLMOS:  No, Your Honor.

17            THE COURT:  I do want to say this to the attorneys.

18  Without question, the three of you were among the best attorneys

19  that I've had appear in this court.  I'm grateful for that in

20  that my law clerks get to see what it's like to be an

21  outstanding trial attorney.  So I'm appreciative of that fact.

22       I'm really appreciative of the fact that there was an

23  incredible amount of professional courtesy, strong advocacy on

24  both sides, but professionalism and courtesy that courts expect

25  and hope from lawyers but which you exhibited on a day-in and

1    day-out basis.

2        I mean this sincerely, I would welcome all three of you back

3    in court at any time given the level of excellence displayed in

4    this trial.  It was hard fought.

5        Mr. Olmos, ultimate respect to you in doing what courts hope

6    and expect from defense lawyers in a very difficult situation,

7    and to the prosecution for being as professional as you were

8    throughout this trial.  And I mean that sincerely.  That it's a

9    pleasure.  It's the best part of being a district court judge

10   when you have attorneys like yourselves trying cases as

11   difficult as this.  So my appreciation to all of you.

12       If anything pops up post trial, I'm sure I will hear from

13   you.  And if not, I'll see all of you in December.  Thank you.

14       (Court adjourned.  3:26 p.m.)

15

16                          CERTIFICATION

17

18       I, Diane J. Shepard, certify that the foregoing is a correct

19   transcript from the record of proceedings in the above-entitled

20   matter.

21                         /s/ DIANE J. SHEPARD
                           DIANE J. SHEPARD, CSR #6331, RPR
22                         Official Court Reporter
                           United States District Court

23

24

25

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460